1  KENNER LAW FIRM, P.C.
   David E. Kenner, SBN 41425
2  Brett A. Greenfield, SBN 217343
   16000 Ventura Boulevard, PH 1208
3  Encino, CA 91364
   818 995 1195
4  818 475 5369 – fax

5

6  Attorney for Plaintiff Josef F. Boehm

7              IN THE UNITED STATES DISTRICT COURT

8                    DISTRICT OF ALASKA

9

10 Josef Franz Boehm,              )
                                   )  MEMORANDUM OF POINTS AND
11          Plaintiff,             )  AUTHORITIES FOR MOTION TO VACATE,
                                   )  SET ASIDE OR CORRECT SENTENCE
12          v.                     )
                                   )
13 United States of America        )
                                   )
14          Defendants.            )
                                   )  CASE NO.: A04-003-01-CR(JWS)
15                                 )
   _____)
16

17

18

19
        I.   FACTUAL BACKGROUND
20
        Based  upon  the  facts  as  stipulated  to  in  the  plea  agreement
21
   sometime beginning in late 2001 and continuing until December of 2003,
22
   the  Defendant  Joseph  Boehm  (hereinafter  referred  to  as  Defendant)
23
   became  involved  with  a  number  of  individuals  who  were  using  and
24
   sharing crack cocaine with a group of females under the age of twenty-
25
   one.   The  group  also  included  some  females  who  were  over  the  age  of
26
   eighteen.
27

28                                  1
   _____
        MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
                      ASIDE OR CORRECT SENTENCE

As further reflected in the stipulation contained in the plea agreement, the Defendant, although a successful businessman, was himself a cocaine addict. Bambie Tyree, one of the co-conspirators, introduced Defendant to the other conspirators who were the actual suppliers of cocaine base to the Defendant. The Defendant, upon receipt of the cocaine base, then delivered it to others by "sharing" the base with them, and in fact, using the base with the Defendant at his own home (forfeited to the Government as part of the plea) and other locations in Anchorage including local hotels.

Further the stipulation states that in addition to using and sharing the cocaine base with the females, most of whom were underage, the Defendant and the others engaged in sexual activities with them as well. The parties agreed in the plea agreement that Defendant and the others were well aware that the young ladies were in fact underage.

It was also undisputed that the Defendant himself was suffering from a major crack cocaine addiction. Defendant started using powder cocaine as early as the 1980's. Defendant began use of the cocaine base in the early 1990's. According to professionals who examined him for competence in the underlying case, Defendant had a long term history of problematic use of crack cocaine. Mr. Boehm was arrested on December 17, 2003 and has been incarcerated since that date.

Defendant had a number of lawyers representing him during the pendency of his Federal criminal case. During the course of that matter, prior to the entry of his guilty plea, Defendant's counsel became concerned about his mental competency to stand trial. To that

2

end, counsel caused to be filed a motion entitled "Defendant Joseph Boehm's Motion to Determine Mental Competency to Stand Trial under 18 U.S.C. §4241," on or about July 26, 2004. A copy of that motion is attached hereto, incorporated by reference herein and marked Exhibit 1.

Among the allegations made in that motion and supporting affidavits were;

1)   There is reasonable cause to believe that the Defendant's mental condition may be so severe as to impact his ability to understand the actual nature of the evidence and/or allegations against him, and/or assist properly in his defense (motion page 2).

2)   Mr. Boehm exhibits multiple examples of what appear to be fixed delusions.  (Jacobson affidavit).

3)   Mr. Boehm believed there were three Bambie Tyrees, two of whom were clones (Weidner-Butler affidavit).

4)   Mr. Boehm was convinced his daughter was missing or dead and had been kidnaped or murdered by pornographers and that she had been replaced by a substitute daughter (Weidner-Butler affidavit).

5)   That he is being victimized in this case by a terrorist cell (Weidner-Butler affidavit).

The motion further indicated that counsel had serious concerns about the sanity of Defendant from their earliest appearance in the case, and had in fact, requested a psychiatric evaluation of Defendant

3

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

from Magistrate Branson at the initial stages of the case.  Magistrate Branson declined the request to transfer for a mental examination, but despite same counsel's fears persisted.

The Defendant's counsel had several expert reports prepared and apparently submitted for a hearing to determine competency for trial held on or about November 17, 2004.[1]

An impressive group of mental health professionals examined Defendant Boehm.  Their conclusions were remarkably consistent. Defendant Boehm suffered from organic brain damage and his ability to function and comprehend were severely impaired.

**A.   GARY A. JACOBSON, M.D.**

Dr. Jacobson prepared a report dated November 11, 2004, a copy of which is attached hereto, incorporated by reference herein and marked Exhibit 2, and later testified at the sentencing hearing.  Dr. Jacobson's report stated in pertinent part;

1)   Defendant Boehm has the disease of substance dependance.

2)   Based on a combination of factors including episodes of head trauma, normal aging, hypertension, a 30 year history of alcohol abuse, a 20 year history of cocaine abuse, a 7 year history of crack cocaine abuse, it is ". . . medically probable that Mr. Boehm had experienced some degree of brain damage before and/or during that period . . ."

---

[1]Inexplicably although counsel submitted reports, the only witness actually called at the competency hearing was the Government expert Dr. Linda Hope.

4

3)   "He demonstrated an overall paranoid ideation about many events in the past. <u>He demonstrated an unusual pattern of thinking with loose associations and tangential thinking</u>. He repeatedly described possible disturbances in the contents of his beliefs to include descriptions of others consistent with fixed delusions (emphasis ours).

Dr. Jacobson reached the following conclusion;

"Mr. Boehm is at high risk to have experienced some type of permanent brain damage related to the events preceding and subsequent to his heavy use of crack cocaine."

**B.   BRUCE N. SMITH, PH.D.**

Dr. Smith prepared a report based on examination conducted on July 27 and July 31, 2004.  Dr. Smith reviewed various reports, including those of the Government experts.  While he did not make a definitive determination on competency he did make the following findings;

"Mr. Boehm does show evidence of clinical depression and a delusional disorder which limits his ability to think in consensual reality based terms . . .

A common characteristic of individuals with delusional disorder is the apparent normality of

5

their behavior and appearance when their
delusional ideas are not being discussed or acted
upon . . . Mr. Boehm may have other mitigating
factors such as cognitive disorder as a result of
his cocaine addiction . . . This appears to go
beyond dysthymia and may have organic
implications.

**C.    ARTHUR KOWELL, M.D.**

Dr. Kowell performed objective neurological tests after the Court
declared Defendant Boehm "competent" to stand trial.  In the Court
order finding Defendant Boehm competent, the Court ordered the
objective testing indicating the courts legitimate concern with regard
to the competency issue.  A copy of the Court order denying
Defendant's motion to be held incompetent for trial is attached
hereto, incorporated by reference herein and marked Exhibit 3.

Dr. Kowell's report concerning the CT scan of the brain, the MRI
the FDG Pet Scan, the Cartoid duplex ultrasound and the Caretec Spect
showed as its conclusion the following;

"The results . . . are compatible with cerebral
ischemic primarily within the distribution of the
middle cerebral arteier bilaterally affecting the
frontoparietial regions and anterior deep
periventricular white matter bilaterally . . .
the ischemic changes of the brain discussed about
could result in a dysfunction of the

6

frontoparietial regions bilaterally and deep periventricular white matter bilaterally."

A full copy of Dr. Kowell's report is attached hereto, incorporated by reference herein and marked Exhibit 4.

Dr. Kowell also testified at sentencing where he elaborated on the meaning of his report. Dr. Kowell's testimony is attached hereto, incorporated by reference herein and marked Exhibit 5.

Dr. Kowell testified at the sentencing that his objective findings would not support a global diagnosis of dementia, but would certainly be consistent with a finding of sub-cortical dementia. This dementia is best defined as a frontal lobe dementia.

Dr. Kowell's more significant finding was that Defendant Boehm exhibited evidence of a vascular disease affecting his brain and consistent with cerebral ischemia. This ischemia results in a lesser blood flow to the brain and results in measurable dysfunction.

**D.    DEBORAH ELY BUDDING, Ph.D.**

Dr. Budding, a psychologist specializing in both clinical and neuropsychology and psychotherapy provided an evaluation of Defendant Boehm on November 11, 2004 and later testified at the sentencing. Dr. Budding's report is attached hereto, incorporated by reference herein and marked Exhibit 6.

Immediately impressing Dr. Budding was the fact that Defendant Boehm's initial encoding of information was variable and limited. Dr. Budding concluded from this that "the amount of information he is able to take in at any one time can vary from moment to moment . . . people

7

with limited and variable initial encoding can often experience . . . difficulties based on a tendency to miss important parts of conversations and thus acting on incomplete information."

This observation coupled with the results of her extensive testing led Dr. Budding to reach the following conclusions:

1)    Boehm presents overall diffuse and rather subtle deficits and presents with symptoms consistent with a cognitive disorder NOS.

2)    Boehm's executive function was in particular poor, especially in the area of planning and problem solving as well as working memory.

3)    While able to work well with simple information but encounters significant problems when required to perform multiple tasks or work with abstract information.

These impressions were reinforced over time.  Dr. Budding's testimony at the sentencing hearing indicated that there had been no change in her assessment of Mr. Boehm.  In her testimony on May 3rd and 4th, Dr. Budding informed the Court that Mr. Boehm was presently delusional.  Moreover, in the past he was floridly delusional and paranoid.  Without question she believed that Mr. Boehm has dementia as well as a cognitive disorder NOS related in whole or in part to brain damage.  A copy of Dr. Budding's testimony at the sentencing hearing is attached hereto, incorporated by reference herein and marked Exhibit 7.

    E.    **JAMES MITTLEBERGER, M.D., FACP**

8

Dr. Mittleberger, a medical doctor provided a declaration under penalty of perjury on November 12, 2004.  A copy of that declaration is attached hereto, incorporated by reference herein and marked Exhibit 8.  Dr. Mittleberger, who specializes in elder care, was quite clear in his assessment of Defendant Boehm.  Dr. Mittleberger said;

> "My first opinion is that Mr. Boehm was significantly cognitively impaired prior to the year 2002 and severely cognitively impaired in the years of 2001-2003.  His cognitive capacity was also profoundly diminished at this time by multiple bizarre delusions and paranoia.  He remains cognitively impaired . . . on examination he has difficulty maintaining a coherent train of thought on answering a complex question . . . .given that he has been in a very structured environment and regular diet it is likely that these executive functions are permanent."

Dr. Mittleberger's testimony at the sentencing hearing was consistent with his report.

## II.   COMPETENCY HEARING AND AFTERMATH

As indicated hereinabove a competency hearing was held on November 17, 2004 before the  trial Judge.  The hearing was sealed, as reflected in the Order dated November 17, 2004.  A copy of  that Order is attached hereto, incorporated by reference herein and marked Exhibit 9.   The Order did not fully address Defendant Boehm's mental status but found only;

> "That Defendant Josef Franz Boehm presently is knowledgeable about and has a rationale understanding of the charges against him and the proceedings required to resolve those charges.  Joseph Boehm is competent to stand trial."

The Court heard only the testimony of Dr. Laura Hope, a

9

Government psychologist.  However, the Court did receive and review reports from the several defense experts referenced hereinabove.  The Court then also issued a minute order reflecting the proceedings.  A copy of Judge  Sedwick's minute order is attached hereto, incorporated by reference herein and marked Exhibit 10.

The minute order reflects the hearing took only one hour to conduct.  After finding Defendant competent, the Court then ordered Defendant to be transported for a Cat Scan and similar tests.  The Court also ordered a report from an approved expert based on those tests.  As dealt with hereinabove, the tests were done and the reports clearly indicated a lack of competence and/or mental deficits on the part of Mr. Boehm.  Inexplicably, no further hearing as to his competence was held.[2]  Two days after the competency hearing, which had been held at the request of his lawyers, Joseph Boehm signed a 34 page plea agreement.

The plea agreement, a copy of which is attached hereto, incorporated by reference herein and marked Exhibit 11.  The agreement called for a plea to two counts and the dismissal of the balance of the Fourth Superseding Indictment.  The counts Defendant agreed to plead to were a 18 U.S.C. 371 conspiracy to engage in sexual activities with minors and a 21 U.S.C. 841(a)(1) 846 conspiracy to distribute cocaine.  A guideline range was set forth in the plea

---

[2]Again the concern for the court with defendant Boehm's potential brain damage was laudatory.  However, it was incumbent on counsel to follow through when the ultimate reports were received.

agreement which suggested a minimum range of 135 months.  Despite the fact that counsel merely two days earlier had been prosecuting a motion brought by them to have the Defendant declared incompetent, and to which they had appended declarations declaring under penalty of perjury their belief he was incompetent, they appended to the plea agreement a declaration proclaiming;

> "As counsel for the Defendant we have discussed
> with him the terms of this plea agreement, have
> fully explained the charged to which he is
> pleadings guilty and the necessary elements, all
> possible defenses and the consequences of his
> plea.  Based on these discussions, we have no
> reason to doubt that the Defendant is knowingly
> and voluntarily entering a plea of guilty.  We
> know of no reason to question his competency to
> make these decisions.  If prior to the imposition
> of sentence, we become aware of any reason to
> question Defendant's competency to enter into
> this plea agreement or to enter a plea of guilty,
> we will immediately inform the Court."[3]

At the same time they signed this declaration they were also aware that further testing had been ordered by the Court to ascertain whether Defendant was suffering from organic brain damage.  Moreover, the certification required that if they came into additional information as to competence prior to the sentencing, they were obligated to bring that to the Court's attention for further consideration.  In fact, the reports of the objective testing by Dr.

---

[3]Also, at the time the attorneys signed these declarations, they possessed report from Dr. Budding and Dr. Mittleberger which indicated that Defendant Boehm did not comprehend or assimilate information.  Their certification of competence seems disingenuous at best.

11

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

Kowell were received after November 22, 2004, as were follow-up reports by Dr. Budding, Jacobson and Mittleberger and counsel never advised the Court of same in the context of competence to plead.[4]

Prior to signing the plea agreement, counsel met with Defendant Boehm to discuss the agreement. At that meeting, despite the predictive guideline range of 135 months plus, counsel indicated to Defendant that he could receive a sentence as low as 60-75 months assuming he could qualify for the safety valve. While counsel believed that their presentation of this potential lesser sentence was presented as a speculative best case scenario, it is recalled by Defendant as probable fact. Based on the unequivocal mental problems suffered by Defendant, such a conflict is easily understandable.

The matter then went to the actual plea hearing before the Court on November 22, 2004. A copy of the plea hearing is attached hereto, incorporated by reference herein and marked Exhibit 12. The following incredible plea colloquy occurred at that time;

"COURT: Although I don't have any reason to believe it's true, it's a question I always ask: have you ever been treated for a mental illness?

MR. WEIDNER: May we have a moment, Your Honor?

COURT: Yes.

_____

[4]Counsel called several doctors at sentencing, but never correlated for the court their findings as to the competence issue, only as to whether Defendant was a leader or organizer in the earlier criminal conduct.

12

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

DEFENDANT BOEHM: I have been evaluated due to these proceedings by . . .

COURT: I am aware you were evaluated by Dr. Hope[5], and we had a proceeding in which I concluded you were competent to stand trial. Other than the examination by Dr. Hope, have you ever been examined with a possibility that you had a mental illness?

MR. WEIDER:  Your Honor, just so it is clear for the record, he has also been examined by our doctors.

THE COURT: Well I realize that . . ."

Thereafter the Court proceeded with the balance of the plea colloquy.  The obvious purpose for making the inquiry is to determine Defendant's mental ability to understand the nature and consequences of his plea.  In light of the extensive mental health issues which permeated this case, a more detailed and probing determination was called for.[6]  In fact, at the close of the plea hearing, the

---

[5]Less than one week earlier, the Court had conducted a competency hearing at which it had been presented with numerous reports establishing a mental defect.  Had counsel called any of its available experts, perhaps the result might have been different.

[6]In June when Dr. Jacobson's report was first proffered, the Defendant was intent on the use of a diminished capacity / insanity defense.  The Court foreclosed that issue due to counsel's failure to timely assert the defense or the expert.  A copy of the government's motion which was granted at Docket entry 384 is

13

Government joined in the defense motion to maintain the Court's prior order for neurological testing.

A sentencing hearing was held on April 28, 2005.  At that time until concluded on May 10, 2005, testimony was taken on numerous issues.  Foremost was the issue whether or not Defendant Boehm should receive a leadership enhancement for the 841, 846 conspiracy.  While extensive psychiatric, neurological and psychological testimony was taken by the Court, it still concluded that during lucid periods between 2001 and 2003 Defendant was an organizer and leader.  While the Court did not find that Defendant suffered from dementia, it did find that Defendant did suffer from a cognitive disorder NOS, an amplified by the defense experts.  A copy of the Court's findings is attached hereto, incorporated by reference herein and marked Exhibit 14 at page 11.  Upon making this finding, the competence of Defendant to enter the plea should have again been addressed, but neither counsel not the Court did so.

The Court then made findings based on a preponderance of the evidence that Defendant Boehm was a leader, organizer and not entitled to the safety valve.  The Court did knowing full well that this finding would exceed the Defendant's maximum sentence based on a fact not admitted by him or found by a jury.

**III. MEMORANDUM OF LAW**

**A.    Defendant Boehm's Appeal Waiver, Even if Knowing and**

_____

attached hereto, incorporated by reference herein, and marked Exhibit 13.

14

**Voluntary, Does Not Preclude the Filing of This § 2255 Petition.**

Defendant Boehm, as a condition precedent to his plea agreement was required to waive his right to appeal as well as his general right to a collateral attack. The plea agreement at page 8, sets forth the extent of the waivers.  The agreement stated;

> ". . . Furthermore, the Defendant also knowingly and voluntarily agree to waive his right to collaterally attack his conviction and/or sentence . . . the only exceptions to this collateral attack waiver are as follows;
> 1) any challenge to his conviction or sentence alleging ineffective assistance of counsel based on information not known to the Defendant and which in the exercise of reasonable diligence, could not be known by the time the Court imposes sentence; and 2) a challenge to the voluntariness of his guilty plea . . ."

In this case, this 2255 Petition is directed in part toward the voluntariness of the guilty plea.  Defendant Boehm is alleging that his plea was not knowing, voluntary and intelligent.  Boehm also raises the issue that he was not competent to either stand trial or enter a guilty plea irrespective of the Court's ruling pre-trial.

Defendant Boehm also raises in this Petition the failure of the trial Court to apply the proper standard of proof at sentencing. Defendant Boehm's basis for jurisdiction is that counsel was ineffective in waiving his right to appeal the requirement that the Court follow the appropriate legal standards at sentencing.

**B.    Defendant Boehm's Guilty Plea was not Knowing or Voluntary as Defendant's Mental Defects Precluded Him From Making an Intelligent Waiver of His Rights.**

15

The Defendant exhibited signs of diminished capacity to his Counsel from the very start of their representation. As early as December 2003, counsel requested a psychiatric examination from the Magistrate. By July the strange, if not bizarre, iterations of the Defendant had become so pronounced that counsel had filed a motion for a hearing to determine if Defendant was competent to stand trial. It is important to note that the focus of a competency inquiry is whether a defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rationale understanding of the proceedings against him. <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). In <u>Drope</u> the Court said;

> "A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

However, as pointed out in the landmark case of <u>Godinez v. Moran</u>, 509 U.S. 389 113 S.Ct. 2680, 125 L.Ed 2d 321 (1993), that while there is no higher standard for determining competence to plead over competence to stand trial, there are additional considerations which must be necessarily addressed. Mr. Justice Thomas writing for the Court stated;

> "A finding that a Defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a Defendant seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself the waiver of his constitutional right is knowing and voluntary."

See also <u>Parke v. Realy</u>, 506 U.S. 20, 28-29, 113 S.Ct. 517, 523, 121 L.Ed2d 391 (1992).

---

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

In fact, while the focus of a competency inquiry is the defendant's mental capacity, the question is whether he has the ability to understand the proceeding. <u>Drope</u>, supra. By the same token, the purpose of the knowing and voluntary inquiry is to determine whether a Defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced. <u>Farretta v. California</u>, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed 2d 562 (1995).

In the instant case, there was no inquiry as to whether, given defendant's mental problems, he actually understood the significance and consequences not only of his plea but his plea agreement. The Court at the time it accepted the plea had already been presented with numerous reports delineating a significant mental deficit. The Court was apprised of a cognitive disorder which, among things indicated the defendant had trouble encoding information, missed information, and was capable of acting to his detriment on incomplete information. (Report of Dr. Budding). The Judge was also aware that defendant's cognitive capacity was profoundly diminished and he was cognitively impaired. (Report of Dr. Mittleberger). In fact, the Court itself, at sentencing, conceded the mental problems, the cognitive disorder, and the impairment of his executive functions. Finally, the Court itself concluded that these problems were likely permanent in nature.

Here experts and the Court acknowledged mental problems related to organic brain damage in the Defendant. Counsel had filed a motion questioning Defendant's general competence. Yet, a mere two days after the competency hearing, counsel had Defendant sign a complicated

17

thirty-four page plea agreement and certified he understood what he was doing.  When as here, counsel has reason to question his client's competency to either plead guilty or to knowingly, intelligently and voluntarily waive rights attendant to pleading guilty the failure to raise the issue may very well constitute ineffective assistance of counsel.  See <u>Rohan v. Woodford</u>, 334 F.3d 803, 818 (9th Cir. 2003), allowing the defendant to plead guilty in this case, knowing he did not fully comprehend the nature and consequences of his plea was outside the wide range of professionally competent assistance.  Absent this ineffectiveness, defendant would have availed himself of his trial rights. <u>Strickland v. Washington</u>, 466 U.S. 688, 108 S.Ct. 2052, 80 L.Ed 2d 674 (1984), <u>Hill v. Lockhart</u>, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), <u>United States v. Howard</u>, 381 F.3d 873 (9th Cir. 2004).

The issue becomes even clearer with the realization that the Court's inquiry into the Defendant's knowing and intelligent plea entry and waiver of rights was so cursory as to be non-existent.  As indicated hereinabove, the plea agreement was a complicated exhaustive 34 page legal document.  The Courts discussion of that plea agreement encompasses two pages of dialogue in the plea colloquy (pages 12-14). In that brief exchange, the Court attempted to precis the 34 page document and in doing so failed to explore with the Defendant clauses and agreements essential to determine whether the entry of the plea was knowing, intelligent and voluntary.  Among the areas contained in the plea agreement which were not at all dealt with in the Court's inquiry were;

18

1)   That the Defendant may not withdraw from his agreement
     unless the Court rejects the Government's Motion to
     Dismiss the remaining charges (plea agreement at page 4).

2)   That the defendants had no right to ask for downward
     departures.  The court failed to explain that meant the
     Defendant could not request a reduction even though one
     might be appropriate under 5k2.0 based on mental defect or
     disease.

3.   That if Defendant was successful on a collateral attack,
     the Government would be free to charge him with all charges
     arising out of the investigation including those which were
     being dismissed.

4.   Failed to advise Defendant that a guilty plea in the
     criminal case could be used as an admission against him in
     a civil proceeding for damages.

5.   That the guideline estimate contained in the plea
     agreement, even though not binding, created a presumption
     that he was a leader/organizer, that he would have to rebut
     to achieve safety valve.

6.   That he was stipulating to an amount of cocaine base which
     subjected him to a ten year mandatory minimum sentence.
     Defendant was not advised that absent this stipulation, the
     Government would have had to prove the amount of contraband
     at sentencing.

7.   That the Defendant was agreeing pursuant to paragraph H of
     the plea agreement to be able at sentencing to only argue

19

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
ASIDE OR CORRECT SENTENCE**

for adjustments to the guideline range that were specifically delineated and permitted in the plea agreement.[7]

8.    That he was agreeing to his own competency to enter the plea pursuant to paragraph K, just two days after a hearing in which he and his counsel took the position he was incompetent.

The failure to address the issues above, coupled with the cursory explanations given during the plea colloquy clearly prohibits a finding of a knowing, intelligent and voluntary plea.  In determining whether a plea is knowing, intelligent or voluntary, the Court must determine whether there was an adequate Rule 11 colloquy.  United States v. Varela, 193 Fed.App. 808 (10th Cir. 2006).  Any waivers of rights such as those impacted by a guilty plea to be knowing, intelligent and voluntary require the relinquishment or abandonment of a known right or privilege. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed 2d 274 (1969).  In fact, it has been held that the long standing test for determining the validity of a guilty plea is whether that plea represents a voluntary and intelligent choice among the alternative courses of action open to a Defendant.  Hill v. Lockhart, 474 U.S. 52, 106, S.Ct. 366 (1985).

---

[7]The Government felt so strongly about limiting the Defendant's right to seek guideline adjustments that this section was in bold type and underlined.  Yet the Court never mentioned this provision to Defendant to determine if he was knowingly waiving the right to a proper guideline sentence.

20

In <u>United States v. Timbana</u>, 222 F.2d 688 (9th Cir. 2000), a case remarkably similar to this matter was discussed.  Although the guilty plea in <u>Timbana</u> was ultimately upheld, it was only because the plea colloquy in that case was significantly more expansive than the one here.  In <u>Timbana</u>, the Defendant who suffered from significant mental (and physical) defects was determined competent to stand trial.  However, the Court took steps to address the competency issue. The Court said;

> "The record shows the Court addressed Timbana personally and advised him of each of the matters set forth in Rule 11( c) . . .
>
> At the commencement of the plea proceedings, the Court instructed Timbana that if he did not understand a question, the Court would try to explain it in more detail. . . The Court's comments at the plea proceedings demonstrate that the Court understood that information be provided to Timbana in a clear, concise and slow manner . . . the record shows that [Timbana] asked several questions and requested an explanation of concepts he did not understand."

Contrast that with the plea colloquy in this matter, here the Judge not only seemed to ignore the fact that he had held competency hearing mere days before, but went so far on the record to comment that;

> " . . . although I don't have any reason to

21

1          believe this is true, it's a question I always

2          ask; have you ever been treated for any mental

3          illness . . ."

4     It is important to note the Court made that statement after

5 seeing reports which indicated Defendant suffered from forced

6 delusions, paranoia, possible dementia, cognitive disorder NOS, and

7 had ordered tests to confirm organic brain damage.  At no time did the

8 Court even ask Defendant to make inquiry if he did not understand a

9 question or comment.   In fact, the Court proceeded as if it were

10 unaware of any problem at all.  As was held in <u>Comer v. Schiro</u>, 480

11 F.3d 960 (9th Cir. 2007);

12          "The purpose of a knowing and voluntary inquiry

13          is to determine whether the defendant actually

14          does understand the significance and consequences

15          of a particular decision."

16

17     There was no effort to make that determination here.

18     Most important was the concession in <u>Timbana</u>, supra that the law

19 in this Circuit is consistent with the law in numerous other Circuits

20 that an otherwise adequate Rule 11 colloquy must be broadened under

21 circumstances where, as here, the Court and counsel were aware of a

22 defendant's mental defects.  The Court said;

23          "The principle announced by our sister circuits

24          . . . is that where a district court is made

25          aware during a Rule 11 proceeding that a

26          Defendant's competency to enter a plea may be

27          impaired it must conduct an inquiry before

28                              22

accepting a guilty plea . . . Our decision today does not put the Ninth Circuit at odds with seven other Circuits."

See <u>United States v. Masters</u>, 539 F.2d 721 (DC Cir 1976), <u>Monroe v. United States</u>, 463 F.2d 1032 (5th Cir. 1972).

In <u>Timbana</u>, supra, Judge Kleinfeld in his dissent spoke forcefully on the issue stating;

"That a defendant has been adjudicated competent to stand trial does not eliminate the need for a more extensive inquiry then usual in a change of plea proceeding. One of our sister circuits has spoken precisely to this issue . . . and held that the prior competency adjudication heightened the district courts obligation to conduct further inquiry because it made the Judge aware of the defendant's past history . . . [a person] may be competent to stand trial but need a more searching inquiry to assure there is a substantial basis in fact for a voluntary and intelligent plea . . . Competency to enter a plea does not establish that a routine inquiry suffices where the very reports establishing competency also establish a need for a more thorough inquiry." See <u>United States v. Parra-Ibanez</u>, 936 F.2d 588 (1st Cir. 1991).

The seriousness of the Court's failure to make the more expansive inquiry here is exacerbated by the fact not present in <u>any</u> of the other precedents which was that at the time the Court was engaging in this plea colloquy it was awaiting the objective neurological test results it had ordered contemporaneously with its denial of the Motion to Declare Defendant Incompetent.

When the parties reached the sentencing phase of this case those reports had been received. The neurological tests in fact confirmed the organic permanent brain damage, which were adopted by the Court

23

at the sentencing.    Despite this, and the testimony which had been adduced, the Court did not make any effort to assure itself that the person being sentenced had in fact entered a knowing, intelligent and voluntary plea.

By failing to raise these matters, and by virtue of their acquiescence in a less than knowing and voluntary plea by failing to assure that Defendant Boehm was in fact entering a knowing and voluntary plea, counsel was ineffective.   This failure by counsel is so serious that its deficient performance created an involuntary plea. Strickland, supra.   See also United States v. Signori, 844 F.2d 635 (9th Cir. 1988).

Clearly absent counsel's deficiencies, Defendant Boehm would not have pled guilty.   Going to trial would have enabled Defendant to assert defenses available to him including diminished capacity.[8] Moreover, Defendant Boehm's recollection of the meeting with his several lawyers was that he could without equivocation receive the safety valve, not be determined to be a leader and would received a sentence of five or six years incarceration.   Mr. Boehm also recalls not being given the plea agreement to read, but merely to sign.   The terms and conditions of the agreement were related to him generally. He certainly did not understand the significance of what he was

---

[8]Even if that were foreclosed by virtue of a Court ruling, that matter could have been addressed on direct appeal which would not have been waived.   In fact, the competency issue also could have been reviewed on direct appeal as well.

24

---

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

doing.[9]

While recognizing that Boehm did go through a relatively truncated plea colloquy, and that his declarations in Court carry a presumption of verity, that does not end the inquiry.  Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed 2d 136 (1977).

The standard in this Circuit as enunciated in Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962) wherein the Court held;

> "We note at the outset that the Appellant's allegations of fact, outside the trial records must be considered in determining whether the petition alleged a denial of Appellant's constitutional right to the effect aid of counsel.  A contrary rule would fall short of protecting this right.  When inadequate representation is alleged, the critical factual inquiry, ordinarily related to matters outside the trial record whether the Defendant has a defense which was not presented, whether trial counsel consulted sufficiently with the accused, and adequately investigated that facts and law . . ."

---

[9]Even if matters are not as recollected by Boehm, it is of no moment.  Boehm was in a fragile mental condition and was according to all experts prone to delusion. Clearly it was incumbent on counsel to assure an understanding of what Boehm was agreeing to.

25

1     As the Ninth Circuit held in <u>United States v. Tucker</u>, 716 F.2d

2   576 (9th Cir. 1983), merely showing up and going through the motions

3   is not enough.   Clearly by any standard enunciated by this Circuit,

4   this plea was neither knowing or voluntary.

5       **C.    The Waivers of the Right to Collateral Relief and Appeal**

6              **Were Not Free, Voluntary and Intelligent.**

7       For the reasons set forth herein above, the specific waivers of

8   collateral relief and to appeal were also not done voluntarily,

9   knowledgeably or intelligently.   We adopt here the specific grounds

10   delineated previously related to Defendant's mental condition as well

11   as his organic brain damage.   Raised additionally is now the fact that

12   the Court's plea colloquy vitiated the waivers in the plea agreement

13   by virtue of informing the Defendant that he was in fact waiving less

14   than set forth in the agreement.

15       With regard to collateral relief, the plea agreement reflects as

16   follows at page 8;

17

18              "Furthermore the Defendant also knowingly and

19              voluntarily agrees to waive his right to

20              collaterally attack his conviction and/or

21              sentence including restitution, forfeiture, fine

22              and supervised release conditions.   The only

23              exceptions are as follows: 1) any challenge to

24              his sentence or conviction alleging ineffective

25              assistance of counsel <u>based on information not</u>

26              <u>now known to the Defendant, which in the exercise</u>

27              <u>of reasonable diligence could not known by him by</u>

28                                    26

---

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
ASIDE OR CORRECT SENTENCE**

<u>the time the Court imposes sentence</u> . . .

(emphasis ours)

Therefore the agreement was permitting only an attack on ineffective counsel and then <u>only</u> for information which they did not have at the time of the plea, and which they could not have discovered by the time of the sentencing. This qualification effectively excused from collateral relief, incompetent advice, incompetent preparation, a failure to meet Court deadlines[10], failure to call witnesses to sentencing and/or any other failure by counsel to perform in an appropriate manner.

As this Court may be aware, several of the minors allegedly harmed by Defendant Boehm have filed civil suits against him. In the discovery phase of these suits, counsel has been able to develop inconsistencies and untruths which had been promulgated during the course of the initial investigation. These inconsistencies and untruths were not of "facts" unknown to Defendant at the time of the plea. In fact, they are corroborative of the Defendant's recollection of events which had occurred during the time frame of the charged conspiracies. These "facts" likewise could have by due diligence been developed by the sentencing hearing. The plea agreement waiver forecloses the raising of these facts in support of collateral relief based on newly discovered evidence.

---

[10]For example, apparently when considering a diminished capacity or insanity defense, counsel missed a deadline which precluded these defenses. The waiver in the agreement foreclosed a review of same.

27

Among the matters developed which can not be raised are;

1)    Deborah Axt's current admission that Defendant never tried to buy her child for sexual purposes.    A copy of the Deborah Axt statement at her deposition is attached hereto, incorporated by reference herein and marked Exhibit 15.

2)    Tina Arndt in a declaration has sworn under penalty of perjury that she was one of the young women who frequented the Boehm residence from 2001-2003. She would testify that Bambi Tyree was the individual who provided crack cocaine to the young women, not Boehm.    That Boehm valued his privacy and attempted to keep people out of his home.    She further swore that persons gained admittance to the premises surreptitiously by breaking windows to enter. Arndt was well acquainted with Sally Purser and was generally with her when she was at Boehm's house. According to Arndt, Boehm never had sex with Purser. Finally Arndt would have testified that during this time period Boehm was wholly incompetent and was not the leader of any criminal activity.[11]

A copy of the Arndt declaration is attached hereto, incorporated by reference herein and marked Exhibit 16.

3)    Vince Bloomfield in a declaration has admitted that he was

---

[11]Because Boehm knew Arndt and disclosed her to his counsel and they never bothered to interview her, he would be foreclosed from using in support of a § 2255.

28

victimized in virtually the same fashion as Joseph Boehm by Bambi Tyree. Mr. Bloomfield testifies that Tyree was the actual customer of the drug dealers, not Boehm. Bloomfield recounts how Tyree got him high on cocaine base and stole more then $250,000.00 from him. Bloomfield also describes the decrepit condition of Boehm during the period of the charged conspiracy. Bloomfield was known to Boehm but counsel never interviewed him. A copy of the Bloomfield declaration is attached hereto, incorporated by reference herein and marked Exhibit 17.

4) Upon information and belief, the Government also knew about Tina Arndt. According to Ms. Arndt she was interviewed by Government agents prior and subsequent to Boehm being charged. According to Arndt, she told the Government facts consistent with those in her declaration. The Government never turned over the reports of these interviews to Boehm or his counsel. This clear <u>Brady</u> violation is not raisable under the waiver contained in the plea agreement.

The waiver in the plea agreement is inconsistent with the "knowing and intelligent" waiver taken on the record by the trial court. In the plea colloquy, the trial Judge informs the Defendant thusly (page 13):

COURT: "Finally, you agree to waive your right to appeal your sentence and your right to collaterally attack your conviction on any grounds except your plea is not voluntary <u>or that you did not have effective assistance of counsel</u>

29

1

        (emphasis ours) . . .

2

        . . . Have I – have we correctly summarized the plea

3       agreement as you understand it Mr. Boehm?

4

BOEHM:    Yes, Yes"

5

6    Therefore, as Boehm, on the record understood, he had an

7 unrestricted right to a collateral attack on ineffective assistance

8 of counsel.  That is what the Court queried him on and that is what

9 he understood.  Based on 9th Circuit law, the plea must be knowing,

10 voluntary and intelligent.  See <u>Miles v. Stainer</u>, 108 F.3d 1109 (9th

11 Cir. 1997).  As was pointed out in <u>Godinez</u>, supra;

12        "This two point inquiry is what we had in mind in

13        Westbrook . . .  this protecting duty imposes the

14        serious and weighty responsibility on the trial

15        Judge of determining whether there is an

16        intelligent and competent waiver by the accused

17        . . ."

18    Justice Kennedy in his concurrence, in which Justice Scalia

19 joined indicated that there is a heightened standard, not one to be

20 concerned with general competence, that must be met before a  waiver

21 is acceptable.   Where as here, there is a conflict between the

22 agreement and the colloquy, the waiver can only be the one the Court

23 questioned upon, and approved.  In <u>United States v. Buchanan</u>, 59 F3d

24 914 (9th Cir. 1995), the Ninth Circuit Court of Appeals held that any

25 ambiguity arising in a Rule 11 colloquy would foreclose the findings

26 of a knowing and intelligent waiver of rights.  This is ever the case

27 where a specific right is waived in the actual plea agreement.  See

28

                                    30
                    _____

         **MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
                    ASIDE OR CORRECT SENTENCE**

1  United States v. Shimoda, 344 F3d 846 (9th Cir. 2003).  As a result,

2  the Defendant should be given the unrestricted right to file a second

3  or successive 2255 (or amend this one) to assert all of the grounds

4  for collateral relief which he can assert based on counsel's

5  ineffectiveness.  This likewise should apply to his general appellate

6  rights.

7      **D.    The Trial Court Based its Sentence on an Improper Standard**

8           **of Proof.**

9      In Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed

10  2nd 311 (1999), the United States Supreme Court examined the Sixth

11  Amendment historical and doctrinal foundations, and recognized that

12  judicial fact finding operating to increase a defendants otherwise

13  maximum punishment posed a grave constitutional question.  Id at 239-

14  252, 119 S.Ct 1215.

15

16     In this case, specifically preserved at the plea colloquy was the

17  Defendant's right to be sentenced under the appropriate standard.  The

18  colloquy reflects at page 14;

19  "MR. WEIDNER:   . . . But as the plea agreement says in its own

20                  summary . . .  We do not specifically agree in the

21                  plea agreement to the preponderance of evidence

22                  standard.  It may very well be that the U.S. Supreme

23                  Court in Fen-Phen (sic) for instance or Booker,

24                  imposes a clear and convincing evidence standard.

25  THE COURT:     All right, well that's fair enough.  I will apply

26                  whatever standard the law tells me to apply."

27     The Court relied on a preponderance of evidence standard at

28                                 31

---

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
ASIDE OR CORRECT SENTENCE**

sentencing.  Defendant Boehm never knowingly waived his right to collaterally attack the improper standard.  If it is alleged he did, he would assert that it was solely due to the ineffective assistance counsel not properly preserving his right to insist on same.

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed 2d 435 (2000), Charles Apprendi was convicted of possession of a firearm for an unlawful purpose, a second degree offense under New Jersey law punishable by five to ten years imprisonment.  A separate hate crime statute authorized an extended term of imprisonment: Ten to twenty years could be imposed if the trial Judge found by a preponderance of evidence that [t]he Defendant is committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, sexual orientation or ethnicity.  The Judge in Apprendi's case so found and therefore sentenced the Defendant to 12 years imprisonment.  The Supreme Court held that the Constitution proscribed the enhanced sentence.  Other than a prior conviction, see <u>Almendariz-Torres v. United States</u>, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed 2d 350 (1998), the Court held in <u>Apprendi</u>, "any fact that would increase the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

In <u>Blakley v. Washington</u>, 124 S.Ct 2531 (2004), Justice Scalia writing for a majority of the Court, clarified how <u>Apprendi</u>, supra should apply at sentencing;

> "The statutory maximum for Apprendi purposes is
> the maximum sentence a Judge may impose solely on
> the basis of facts reflected in the jury verdict
> or admitted by the Defendant . . . In other words

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

1        the relevant statutory maximum sentence a Judge
2        may impose after finding additional facts, but
         the maximum he may impose without any additional
3        findings. . ."

4      Appellant's Sixth Amendment challenge to his sentence is

5  supported by the concurrence of Judge Barkett of the Eleventh Circuit

6  in United States v. Faust, 456 F.3d 1342 (11th Cir. 2006), there Judge

7  Barkett wrote about the sentencing process vis a vis the Sixth

8  Amendment and the function of the jury.

9        "Insisting that its decisions in Jones, Apprendi,
         and Booker are not "motivated by Sixth Amendment
10       formalism, but by the need to preserve Sixth
         Amendment substance," id. at 237, 125 S.Ct. 738,
11       the Supreme Court has consistently returned to
         the bedrock principle that criminal sentences
12       must be "authorized" by "the jury verdict
         alone."See Booker, 543 U.S. at 235, 125 S.Ct.
13       738; Blakely, 542 U.S. at 305, 124 S.Ct. 2531;
         Ring, 536 U.S. at 604, 122 S.Ct. 2428. There are
14       at least two reasons why Sixth Amendment
         substance" is violently eroded when our notion of
15       a sentence "authorized by the jury verdict" is
         limited to punishments which merely stay within
16       the statutory maximum for the crime of
         conviction. First, the reasonable doubt standard
17       is warranted when imputations of criminal conduct
         are at stake not only "because of the possibility
18       that [an individual] may lose his liberty upon
         conviction," but also "because of the certainty
19       that he would be stigmatized " See In re Winship,
         397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368
20       (1970) (emphasis added); see also McMillan, 477
         U.S. at 96, 106 S.Ct. 2411 ("Once a State defines
21       a criminal offense, the Due Process Clause
         requires it to prove any component of the
22       prohibited transaction that gives rise to both a
         special stigma and a special punishment beyond a
23       reasonable doubt."). Even though Faust's maximum
         possible sentence was not increased by the
24       sentencing judge's independent findings-three
         separate findings of actual, criminal conduct-
25       they certainly do change the quantity and quality
         of the stigma he faces. Second, and even more
26       importantly, "to consider acquitted conduct
         trivializes legal guilt' or legal innocence'-
27       which is what a jury decides-in a way that is

28                          33

1    inconsistent with the tenor of the recent case
2    law," Pimental, 367 F.Supp.2d at 152, by
     "reducing the jury's role 'to the relative
3    importance of a lowlevel gatekeeper." Booker, 543
     U.S. at 230, 125 S.Ct. 738, citing Jones v.
4    United States, 526 U.S. 227, 230, 119 S.Ct. 1215,
     143 L.Ed.2d 311 (1999). In sentencing on the
5    basis of acquitted conduct, a court *is expressly
     considering facts that the jury verdict not only
6    failed to authorize; it considers facts of which
     the jury expressly disapproved*." Pimental, 367
7    F.Supp.2d at 152 (emphasis added).

     <u>Faust</u>, 456 F.3d 1350-51 (Barkett, J, concurring).

     It is clear that the legal landscape concerning the application

of the sentencing guidelines continues to shift in the direction

pointed up by Judge Barkett. Most recently, the United States Supreme

Court in <u>Cunningham v. California</u>, 127 U.S. 856 (2007) reaffirmed the

<u>Jones</u>, <u>Apprendi</u>, and its progeny stating that

              "[a]s this Court's decisions instruct, the
              Federal Constitution's jury-trial guarantee
              proscribes a sentencing scheme that allows a
              judge to impose a sentence above the statutory
              maximum based on a fact, other than a prior
              conviction, not found by a jury or admitted by
              the defendant. Apprendi v. New Jersey, 530 U.S.
              466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000; Ring
              v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153
              L.Ed.2d 556 (2002); Blakely v. Washington, 542
              U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004);
              United States v. Booker, 543 U.S. 220, 125 S.Ct.
              738, 160 L.Ed.2d 621 (2005). "[T]he relevant
              'statutory maximum,' " this Court has clarified,
              "is not the maximum sentence a judge may impose
              after finding additional facts, but the maximum
              he may impose *without* any additional findings."
              <u>Blakely</u>, 542 U.S., at 303-304, 124 S.Ct. 2531
              (emphasis in original).

<u>Cunningham</u> 127 S.Ct at 860.

     The Court went on to say:

              "[t]his Court has repeatedly held that, under the

                              34
─────────────────────────────────────────────────────
          **MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
                    ASIDE OR CORRECT SENTENCE**

1
2
3

> Sixth Amendment, any fact that exposes a
> defendant to a greater potential sentence must be
> found by a jury, not a judge, and established
> beyond a reasonable doubt, not merely by a
> preponderance of the evidence."

4
5

Id. at 863-64.

6
7
8
9
10
11
12

   In light of these authorities, Defendant Boehm urges this court to vacate his sentence.  The sentencing judge relied on facts which were not proved to a jury. Boehm argues that this sentencing procedure violated his Sixth Amendment rights as defined in the above-cited cases.  As a result, at a minimum, a new sentencing hearing where Appellant's constitutional rights are honored is required.

Respectfully submitted;

13
14
15
16
17
18
19

DATED this 25th day of May, 2007 at Encino, California.

20

                              KENNER LAW FIRM, APC

21
22

                    By:_____/s/_____

23
24
25
26
27

                         David E. Kenner
                         California 41425
                         16000 Ventura Blvd.
                         Penthouse 1208
                         Encino, California 91436
                         Telephone: (818) 995-1195

28

                              35

**MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

36

MEMORANDUM OF POINTS AND AUTHORITIES FOR MOTION TO VACATE, SET
ASIDE OR CORRECT SENTENCE