FILED

AUG 0 3 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

By _____ Deputy

1          UNITED STATES DISTRICT COURT

2               DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA,     )  Case No. A04-0003-01-CR (JWS)
                                    )
4                    Plaintiff,     )  Anchorage, Alaska
                                    )  Friday, May 6, 2005
5               vs.                 )  10:33 o'clock a.m.
                                    )
6                                   )
     JOSEF F. BOEHM,                )  **IMPOSITION OF SENTENCE –**
7                                   )  **DAY 7**
                     Defendant.     )
8    _____)

9                      VOLUME VII
10           **TRANSCRIPT OF PROCEEDINGS**

11         BEFORE THE HONORABLE JOHN W. SEDWICK
             UNITED STATES CHIEF DISTRICT JUDGE
12

     APPEARANCES:
13

14   For the Plaintiff:        FRANK RUSSO, ESQ.
                               JAMES GOEKE, ESQ.
15                             Assistant U.S. Attorney
                               U.S. Attorney's Office
16                             222 West 7th Avenue, #9
                               Anchorage, Alaska   99513-7567
17                             (907) 271-5071

18                             SHERRI STEPHAN, ESQ.
                               Department of Justice
19                             Child Exploitation & Obscenity
                                 Division
20                             1400 New York Avenue, NW
                               Washington, D.C.   20530
21

22   For the Defendant:        PHILLIP PAUL WEIDNER, ESQ.
                               Weidner & Associates, Inc.
23                             330 L Street, Suite 200
                               Anchorage, Alaska   99501
24                             (907) 276-1200

25





APPEARANCES (continued):

1

For the Defendant (cont'd):    REX LAMONT BUTLER, ESQ.
                               Attorney at Law
2
                               745 West 4th Avenue, Suite 300
3                              Anchorage, Alaska   99501
                               (907) 272-1497
4

5                              KEVIN T. FITZGERALD, ESQ.
                               Ingaldson Maassen
6                              813 West 3rd Avenue
                               Anchorage, Alaska   99501
7                              (907) 258-8750

8    Probation Officer:        BARBARA NICHOLS
                               MARCI LUNDGREN
9                              U.S. Probation Office
                               101 12th Avenue, Room 322
10                             Fairbanks, Alaska   99701
                               (907) 456-0363
11

12   Court Recorder:           ROBIN CARTER/ELISA SINGLETON
                               U.S. District Court
13                             222 West 7th Avenue, #4
                               Anchorage, Alaska   99513
14                             (907) 677-6127/6105

15   Transcription Service:    NODAK ROSE TRANSCRIPTS
                               721 North 19th Street
16                             Bismarck, North Dakota   58501
                               (701) 255-1054
17

18   Proceedings recorded by electronic sound recording.
     Transcript produced by transcription service.
19

20

21

22

23

24

25

1          ANCHORAGE, ALASKA - FRIDAY, MAY 6, 2005

2      (Call to Order of the Court at 10:33 a.m.)

3      (All parties present; defendant present)

4          THE CLERK:  -- District of Alaska is now in session,

5  the Honorable John W. Sedwick presiding.

6          THE COURT:  Good morning.

7          COUNSEL:  Good morning, Your Honor.

8          THE CLERK:  Your Honor, appearing telephonically are

9  Drs. Mittelberger, Budding, and Glaser.

10         THE COURT:  Thank you.  I understand they're here to

11 listen to the testimony from Dr. Martino or -- is Dr. Martino

12 here?

13         MS. STEPHAN:  Yes, he is, Your Honor.

14         THE COURT:  All right.  Let's have him come forward

15 and give him an oath.

16         MS. STEPHAN:  Dr. Martino?

17                    (Pause)

18         THE COURT:  If you'll stand in front of the Clerk

19 here, sir, she'll give you an oath.

20         THE CLERK:  Raise your right hand.

21         **RONALD MARTINO, PLAINTIFF'S WITNESS, SWORN**

22         THE CLERK:  Thank you.  Please be seated in the

23 witness box.  Sir, please state your full name and spell your

24 last name.

25         THE WITNESS:  Ronald A. Martino, M-A-R-T-I-N-O.

Martino - Direct                    7-4

1    THE CLERK:  And what is your address?

2    THE WITNESS:  1919 Lathrop Street, Fairbanks, Alaska.

3    THE CLERK:  Thank you.

4    THE COURT:  Ms. Stephan?

5    MS. STEPHAN:  Thank you, Your Honor.

6                        **DIRECT EXAMINATION**

7    BY MS. STEPHAN:

8    Q    Dr. Martino, could you please tell the Court first what

9    your educational background is?

10   A    I did my undergraduate work at Rutgers University in New

11   Jersey, and then afterwards attended Rutgers Medical School for

12   two years, and then went on to Tufts School of Medicine, where

13   I graduated in 1975.  Then I did a -- a surgical-medical

14   internship at Newton-Wellesley Hospital in Boston in 1976.

15   Then in '77 and '78, I did a residency in psychiatry at Mount

16   Sinai Hospital in New York.  Then in '78 and '79, a residency

17   in neurology at Mount Sinai Hospital in New York.

18   Q    Can you tell me what your professional experience has been

19   since that time?

20   A    Well, I on active duty two years in the Army where I

21   practiced neurology and psychiatry, and then since that time

22   I've been in private practice, practicing both specialties.

23   Q    Both neurology and psychiatry?

24   A    That's correct.

25   Q    And are you currently the Section Chief of Psychiatry at

1  Fairbanks Memorial Hospital?

2  A    Yes.

3  Q    Do you have any board certifications?

4  A    Yes.  I'm board certified in psychiatry and I'm also board

5  certified in neurology.

6  Q    And what about your memberships?

7  A    AMA, APA, AAN.

8  Q    Okay.  And those are basically American Psychiatric

9  Association, American Medical Association, and American Academy

10 of Neurology?

11 A    That's correct.

12 Q    And you actually have a publication specifically related

13 to cognition, correct?

14 A    Cognition in the elderly, that's correct.

15         MS. STEPHAN:  Your Honor, at this time I'd like to

16 offer Dr. Martino as an expert in the field of neurology and

17 psychiatry.

18         THE COURT:  Any objection?

19         MR. WEIDNER:  I don't object as to those fields, but

20 he hasn't been qualified in the subspecialties.  But only as to

21 those general fields, I don't object, and I'll just reserve my

22 cross, Your Honor, as to the weight to be given to his

23 qualifications.

24         THE COURT:  Well, certainly you'll have an

25 opportunity to examine him.  I do find that Dr. Martino is

## Martino - Direct                                7-6

1  qualified by experience and training to offer expert opinion

2  testimony in the fields of psychiatry and neurology, and that

3  the testimony in these fields may be of benefit to the finder

4  of fact.  For these reasons, he is authorized to proceed and

5  offer opinion testimony in this proceeding.  Ms. Stephan?

6           MS. STEPHAN:  Thank you, Your Honor.

7  BY MS. STEPHAN:

8  Q    Dr. Martino, were you asked to evaluate the defendant,

9  Josef Boehm, in this case, and provide your evaluation?

10 A    Yes, I did.

11 Q    And doing so, did you meet with him personally?

12 A    Yes, I met with him at the facility -- correctional

13 facility here in Anchorage.

14 Q    And that was on -- do you know actually the date that

15 occurred?

16 A    I don't have my note in front of me.  It should be in my

17 report.

18           MS. STEPHAN:  May I actually approach the witness,

19 Your Honor?

20           THE COURT:  You may.

21                      (Pause)

22           MR. WEIDNER:  If I can just see what's being given to

23 the witness.

24           MS. STEPHAN:  I've handed Dr. Martino exhibit --

25 Government's Exhibit Number 61, and I'll have Dr. Martino

*Martino - Direct*                                          7-7

1  explain to the Court what that is.

2  A    That's my report when I examined him at the pretrial

3  facility on February 14, 2005.

4  BY MS. STEPHAN:

5  Q    Okay.  And your report is ten pages in length?

6  A    Yes, that's correct.

7  Q    Okay.  And it's signed by you?

8  A    Yes.

9  Q    And this basically is a -- a summary of your evaluation --

10 your interview?

11 A    Yes.

12 Q    Did you review any kind of documents or any material in --

13 before actually authoring this evaluation?

14 A    Yes.  I listened to the various audio -- audio tapes made

15 of phone conversations, read the grand jury transcripts, and

16 read the various expert witnesses' reports.

17 Q    And there's a summary of the material that you did

18 review --

19 A    Yes.

20 Q    -- in your report?

21 A    Yes.

22 Q    Prior -- I mean, after the time that you authored this

23 evaluation, did you receive more materials to review?

24 A    Yes, I -- I did.  The -- some of the experts submitted

25 supplementals to their original reports --

1  Q    And --

2  A    -- and I did review those supplementals, and the

3  presentencing report, I had an opportunity to -- to evaluate

4  after I wrote this report.  And I think those were the main --

5  main items.  And -- and some publications submitted by some of

6  the experts for the defense.

7              MS. STEPHAN:  Okay.  Thank you.  Your Honor, at this

8  time, I'd like to move for Government's Exhibit Number 61.

9              THE COURT:  Any objection?

10             MR. WEIDNER:  That's his report of March 16th, 2005?

11             MS. STEPHAN:  That's correct.

12             MR. WEIDNER:  No objection.

13             THE COURT:  Exhibit 61 is admitted.  Ms. Stephan, I

14  don't think I have a copy of that.

15         (Plaintiff's Exhibit 61 admitted)

16             MS. STEPHAN:  I actually -- I -- if you can hand the

17  judge the exhibits, Dr. Martino has an exact copy in front of

18  him.

19             THE COURT:  Thank you.  All right.  Thank you.

20             MR. WEIDNER:  Your Honor, just to be correct on an

21  evidentiary matter, I don't object, Your Honor, to the Court

22  considering this report, but we're not conceding all the

23  hearsay matters referred to therein.

24             THE COURT:  Well, there's -- I mean, that's -- that's

25  implicit in any expert's report, it was implicit in your

Martino - Direct                    7-9

1  experts' reports.  You can take whatever position you want on

2  that, but it's been admitted in evidence.

3  BY MS. STEPHAN:

4  Q    Dr. Martino, as part of your evaluation, did you review

5  scans of radiological and testing in this case?

6  A    Yes, I -- I did.

7  Q    And that included a CT scan, an MRI, a PET scan, and a

8  SPECT scan?

9  A    That's correct.

10  Q    And did you also have the opportunity to review the actual

11  imaging that was done?

12  A    Yes, I -- I did look at the images.

13  Q    Do you have in front of you what I think has been marked

14  previously as Defense Exhibit Z, if I'm correct, and that is

15  the Providence Imaging Center radiology consultation studies?

16  A    Yes, I have that.

17  Q    What I'm going to ask you to do is to focus your attention

18  first on what has been marked as the CT scan.

19  A    Yes, I have that.

20  Q    Can you first tell the Court what exactly a CT scan is and

21  what it looks for?

22  A    Well, CT scanning looks primarily for structural changes

23  in the brain, and it's a -- essentially a computerized X-ray,

24  it does use X-ray radiation to image the brain.  It is

25  sensitive -- especially sensitive to bleeding or to masses or

1 | to increases in fluid spaces in the -- in the brain.

2 | Q    And after reviewing the -- both the scan itself as well as

3 | the impressions from Providence Imaging Center, can you please

4 | tell us what the results show?

5 |          MR. WEIDNER:  Objection.  Compound, Your Honor, in

6 | terms of the -- in referring to the report versus review of the

7 | scans.  He hasn't been offered in the subspecialty of reading

8 | the scans, and I don't object to him relating what the reports

9 | say, but he hasn't been offered as an expert in actually

10 | reading scans or that subspecialty.

11 |          THE COURT:  Well --

12 |          MS. STEPHAN:  I think he describes what he used to

13 | base his opinion, Your Honor.

14 |          MR. WEIDNER:  I'm just concerned on the com --

15 |          THE COURT:  Mr. Weidner, I do believe that someone

16 | who is in this field is likely qualified to rely on these kinds

17 | of materials in developing a diagnosis.  So the objection is

18 | overruled.

19 |          MR. WEIDNER:  My concern, Your Honor, is that with

20 | the compound nature of the question because she asked him to

21 | lump it together about what he saw in the films or what he was

22 | reading from the reports.  I think we need --

23 |          THE COURT:  I don't believe it was compound.  I think

24 | she said taking these things into account --

25 |          MR. WEIDNER:  All right.

<u>Martino - Direct</u>                                    7-11

1        THE COURT:  -- here's the question.  But you better

2   state it again.  I think we probably all lost track of it.

3        MS. STEPHAN:  Certainly, Your Honor.

4   BY MS. STEPHAN:

5   Q    Dr. Martino, what I'm asking you to do is just basically

6   give me your impression of what the CT scan results showed.

7   A    It was a normal CT scan of the head.

8   Q    So there was absolutely nothing in there that showed any

9   kind of problem or impairment?

10  A    It was completely unremarkable.

11  Q    Thank you.  Let's move then to the MRI.  Can you please

12  describe for us what an MRI is and what it looks for?

13  A    Well, an MRI is a -- again, a scan which emphasizes

14  evaluating the structure of the brain, and it uses magnetic

15  energy and radio frequencies to spin the molecules in the brain

16  in a certain way.  So it's very sensitive to picking up

17  structural damages such as damage done by strokes or tumors or

18  trauma.

19  Q    And you had the chance to review both the MRI as well as

20  the radiological impressions?

21  A    Yes.  The MRI showed some what we call T2

22  hyperintensities.  that is when you look at the scan, these

23  look like little white areas in the white matter of the -- of

24  the brain.  And I felt this was no more than would be expected

25  in a sixty-one-year-old man with hypertension.  I certainly

## Martino - Direct                      7-12

1   agreed with the radiologist's impression that there were no

2   strokes seen there.

3   Q    Okay.  Can you give us a little bit of information about

4   white matter changes?  What do you mean by that, what are they?

5   A    Well, when you look at the scan, they actually look like

6   white areas in the -- in the deeper parts of the brain.  When

7   MRI first started to be done critically, nobody really knew

8   what these areas of white matter -- these little white areas

9   represented.  In fact, these little areas were originally

10  called UBO's, Unknown Bright Objects, strictly a descriptive

11  term.

12      Now they're referred to as white matter intensities

13  commonly -- we see them frequently on scans in the elderly

14  population, anywhere -- depending on who you (indiscernible),

15  anywhere from thirty to ninety percent of individuals will have

16  these white matter intensities on their scan.  There's not a

17  lot of agreement as to their clinical significance.  I think

18  you have to apply it to each case.

19      What they actually are pathologically can vary.  Sometimes

20  when you -- on police mortem studies and autopsies when you

21  study these areas, some of them represent a damaging of the

22  insulated covering of the nerves, so one can assume the nerves

23  were still functional with that sort of damage.  Occasionally,

24  you will see scar tissue in these areas.  On other occasions,

25  you'll see sort of a collection of -- of fluid, and

<u>Martino - Direct</u>                                7-13

1  occasionally some of these areas actually represent destruction
2  of neurons and other neural elements in that area.
3      So it really varies as to what these white areas
4  represent, and you can't tell just by looking at the -- at --
5  at -- at the scan, and a certain number of them are considered,
6  you know, pretty much normal in clinical practice in the older
7  population.
8  Q    Okay.  Can you please followup a little bit more on that?
9  When you say white matter changes consistent with someone of
10 his age.
11 A    Yes.
12 Q    Can you please followup a little bit more on that?
13 A    Yes.  The main --
14          MR. WEIDNER:  Objection, Your Honor.  Misstates the
15 evidence as it -- she said consistent with his age.  He hasn't
16 identified the older population or elders.
17          THE COURT:  Excuse me.  Perhaps you could lay a
18 little groundwork here, Ms. Stephan, as to what the doctor has
19 in mind by --
20          MS. STEPHAN:  Certainly.
21          THE COURT:  -- when he uses those terms.
22 BY MS. STEPHAN:
23 Q    Okay.  Doctor, you had testified something about the age
24 being a factor with white matter changes.
25 A    Yes.

1  Q    Could you describe that, for us?

2  A    Yes.  Well, the main risk factor for seeing these white

3  matter changes, the main correlate, is age, and you begin

4  seeing them when individuals are in their mid to late fifties

5  and they tend to be more frequent as the individual is -- is

6  older.

7  Q    And does hypertension play any role in any of that?

8  A    Hypertension does increase -- well, these -- these areas

9  tend to be more common in people with hypertension.  There's

10 not necessarily a causative link there, but -- but there's --

11 they're associated.

12 Q    Can you please then give us your opinion on the white

13 matter changes that you saw or reviewed from the radiological

14 study?  How much or how little was there, I guess is the

15 question.

16 A    Yeah.  I would say the changes are mild and if I were

17 evaluating this individual clinically, I would take note of it,

18 but I would not necessarily feel that it had clinical

19 significance.

20 Q    Let's now focus on the SPECT scan.  Can you please first

21 describe to the Court what a SPECT scan is and what it looks

22 for?

23 A    Well, a SPECT scan involves the injection of a

24 radioisotope into the patient, and then the radioisotope tends

25 to collect in that part of the brain where there is

1  circulation.  So the higher the blood circulation in that part

2  of the brain, the more of a collection of the radioisotope.  It

3  then emits photons which are counted in -- in -- on detectors

4  and an image is built up.  It's felt that it generally reflects

5  circulation in some rough way in the brain.

6  Q    And did you review both the SPECT scan images as well as

7  the radiological impressions?

8  A    Yes, I did.  And I did not find there was anything

9  significant on the SPECT scan.  I thought there was an

10  interesting finding which is somewhat difficult to explain, and

11  that there was a asymmetry in -- in the circulation of the

12  basal gang -- ganglia.  These are grey matter nuclei deep --

13  deep in the brain.  The radiologist felt there was a subtle

14  asymmetry there.  In other words, on the -- the tracer uptake

15  was greater on the left side, but on the right side during the

16  resting part of the -- of the -- of the study.  And on the

17  activation study, this reversed itself; the circulation was

18  greater on the right side than the left side.  On neither side

19  was the circulation abnormally low, but one side tended to be

20  higher -- the circulation tended to be higher than the other.

21  Q    Okay.  So when we're talking about circulation, we're

22  talking about blood circulation?

23  A    Well, that's the general correlation between the isotope

24  uptake as with blood circulation in the brain.

25  Q    The results of the SPECT scan are actually showing an

1  increased blood circulation not a decreased, is that fair to

2  say?

3  A    This is the way the radiologist interpreted it and I -- I

4  have no reason to disagree with it looking at the scan myself.

5  Q    Now you had mentioned this basal ganglia.  Can you please

6  tell us what that is and what its function is?

7  A    Well, there are a number of parts of the basal ganglia,

8  and these are -- we think of the brain the -- as having the

9  grey matter on the outside of the brain, but there are actually

10 grey matter nuclei in the deep parts of the brain.  And the

11 nuclei, called the basal ganglia, are composed of a number of

12 grey matter nuclei -- the putamen, the globus pallidus, and the

13 caudate.

14     Now when clinical neurologists say an individual had a

15 stroke in her basal ganglia, they're referring to the caudate

16 and the putamen, although strictly anatomically and

17 functionally, the caudate nucleus is also a part of the basal

18 ganglia.  Now the -- the -- the -- the -- the two parts, the

19 putamen and the globus pallidus, are primarily nuclear motor --

20 motor nuclei.  They -- they have to do with motor function.

21 When they're not functioning correctly, the individual has

22 problems with motor movement.

23     Now the caudate does have some cognitive function.  If the

24 caudate part of the basal ganglia are damaged, the individual

25 can have cognitive problems.  This SPECT scan was referring

1  only to the motor part of the basal ganglia, the caudate -- the

2  putamen and the globus pallidus.  It was not referring to the

3  caudate part of it.

4  Q    Okay.  Now was there any scan that was done that did look

5  at the caudate part of it?

6  A    Well, this scan looks at the caudate part of it, but there

7  was no comment about any unusual -- anything unusual about that

8  part of it.

9  Q    So in your view of any of the scans or any of the

10  radiological reports, there was no evidence the caudate had any

11  problems whatsoever.

12  A    That's correct.  The caudate is seen fairly well on the

13  MRI, and it looked perfectly normal, and then on the -- the PET

14  scan, there was no metabolic abnormalities in that part of the

15  brain.

16  Q    Okay.  Let's then talk about the PET scan.  Could you

17  please explain what that is and what it looks for?

18  A    Well, the PET scan is a more sophisticated scan than the

19  SPECT scan.  The -- the PET scan relies upon what they -- a

20  positron colliding with electrons and giving off photons which

21  are detected by the detectors in the scanner.  So it generates

22  much more information than the SPECT scan does.

23  Q    So it's more sensitive than the -- than the PET [sic]

24  scan?

25  A    More sensitive, higher resolution, that means you can see

1   smaller areas of the -- of the brain.  It is considered -- you

2   know, of the two -- of the two types of functional studies,

3   SPECT versus PET, the PET is considered to be the -- the better

4   procedure.

5   Q    Okay.

6   A    And it relies upon a isotope which actually enters the

7   metabolic system of the brain.  So in this case, it was

8   fluoro-2-deoxyglucose.  In other words, it's a labeled glucose

9   which is metabolized by the brain just as glucose would be.

10  And so it tells you in some rough fashion whether the brain is

11  -- is metabolizing its main energy source correctly.  Dead

12  cells or badly damaged cells have very low metabolism because

13  there are fewer cellular elements there to utilize the glucose.

14       Healthy cells will metabolize glucose in a more normal

15  fashion, and the PET scan show that the brain in this instance

16  seemed to have a uniform and normal metabolism of glucose,

17  including all of the elements of the basal ganglia.

18  Q    Okay.  Thank you.  And did you also review the

19  radiological impressions of the carotid duplex ultrasound, I

20  guess it is?

21  A    Yes.  And I -- I strictly just reviewed the report there.

22  Q    And can you give us what your impression is after

23  reviewing that?

24  A    Well, there -- there was just minimal plaqueing; that is,

25  these little rough areas in the -- in the origin of the carotid

1    arteries in the neck.  Clinically, this would not be considered

2    of a concern because all of us develop some degree of arterial

3    sclerosis, and in fact any -- any part of life, if you look

4    closely enough at the arteries, there will be some arterial

5    sclerosis, and this increases as -- as -- as people age.

6        But -- but there's an extensive study of young soldiers

7    killed in the seven-day Israeli war, and on careful autopsy,

8    they already had the beginnings of arterial sclerosis.  So

9    this, again, is -- is -- the main risk factor is age.

10   Q    Okay.  Now based upon -- well, taking all the scans

11   together and the impressions you've read, can you give the

12   Court what your overall impression is about the defendant's

13   physical brain functioning?

14   A    As it pertains to the scan or my overall evaluation?

15   Q    Your overall impression.  Mm-hmm (affirmative).

16   A    I -- I did not find any neurological problems with Mr.

17   Boehm's exam.  I felt that his cognitive function, certainly on

18   the -- the usual bedside exam, appeared to be within normal

19   limits.  His general exam -- that is, his motor functioning,

20   his reflexes, his visual system, his eye movements -- were all

21   normal.

22   Q    Now looking at the -- your own impressions of the scans

23   themselves taken as a whole, can you tell me what that

24   illustrates to you, if anything?

25   A    Well, I believe the scans reflect his normal exam.  For

1  instance, if he had a great deal of these white matter changes,

2  we might expect to see increased deep tendon reflexes on his

3  clinical exam, or weakness on his clinical exam, or slowing of

4  fine motor movements.  You know, we didn't -- we didn't see

5  those sorts of changes.  But I have to emphasize the most

6  important thing is what you see in the individual, not what you

7  see on the scans.

8  Q    Okay.  Can you please then -- let's focus on your meeting

9  with the defendant.  Can you please explain how that meeting

10  went, what you did, how long it lasted?

11  A    Well, we -- we got together in the clinical exam room at

12  the facility, so I had an examining table there and it was

13  conducted in a manner I usually conduct either a forensic or

14  clinical exam.  The first part of it involved talking to the

15  defendant and getting his history, getting his -- his side of

16  the story; this is my name and opportunity to get -- to get his

17  story directly from him, not through other people.  So my

18  general pattern is, of course, to ask questions, but to let the

19  individual talk about himself and tell me what his experiences

20  are.  And I thought Mr. Boehm was -- was cooperative in that.

21  Q    What about your physical observations?  What do you do --

22  A    He -- he tended not to smile very much.  I -- I don't

23  think my humor had any effect on him, but he was friendly, and

24  he did have good facial expression, so I felt that his -- when

25  you just talk, we all have certain mannerisms and movements of

<u>Martino - Direct</u>                                        7-21

1    our face and hands, and he -- I felt he had normal spontaneous
2    -- what we call spontaneous movements.  Sometimes if
3    individuals have damage, let's say, to the basal ganglia, they
4    won't have these spontaneous movements.  They'll sit there
5    almost like a statue.  They don't -- they don't blink at a
6    normal rate, they don't change their posture.  There's a lack
7    of these spontaneous movements, so we watch closely for this,
8    and this all looked normal in the defendant's case.
9    Q    In the course of your evaluation, did you also review
10   reports by Dr. Lisa Hope as well as Dr. Deborah Budding?
11   A    Yes, that's correct.
12   Q    And can you please tell me your impressions after reading
13   those reports?
14   A    Yes.  Of course, this was neuropsychological testing,
15   which is an expanded mental status exam, and Dr. Hope felt she
16   did not find any abnormalities on the -- in the defendant's
17   exam.  She felt his working memory was good, his memory in
18   general was good.  She didn't feel that she saw any delusional
19   material.
20   Q    Mm-hmm (affirmative).
21   A    Dr. Budding felt that there were some difficulties with
22   working memory and some other areas of executive function, and
23   she described it as dysfunction -- as -- as somewhat diffuse
24   but subtle.  So she used the word subtle in her assessment of
25   whatever areas of dysfunction she felt there were.

1  Q    Okay.  Now there has been some testimony in this case that

2  the defendant is delusional.  Can you please comment on that?

3  A    I -- I did not think the defendant had a -- a fixed

4  delusion.  He -- he certainly has some ideas which I try to

5  explore.  For instance, he said at one point he thought

6  possibly his daughter either maybe wasn't his daughter or had

7  been altered somehow through plastic surgery, and then he

8  thought he saw her picture on the cover of a magazine as a porn

9  star.  So we had this investigated and when we discussed it, he

10  -- he -- he -- he would back off, he would say, well, I don't

11  -- I don't really think she's a porn star, but -- but I thought

12  that she might have been.  So -- so people who are delusional,

13  you can't talk them out of their delusion.  That's part of the

14  definition.  It isn't -- it isn't changeable through -- through

15  logic.  If you try to talk them out of it in a logical fashion,

16  they just change the logic around so that you're right back

17  where you started.  So -- so -- so I would call this maybe an

18  over-valued idea, but not a true delusion.

19      I -- I -- I felt that it may have fit in with Mr. Boehm's

20  -- he gave me a history of some difficulties in recognizing

21  people, which I felt might be relevant.  He said that -- this

22  is -- you know, sometimes he'll see people in a store and

23  thinks that he knows them.  Not necessarily porn stars or

24  anything, but that he knows them.  He goes up to them and he

25  talks to them and then he realizes he doesn't know them.  So I

1  believe he has some difficulties in facial recognition, and

2  facial recognition is a very special human cognitive skill, and

3  like every other skill we have, it's -- it's on a spectrum.

4  Some people are very good at it, and some people are

5  particularly bad at it.

6       The extreme of being bad at it a condition called

7  prosopagnosia where you cannot recognize people who you know

8  even very well, children, spouse, and there are lesser degrees

9  of that.  Certainly, I think the defendant has a much lesser

10 degree of that, but I do believe he has some difficulties with

11 facial recognition.  I think we all experience that.

12      I know when I lived in New York City, my wife would -- oh,

13 that was Dustin Hoffman sitting down the way from us, or that

14 movie star, and I'd have no idea.  No way was I going to

15 recognize that individual, but my wife is very good at

16 recognizing these people.  So I think that's an everyday

17 example of how there's gradation of skill in facial

18 recognition.

19 Q    Now if you're looking for any kind of physical proof of

20 this, would there be?

21 A    I'm sorry?

22 Q    If you're looking for a physical correlation to facial

23 recognition issues, is there any way to be able to do that?

24 A    Well, lesions can be -- have been described in any number

25 of parts of the brain, but generally if there's a -- it

1   wouldn't have to be a stroke-like lesion, it would have to be a
2   significant lesion, in the posterior temporal area, you know,
3   bordering on the occipital area where the -- the visual centers
4   come in contact with the memory and emotional centers of the
5   brain.  And I've certainly seen patients who have had lesions
6   there who have lost their ability to recognize faces.

7   Q    Okay.  Now following along on this line, did you read any
8   evidence in the materials that the defendant talked about --
9   three Bambies, or more than one Salley -- information of that
10  nature?

11  A    Yes.  I think Salley talked about that in one or two of
12  her interviews, and I think she depicted it as almost -- as
13  almost a game they would play, and which Salley are you today,
14  and so forth.  And she also mentioned that -- that he -- liked
15  to tell her that -- that she reminded him of his daughter, in
16  fact would even call her by his daughter's name.  And I -- I do
17  think -- I do think this reflects a certain fas -- fascination
18  and fantasy the individual has with -- with pornography, and I
19  think that's why it's -- it's easy for him to make these kinds
20  of -- of connections.  I think it's -- in my opinion, it adds
21  to his sexual excitement to make these connections.

22  Q    I actually do want to talk about that, but before we get
23  there, let me go back to some of this -- the testing and the
24  results that you talked about.  There was testimony in the
25  courts that the defendant also has vascular dementia.  Can you

## Martino - Direct                                        7-25

1  please comment on that?

2  A    A vascular dementia?

3  Q    Yes.  Mm-hmm (affirmative).

4  A    Well, I don't believe the defendant has a dementia of any

5  kind.  I've not seen any written reports from the other experts

6  saying he has a dementia, so that's new -- new material to me,

7  but I don't believe he has a dementia.

8  Q    And if that -- well, can you tell me, what is -- what is

9  dementia and what would you look for?

10  A    Well, dementia requires that you have some difficulties

11  with memory --' and there are different kinds of memory, but

12  some difficulties with memory, and then some significant

13  difficulties with some other higher cognitive function, and it

14  has to be severe enough so that it interferes with your

15  everyday function -- your work, your -- maybe your

16  relationships, but some -- has to have some significant

17  functional meaning to your life in order to call it a dementia.

18  It fall -- if it falls short of that, you call it a cognitive

19  disorder NOS as Dr. Budding did.

20  Q    So in all the reports that you reviewed, you didn't see

21  any report that indicated that he had that diagnosis, vascular

22  dementia?

23  A    No, he -- he does not have dementia in my opinion, and

24  there's no evidence on his clinical exam that he has the kinds

25  of findings you would see in a vascular dementia.  Vascular

1  dementia means -- we used to call it multi-infarct dementia,
2  meaning that it's a dementia caused by a series of large or
3  small strokes, but -- but the point being is that the brain has
4  some number of strokes in it, and there's nothing in Mr.
5  Boehm's history or clinical exam or imaging studies for that
6  matter to draw that conclusion.
7  Q    There was also testimony the defendant has leukoaraiosis.
8  Could you please comment on that?
9  A    Yes.  Leukoaraiosis, I believe, is derived from the Greek,
10 and this was strictly a descriptive term of these white matter
11 hyperintensities that I talked about earlier in the deep part
12 of the brain.  It's -- it was a term chosen for its neutrality
13 and what it implies about the function of the brain.  It's
14 strictly a descriptive term.  So to say that somebody has
15 leukoaraiosis is -- I mean, it's just a description and it's
16 not necessarily pathological, but it's a finding in the brain.
17                          (Pause)
18 Q    There's also testimony by several of the experts for the
19 defendant that the defendant has significant cognitive
20 impairment.  Can you comment on that, please?
21 A    I did not find here on my exam or in his tapes -- you
22 know, listening to his phone conversations -- his -- his speech
23 was well organized during these phone conversations, he was
24 very much in command, he had a good -- good memory, he talked
25 about having the -- I believe the furnace repaired in the

## Martino - Direct                                    7-27

1   garage, he talked about what the building code might be, and

2   talked about other repairs around the house, talked about phone

3   numbers of various people, told his stepson that the stepson

4   had a bad memory for failing to carry through some of his

5   instructions.  So I have not seen anything either on clinical

6   exam or -- or in these other documents that -- reason to

7   believe he has any significant cognitive impairment.

8   Q    Can you tell me what -- how cocaine use would affect a

9   person like the defendant?

10  A    Their life -- you say life expectancy?

11  Q    No.  Let's talk generally that -- let me back up.  The

12  tapes that you reviewed were jail tapes, correct?

13  A    That's correct.

14  Q    And you reviewed assuming hours of those, correct?

15  A    Right.  There were a number of hours.

16  Q    Now if you go back in time to when the defendant was using

17  cocaine --

18  A    Mm-hmm (affirmative).

19  Q    -- can you tell me how cocaine would affect a person with

20  -- well, basically you said no real physical changes except for

21  age-related.

22  A    Well, again, mild or moderate cocaine use may not cause

23  any cognitive impairment.  In fact, you know, cocaine is a

24  stimulant.  Fighter pilots are routinely ordered stimulants on

25  long missions, so in -- in low pharmacological quantity, it

Martino - Direct                                    7-28

1    doesn't have any bad effect on the brain.  However, when you

2    abuse it, it can have a number of -- cause a number of

3    problems.  With the brain itself, it could -- it could cause

4    the individual to be hyperactive -- motorically hyperactive, be

5    moving around a lot.  It could cause him to have misperceptions

6    or even delusions if they take high quantities of a stimulant

7    such as cocaine, it could lead to hallucinations in a high

8    enough quantity, or as it did for Salley in a high -- high

9    quantities it can cause convulsions.

10   Q    Does paranoia have any relationship to the use of cocaine?

11   A    Yes, paranoia does.  That's a common -- a common symptom

12   seen with use of all -- overuse of all the stimulants.  The

13   individual becomes very fearful and can become very paranoid.

14   In some instances, it can even lead to violence.  Of course,

15   this is also fostered by the fact that when people are

16   overusing stimulants, there's also a concern about being

17   arrested and the law which -- which adds to their paranoia.

18   But it's a definite symptom of cocaine or stimulant abuse.

19   Q    Now did -- you were provided with some articles to read

20   about -- the defense experts had relied upon?

21   A    Yes.  I did review those.

22   Q    I'm not going to make you go through all of them, but I'm

23   going to focus on a few.  Did you read a article, it's Defense

24   Exhibit O, which is "The impact of age-related cerebral white

25   matter changes on the transition to disability -- the LADIS

1  study"?

2  A    Yes.   The -- it was an interesting paper, but it really

3  talks about the design of a study that hasn't been done --

4  that's only just being started.  And the whole point of the

5  paper is that it's uncertain what these white matter changes in

6  the brain mean.  So what they're doing in this study -- they're

7  -- they're collecting individuals and they're testing them

8  clinically and they're doing MRI's now, and then in X number of

9  years, they will repeat that process to see what, if any,

10  correlation will occur between the individual's health and

11  changes on their MRI.  So this is a study to address, you know,

12  the many uncertainties of these white matter changes in the

13  brain that we observe on the MRI.

14  Q    So there's -- there's no conclusions about what -- how the

15  white matter affects cognitive --

16  A    No.   This study is designed to try to reach some

17  conclusions at some future date.

18  Q    Thank you.  Did you review an article which is Defense

19  Exhibit S, which is "Vascular death in elderly neurological

20  patients with leukoaraiosis"?

21  A    Yes, I did.

22  Q    Could you please comment on that article?

23  A    Well, I thought it was an interesting article, but, you

24  know, they used -- if my memory serves me, they used CT

25  scanning as the screening tool to detect these white matter

1   lesions, and CT scanning is much less sensitive than MRI.  So

2   for an individual to have white matter lesions apparent under

3   CT scan, it has to be pretty severe.  In fact, if the defendant

4   was in that study, he would have been in the control group, the

5   normal group, because his CT scan is normal.

6   Q     And there was a discussion, and I'm not quite sure if it

7   was actually a diagnosis or not from the defense experts, of

8   reduplicative phenomena.  Can you discuss that?

9   A     Yes.  I didn't have an opportunity to read the paper they

10   submitted, but this is a well-known phenomena.  It used to be

11   called the Capgras Syndrome.  It was originally described, I

12   believe, by French psychiatrists, and an individual has a

13   belief -- there are many variations of it.  One variation is

14   more common, we see that in the general hospital all the time

15   as an individual believes that they are in a reduplicative

16   place.  In other words, you ask them where are you?  I'm in

17   Mount Sinai Hospital in -- in Los Angeles.  Well, no, no, we're

18   in New York.  No, they insist that they're in Mount Sinai

19   Hospital in Los Angeles.  See, they reduplicate the place, they

20   move the hospital somewhere else.

21         And then there's reduplication of identity, which is

22   somewhat less common but seen both in psychiatrist disorders

23   and neurological disorders where individuals tend to become

24   convinced that somebody's actually been replaced by a double.

25   But it's generally very fixed and firm, you can't talk them out

Martino - Direct                                    7-31

1    of it, and if you say, well, but this individual has children

2    just like Al, and this individual lives in a house -- same kind

3    of house Al -- yeah, well all that has been reduplicated; the

4    house has been reduplicated, the children have been

5    reduplicated, it can be very elaborate, and -- and you -- then

6    again, one of the -- you know, the characteristic of it is the

7    difficulty of getting the individual to be convinced otherwise.

8    Q    In review of Dr. Hope's report, does she address that

9    issue of whether ideas are fixed or not fixed?

10   A    She felt they weren't fixed.  She did not feel that the

11   defendant had a fixed delusion.

12   Q    And in her report, did she talk at all about whether or

13   not she challenged the defendant on some of these beliefs and

14   that's where she reached her conclusion?

15   A    Yes.  He was -- he would back off and look at more

16   reasonable alternatives which would not be characteristic of a

17   delusion.

18   Q    And did you explore that in your evaluation as well?

19   A    To some degree.

20   Q    And you did not find any kind of fixed, permanent --

21   A    No, he would look at other -- you know, other explanations

22   once you pushed him a bit.

23   Q    Did you have an opportunity to review the defendant's

24   criminal history in your evaluation?

25   A    Yes, I did.

1  Q    Can you please tell me if it holds any significance to

2  you?

3  A    Well, I do believe it does hold some significance.  He was

4  -- I read the police reports and he was convicted of two rapes

5  on different occasions of underage females.  I believe he had

6  sex with a thirteen -- thirteen-year-old female in 1965 in

7  January, then I believe in the same year, he was apprehended

8  after he had more forcible sex with I believe a fifteen-year-

9  old female.

10       Besides the girls being underage, I felt there were other

11  parallels as I read through the police report.  The activity

12  occurred in his trailer home -- in his home, there were other

13  individuals involved -- other men involved -- while the sex was

14  going on, so it was sort of a group affair.  One of the

15  individuals who was convicted of rape in that first incident

16  made the remark to the police that Joe, in this instance the

17  defendant, told me I could use his house -- his trailer any

18  time I want, he had free access to it.  Again, certain

19  parallels to what's gone on later in the defendant's life, even

20  -- even the white luxury car; back then it was a Thunderbird.

21  Q    Now you talked a little bit about the defendant's sexual

22  interests or -- or fantasies I think is the term you used.  Can

23  you describe what you mean a little bit more about your

24  findings?

25  A    Well, I think his interest -- he has an interest in young

<u>Martino - Direct</u>                              7-33

1    women.  S.P., in her interviews, mentioned that he would become

2    more sexually excited if she would say that he is -- that she

3    was twelve years -- twelve years old.  And again, him linking

4    S.P. in some way to his daughter is also -- shows some linkage

5    there with -- with underage -- even though, obviously, his

6    daughter was an adult at the time, but I think it goes back to

7    a bit of an incestuous fascination there.

8        And it excited him to think that these young women would

9    be in pornographic movies.  He -- he -- you know, he liked that

10   idea that some young women that he knew would be in a

11   pornographic movies, and at least Salley testified that she was

12   rewarded for bringing young women to his home, and -- and the

13   criteria were -- were young -- young women.

14   Q    There were some indications in the transcripts about the

15   girls believing that they were being videotaped.

16   A    Yes.

17   Q    Can you please explain your impressions of that?

18   A    Well, that seemed to be a thread which was seen in several

19   of the interviews, but -- but I did notice that -- I stumbled

20   over the initials here that D.A., I believe the mother of one

21   of the girls, said that the defendant had gone to her home and

22   said that he had her daughters on videotape involved in sexual

23   acts, and that she could -- and that he would be willing to pay

24   her -- pay the mother for access to the daughters and that she

25   could -- you know, you could either -- they could either do it

1   for, you know, for pay or do it for nothing, but that he had

2   this on tape.  I don't think any tapes were confiscated in the

3   police reports, so he -- he may have made that up as a way of

4   using leverage, but in a group of individuals who are using

5   cocaine and are somewhat paranoid to begin with, that these

6   sorts of ideas and stories, you know, travel pretty fast

7   through the group.  This is the sort of thing that paranoid

8   individuals latch onto, you know, they're being videotaped

9   either secretly or otherwise.

10  Q    And as you mentioned, paranoia is something that occurs

11  with users of cocaine.

12  A    Absolutely.

13  Q    Did you review any information in your evaluation about

14  reports of drinks being spiked or food being laced with

15  something?

16  A    Yes.

17  Q    Suspicions of that anyway.

18  A    And it took a very characteristic form where people would

19  -- evidently at least some people got to the point where they

20  wouldn't drink out of a container that had already been opened

21  -- rather the food package that -- that had already been

22  opened.  And this is a common -- a common paranoid idea.  I

23  mean, I just had a patient in the hospital recently.  The

24  individual had to be given bottled water and they had to break

25  the seal themselves before they would drink any water.  I mean,

<u>Martino - Direct</u>                                 7-35

1   this is the nature of paranoia.

2   Q    Now can you describe, if you can if you have any

3   impressions about the way the defendant kept his home -- the

4   structure of his home or anything of that nature?

5   A    I'm sorry, the structure?

6   Q    How the defendant kept his home, monitored his home, or

7   anything of that nature.  Do you have any impressions about

8   that?

9   A    Well, I get the impression that he had things -- he had

10  certain people that were performing certain tasks for him to

11  his satisfaction.  You know, when -- and I think this is,

12  again, a pattern for the defendant.  I think Mr. -- possibly

13  Mr. Kangass was saying how the defendant in the business

14  selected certain competent people to run the business the way

15  he wanted it run, and then would let them run it.  He was very

16  good at delegating authority in that way and organizing things

17  in that fashion.  And I think statements of the various people

18  involved in this case would -- reflected a similar kind of

19  organization in his household.  Bambi was in charge of the

20  girls, Bolling and Williams in charge of the drugs, you know,

21  so it was a similar kind of organization.

22       But as S.P. said in one of her interviews, Bambi told her

23  that everything revolves around making the defendant happy.

24  That was the general thrust of the -- of the way things were

25  organized, and I think it can be not an uncommon way of

<u>Martino - Direct</u>                                          7-36

1  organizing things.  Have trusted lieutenants carry out your

2  wishes to make sure that things are set up the way you want

3  them.

4  Q    Did you read any information or reports about Kathleen and

5  Salley being sent to Seattle?

6  A    Yes.  I --

7  Q    Can you give me your impressions of that?

8  A    Yeah.  I though that was a good indication that the

9  defendant had some -- not only good cognitive function, he --

10 he saw the risk that was occurring because Salley's mother was

11 starting to call his business, you know, he -- he did not want

12 that.  He wasn't so down and out on drugs that he was willing

13 to risk difficulties with his business.  He --

14          MR. BUTLER:  Excuse me, Your Honor.  Can we change

15 this out.

16          THE COURT:  All right.  We'll -- we need to take a

17 brief recess while Mr. Boehm's earphones are replaced.  Thank

18 you, Mr. Butler.

19          MR. BUTLER:  Yes, sir.

20                         (Pause)

21          THE COURT:  Ready to proceed?

22          MR. BUTLER:  Thank you, Your Honor.

23          THE COURT:  Please proceed.

24          MS. STEPHAN:  Thank you.

25 BY MS. STEPHAN:

Martino - Direct                                7-37

1  Q    You can continue where you left off.

2  A    Yes.  It showed that the defendant still cared about his

3  business and could recognize threats to that business in some

4  reasonable way, of -- of S.P.'s mother calling -- you know,

5  calling the work, and he -- he formulated a plan, he gave

6  instructions to get tickets, said where the tickets should be

7  purchased and the cheapest -- cheapest tickets, and -- and he

8  even remember to do something I frequently forget with

9  children, and that is make sure they have an ID 'cause not all

10 young people have a driver's license, and this was also taken

11 care of at his instruction, evidently to get these two

12 individuals to Seattle, and he had one of his lieutenants

13 accompany S.P. to Seattle.

14 Q    So he delegated some of those tasks.

15 A    Yes, he, again, delegated the chores.

16 Q    And can you comment on your impressions of his executive

17 functioning based upon anything you reviewed including that?

18 A    Yes.  Well, I believe at times he had fairly good

19 executive functioning, certainly adequate, certainly getting

20 Salley out of town was one example of that, but even -- even

21 supposedly he was taking three or five thousand dollars a day

22 out of the bank.  That didn't come out of an ATM.  He had to

23 interact with a teller, I assume, in some credible fashion so

24 that -- you know, they're just not going to hand over three or

25 five thousand dollars in cash to somebody they think might not

1  be in a proper frame of mind or might be incapacitated in some

2  way.

3      The -- Mr. Burnett said that even at the depths of his

4  drug abuse, that he could pick errors out of legal contracts

5  that -- that even Mr. Burnett and the attorney had missed, and

6  felt he was almost clairvoyant -- I think he used that word,

7  clairvoyant -- in his -- in his abilities, even though he was

8  obviously abusing drugs heavily at that point.

9  Q    You've mentioned several times Salley's transcripts that

10  you reviewed, correct?

11  A    Yes.

12  Q    You read, I think, three transcripts in total, is that

13  accurate?

14  A    I believe so, yes.

15  Q    And can you give me your impressions of Salley?

16  A    Well, Salley, at least at some point, was a young

17  adolescent.  She was like a -- in my opinion, like a child in a

18  dysfunctional family at -- at the defendant's home.  I think

19  her impressions of what was going on there was -- at least her

20  conclusions about what was going on there were somewhat

21  childlike in what she thought was happening.  You know, that

22  she felt that the defendant was being victimized by Bambi, or

23  victimized by other people.  I -- that -- that's somewhat akin

24  to what -- the kinds of conclusions a child would draw.

25      You have to remember, adolescents -- their frontal lobes,

1   their executive function is not matured yet.  It doesn't mature

2   until an individual gets into their early twenties.  So I think

3   in that regard, she was very impressionable in her idea that

4   somehow Bambi was victimizing the defendant.  It's like -- it's

5   like children who see a divorce or major conflicts between

6   their parents.  They have a very naive idea of what's going on.

7   They don't really know what's going on behind the scenes.

8   Sometimes as an adult, they come to realize, well -- well, Dad

9   wasn't really all bad and all that, or Mom wasn't really all

10  bad and that.

11       So -- so I think she looked at her explanations for what

12  she was, I believe, were -- were very naive.  I mean, she made

13  observations and I'm not devaluing the observations, but I am

14  calling into question some of her conclusions about what she

15  saw.

16  Q    Did you have an opportunity to review a transcript of the

17  defendant's arrest on December 13th of '03?

18  A    Yes, yes, I did.

19  Q    Did you draw any impressions from that?

20  A    Well, I thought he didn't say anything unreasonable.  He

21  tried to make some excuses about why he had cocaine in his

22  pocket, he said it was somebody's else's coat.  He certainly

23  didn't confess to anything.

24  Q    Now you'd already briefly mentioned the audio tapes taken

25  of the defendant while he's -- he was in jail.  I would imagine

## Martino - Direct                                              7-40

1    because you mentioned them, they were significant to your

2    evaluation.

3    A    The audio tapes, I believe, sort of caught him in a

4    natural state in the way he interacted with people.  I mean, he

5    wasn't interacting with doctors or lawyers, he was interacting

6    with -- with friends and family, and I felt his thinking was --

7    was well organized and logical.  It wasn't -- he didn't seem

8    like a submissive or beaten down man, he -- he readily gave

9    orders and -- and had some high standards about how he expected

10   those instructions to be carried out, and his instructions all

11   sounded reasonable, nobody said to him, Mr. Boehm, that's

12   crazy, we're not going to do that.

13        Although, you know, he had some frustrations in getting

14   call forwarding straightened out at his home.  He wanted

15   certain science fiction books and he gave some detailed

16   instructions how to go about getting those books, who the

17   author was, how many volumes there were, and -- and voiced a

18   lot of frustration when people didn't carry out their

19   assignments.  He seemed very much in command.

20   Q    Now is there anything in your evaluation that would lead

21   you to conclude the defendant's life expectancy should be

22   altered in any way?

23   A    No.  Unless there have been some tests run that I'm not

24   aware of, there's no reason to think that at this point, that

25   his life expectancy would be decreased other than there

1  probably is some small decreased just with hypertension, but

2  he's had that for many -- many years.  You know, some of the

3  articles, I believe, that the defense experts submitted showed

4  a correlation with certain changes in the brain and certain

5  changes in the coronary arteries, but you know, I think the

6  point of the article was to -- if you have a person with severe

7  changes in the vessels of the brain, then you better look at

8  the coronary arteries because those changes have gone on there.

9      Now you don't need a MRI to know that.  We know that

10 people who have strokes, for instance, they're more likely to

11 die of a heart attack than they are to die of a stroke.  So

12 since the defendant hasn't had any strokes and as far as I know

13 nobody's detected any abnormalities in his heart, I don't see

14 why some significantly reduced life span would be predicted for

15 him.

16 Q    Now there was a lot of talk during the course of the

17 testimony about the defendant exhibiting remorse to the defense

18 experts.

19 A    Mm-hmm (affirmative).

20 Q    Can you please tell me if you have any comments on that?

21 A    Well, when I evaluated him, of course, I knew he had

22 already pled guilty to two counts, and -- and he said it

23 disgusted him to have pled guilty, and he outright denied ever

24 having sex with underage girls.  I thought that was a little

25 unusual.  It certainly hampered my exploration of these issues,

1  but he was very (indiscernible) about that, he never had sex

2  with any underage girls.  He was only willing to say he had sex

3  with Bambi on a few occasions when she was older.

4          MS. STEPHAN:  Okay.  Could I have a minute, Your

5  Honor?

6          THE COURT:  You may.

7                    (Pause)

8  BY MS. STEPHAN:

9  Q    All right.  Dr. Martino, you had testified before about

10  this problem with facial recognition.

11  A    Yes.

12  Q    Can you tell me if there's anything on any of his scans

13  that could correlate to that finding?

14  A    I thought that on a -- one of the T1 scans, there seemed

15  to be a lesion in the general area where facial recognition

16  might be, but I couldn't confirm it by finding it on the T2 --

17  T2 scan, so I don't think I'd want to make any firm comments

18  there except that it seemed suspicious and in the same general

19  area, but -- but I would have liked to have confirmed that

20  lesion was there on the T2.

21  Q    I see.  Okay.  Now Dr. Martino, do you have an opinion

22  then, based upon your entire evaluation and review of records,

23  whether or not the defendant acted as an organizer or a leader

24  or a manager or supervisor in his criminal activity?

25  A    Yes.  Well, I think he certainly had the -- the cognitive,

1  you know, intellectual abilities to be an organizer and a

2  ringleader, and from the whole pattern of it's -- statements

3  made by various people involved and his very assertive style

4  over the telephone, I would say my opinion is that -- that he

5  was a ringleader.

6         MS. STEPHAN:  Thank you.  I have no further

7  questions, Your Honor.

8         THE COURT:  Thank you, ma'am.  Mr. Weidner?

9         MR. WEIDNER:  Thank you.

10                    (Pause)

11                **CROSS-EXAMINATION**

12  BY MR. WEIDNER:

13  Q    Good morning.

14  A    Good morning, sir.

15  Q    My name is Phillip Weidner, sir.  We've never met before,

16  have we?

17  A    I don't believe so.

18  Q    Right.  And you work as a -- you practice as a

19  neurologist?

20  A    Neurologist and a psychiatrist.

21  Q    Do you have any subspecialization?

22  A    Subspecialty within the field of neurology?

23  Q    Yes.

24  A    No, I'm a general neurologist.

25  Q    All right.  Are you aware of any subspecializations that

1  might be available in the field of neurology?

2  A    Well, there's child neurology, there's neuromuscular

3  specialties in neurology.  Neurology doesn't have a lot of

4  board-recognized subspecialties.  It has a few.

5  Q    Are you aware of clinical neurophysiology?

6  A    Yes, I am.

7  Q    And that's a subspecialty in the area of psychiatry and

8  neurology?

9  A    I would consider it primarily to be in neurology.

10  Q    And are you aware of the fact that Dr. Kowell is board

11  certified in clinical neurophysiology?

12  A    I saw that on his CV.

13  Q    You don't dispute it, do you?

14  A    No.

15  Q    And you're not -- you're not board certified in that

16  subspecialty?

17  A    No.

18  Q    And are you aware of the fact that there was testimony

19  that the standard neurological residency is three years?

20  A    I'm aware of that.

21  Q    How long was your residency in neurology?

22  A    Well, I -- my -- the board credited me for three years.

23  The rules at that time -- let me explain it to you.

24  Q    Go ahead.

25  A    The rules at that time was that if you do a dual neurology

<u>Martino - Cross</u>                                    7-45

1   and psychiatry, since they're both accredited by the same

2   board, neurology requires a year of psychiatry as part of their

3   training, neurology requires a year of -- psychiatry requires a

4   year of neurology as part of their training.  So if you did two

5   years of each consecutively in the same institution, then you

6   were board eligible in both and then I passed the board

7   certification exams in both.

8   Q    And my question was do you have three years of residency

9   training in neurology?

10                        (Pause)

11  A    I believe I had the equivalent of three years training

12  because one year of psychiatry counted for one year of

13  neurology.

14  Q    Any further explanation you'd like to give in that regard?

15             MS. STEPHAN:  I'm going to object, Your Honor.

16             THE COURT:  Sustained.

17  BY MR. WEIDNER:

18  Q    Now you've been retained by the prosecution in this case?

19  A    Yes.

20  Q    Have you been retained by the prosecution in other cases?

21  A    I believe I had been retained by the prosecution in two

22  cases I can think of, and --

23  Q    And you understand the meaning of the word fair, don't

24  you?

25  A    Yes.

## Martino - Cross                                    7-46

1  Q    And you -- of course, you come here to -- you're paid to

2  be fair and give fair answers to questions?

3  A    I'm sorry.

4         MS. STEPHAN:  I'm going to object, Your Honor.

5  A    I didn't understand the --

6  BY MR. WEIDNER:

7  Q    You, of course, have come here today to be fair and to

8  give fair answers to questions, correct?

9  A    I'm here to give a balanced answer based on my opinions

10  and knowledge, sure.

11  Q    And as a part of your practice, you rely upon the

12  literature, do you not?  Other recognized literature as to

13  phenomena you describe.

14  A    We read the literature.  Some of the literature is worth

15  relying upon and some isn't, depending on -- on how the

16  literature has been compiled.

17  Q    And as a part of your practice, you recog -- you rely upon

18  recognized neuropsychological testing, don't you?

19  A    Yes, neurological -- neuropsychological testing is -- is a

20  useful tool.

21  Q    Well, it's -- it can be a very useful tool in diagnosing a

22  person as to whether there's cognitive dysfunction, isn't that

23  correct?

24  A    Yes.

25  Q    And you recognize certain neurological testing as -- as

1  appropriate testing for that purpose?

2  A    Certain -- certain types of testing, yes.

3  Q    For instance, the Wisconsin Card Sorting Test, you're

4  familiar with that?

5  A    In general terms.

6  Q    Well, it's a well-recognized test that's appropriate to

7  rely upon, isn't it?

8  A    It is a widely used test, yes.

9  Q    And you're aware of Dr. Budding's administering of that

10  test to Mr. Boehm?

11  A    Yes.

12  Q    And Dr. Hope didn't, did she?

13  A    I don't believe so.

14  Q    And you're aware that Dr. Budding's interpretation of that

15  test indicated there is evidence from the actual data a

16  cognitive dysfunction?

17  A    On the card sorting?

18  Q    Yes.

19  A    Yes, I believe that was her opinion.

20  Q    And you don't dispute that, do you?

21  A    No, I wouldn't dispute her findings.

22  Q    So you would be kind enough to tell this Court then that

23  there is neurological -- or psychological testing of a well-

24  recognized test that indicates there's cognitive dysfunction in

25  Mr. Boehm, correct?

## Martino - Cross                                    7-48

1  A    I'm not sure I understood that question.

2  Q    I'll -- are you aware of the other test that Dr. Budding

3  administered to Mr. Boehm?

4  A    Well, I read through Dr. Budding's report.

5  Q    Are you aware of the actual test that she was kind enough

6  to explain to His Honor, how the data indicated there was

7  indications of cognitive dysfunction in Mr. Boehm?

8  A    That was her opinion, that there was cognitive

9  dysfunction, yes, subtle I believe is the word she used.

10  Q    Well, we'll get to subtle in the moment, sir, but you

11  don't dispute, do you, that any of Dr. Budding's actual

12  testimony as to the results of the tests that were administered

13  to Mr. Boehm show cognitive dysfunction?

14  A    Well, I haven't had the privilege of hearing Dr. Budding's

15  testimony.  I can only talk about her report.

16  Q    Well, is there any -- you haven't been aware of any of the

17  testimony by any of the defense experts in this case?

18  A    Quite frankly, only in the most general terms, and I've

19  heard nothing about Dr. Budding's testimony specifically.

20  Q    Well, do you dispute any of the testing administered by

21  Dr. Budding?

22  A    Dispute the testing?

23  Q    Yes.

24  A    I feel all the tests were appropriate.

25  Q    Do you dispute Dr. Budding's interpretation of any of that

1  testing?

2  A    As her interpretation existed in her report, I didn't take

3  any great issue with it.

4  Q    I want to ask you just some basic questions about the

5  brain if I could and see if we can agree on some things.

6                          (Pause)

7  You're familiar with the frontal parietal regions of the brain?

8  A    Yes.

9  Q    And is that where cognitive function as to executive

10  function is -- has a significant involvement?

11  A    Yes, as part -- the -- the frontal areas, prefrontal areas

12  are significantly involved in cognitive function.

13  Q    And you're familiar with anterior deep periventricular

14  white matter in those regions, correct?

15  A    Well, that's just a description, yes.

16  Q    And you're aware of the fact -- and I realize that you

17  have a certain position as to the significance of that, but

18  you're aware of the fact that the actual testing in this case,

19  the MRI testing, showed evidence of ischemia in that area?

20                          (Pause)

21  Cerebral ischemia?

22  A    That was the -- the term the radiologist used.

23  Q    Well, you don't quarrel with that, do you?  That's what

24  the radiologist said and you agreed with his report, didn't

25  you?

1  A    Well, you can interpret those areas as ischemic.

2  Q    Well, let's see if we can pin it down a bit.  Do you or do

3  you not agree with what the radiologist said, that there was

4  evidence of cerebral ischemia in those areas?

5  A    Yes, some evidence, yes.  I -- I would not disagree with

6  that.

7  Q    So you admit that there is physical evidence from the

8  films of evidence of cerebral ischemia in the frontal parietal

9  region of the brain.

10  A    What I agree with is that the radiologist's interpretation

11  is a legitimate one, but not necessarily the only one.

12  Q    All right.  And when -- when Dr. Kowell testified to this

13  Court as to his opinion, he made the following statement:

14            "My opinion is that the patient has evidence of

15            vascular disease affecting his brain consistent with

16            cerebral ischemia, ischemia meaning decreased blood

17            flow, primarily within the distribution of the middle

18            cerebral arteries bilaterally affecting the frontal

19            parietal regions in the anterior deep periventricular

20            white matter bilaterally."

21  You agree with that, don't you?

22  A    I believe he reached too far on the amount of data

23  present.  No, I -- I couldn't swallow that completely.

24  Q    Where do you disagree?  Is there vascular disease in the

25  brain?

<u>Martino - Cross</u>                    7-51

1  A    There is some vascular disease in the brain as there is in

2  every sixty-some year old brain.

3  Q    So you agree there's evidence of vascular disease,

4  correct?

5  A    There is some evidence.

6  Q    And you agree that's consistent with cerebral ischemia.

7  We just established that, right?

8  A    It could be ischemia, but it may not be.  If somebody

9  wanted to say it was ischemia, I couldn't prove them wrong, and

10  I think it's a legitimate interpretation.

11  Q    Well, do you agree or disagree with the radiologist's

12  reading?

13            MS. STEPHAN:   Objection.

14            MR. WEIDNER:   If he's --

15            MS. STEPHAN:   I think he's answered that.

16            MR. WEIDNER:   I'll withdraw.

17  BY MR. WEIDNER:

18  Q    Is the radiologist right or wrong when he said that?

19            MS. STEPHAN:   I'm going to object, Your Honor.  He's

20  already answered that question.

21            THE COURT:   He has.  You don't need to repeat it.

22  BY MR. WEIDNER:

23  Q    And does ischemia mean decreased blood flow?

24  A    Ischemia means inadequate blood flow for the full

25  metabolic requirements.

<u>Martino - Cross</u>                     7-52

1  Q    And does it -- for the results we've seen of the scans, is

2  there indication as described by the radiologist that it's

3  within the distribution of the middle cerebral arteries

4  bilaterally?

5  A    Well, as you noticed, I said, you know, ischemia has

6  something to do with the metabolic requirements, and the -- and

7  the functional scans that looked at metabolic requirements

8  seemed to show that the blood supply was adequate and meeting

9  the metabolic demands of the brain.  So, you know, looking at

10 it in its totality, I'm not sure I can really agree with the

11 idea that there was significant ischemia.

12 Q    Well, the MRI report you testified to --

13 A    Yes.

14 Q    -- signed by Fisher, M.D., John R., on November 29th,

15 2004, relating to Mr. Boehm says:

16          "Impression:  Small vessel ischemic changes, cerebral

17          white matter."

18 Is that right or wrong?

19 A    I think it's a legitimate interpretation and I -- and I

20 wouldn't disagree with it.

21 Q    And ischemic changes means decreased blood flow, doesn't

22 it?

23 A    Ischemic changes means blood flow not adequate for the

24 metabolic demands of a particular area.

25 Q    And if it's not adequate for the metabolic demands, it has

<u>Martino - Cross</u>                                    7-53

1  an impact on the cells, doesn't it?

2  A    It could, but then again it may not.  Just as the heart

3  has ischemic changes and you have -- and you have pain, it

4  doesn't necessarily mean it destroys tissue.

5  Q    If it does have an impact on the cells and destroys brain

6  cells, do brain cells regenerate?

7  A    Brain cells can regenerate.

8  Q    In the frontal lobes?

9  A    Probably not in the frontal lobe.

10  Q    So in the areas that we're talking about associated with

11  these higher-order cognitive function, if the cells are dead,

12  they're dead, right?

13  A    If they're dead -- if -- yes, then they most likely will

14  not regenerate those particular cells, but other cells can take

15  over.

16  Q    Is that a yes?

17  A    If they're dead, they're dead, yes.

18  Q    And when this radiologist -- this trained radiologist gave

19  his report and said, "Impression:  Small vessel ischemic

20  changes," he's not necessarily talking about small changes,

21  he's talking about the small vessels in that part of the brain

22  that is related to higher-order cognitive function, correct?

23  A    Well, he's referring to small -- to the small vessels.  I

24  mean, that's --

25  Q    Right.

## Martino - Cross                              7-54

1   A     -- that's what he said.

2   Q     All right.  Now as to Dr. Kowell's opinion, which he was

3   kind enough to impart to the Court, he stated:

4                "The vascular changes and findings on the MRI scan of

5                the brain of 11/29/2004" -- that's the one I just

6                read you -- "and the SPECT scan of the brain on

7                1/4/2005, were secondary to the patient's history of

8                hypertension and chronic cocaine abuse."

9   You agree with that, don't you?

10  A     Yeah, I think that's a reasonable conclusion.

11  Q     And in fact, in your own report, and you'll have to excuse

12  me for a second so I can find that report, as of the SPECT scan

13  results, which is the asymmetry of the blood flow of -- on two

14  sides, you opine that you suspected that was attributable to

15  cocaine abuse, didn't you?

16  A     Yes.  I felt it could be, and it's only a theory, due to

17  chemical imbalance created by cocaine abuse.

18  Q     Now -- and that is what you referred as in the area of the

19  basal ganglia?

20  A     That is the area of the basal ganglia, the putamen and

21  globus pallidus.

22  Q     So you admit, don't you, that from the SPECT scans in this

23  case, including the radiologist's report, Dr. Boehm's [sic]

24  opinion and your own opinion, there is evidence --

25                THE COURT:  Excuse me.  Dr. Boehm?

1    MR. WEIDNER:  Excuse me.  My apologies, Your Honor.

2  Let me start again.  Thank you.

3  BY MR. WEIDNER:

4  Q    You admit, don't you, that from the evidence in case -- in

5  this case, including the SPECT scans, Dr. Kowell's opinion, and

6  your own opinion, that there's evidence in the SPECT scans of

7  asymmetric blood flow in the -- as of the basal ganglia?

8  A    Asymmetric I would agree to.

9  Q    And -- but you refer to that physical evidence in your

10  report by saying that the basal ganglia is not directly

11  involved in cognitive function, right?

12  A    Those particular parts of the basal ganglia.

13  Q    That's your explanation as to why you don't think that the

14  physical evidence of some abnormality in the basal ganglia may

15  have impacted cognitive function.  That's a fair statement,

16  isn't it?

17  A    Well, I -- I -- I -- I don't know.  I think it would be --

18  if you're trying to characterize my opinion, I don't think it

19  would be a fair characterization.

20  Q    Well, let's go to what you said.  You have your report

21  there?

22  A    Yes, I do.

23  Q    You see your signature?  Right?

24  A    Yes.

25  Q    Take the time.  It's okay.  You signed it, right?

Martino - Cross                           7-56

1   A    Yes.

2   Q    You meant it, right?

3   A    Yes.

4           MS. STEPHAN:  I'm just going to object, Your Honor.

5   BY MR. WEIDNER:

6   Q    And you say there:

7           "There was an asymmetry of activation of his basal

8           ganglia on SPECT."

9   You agree with that, right?

10  A    Yes.

11  Q    And you say:

12          "I am uncertain as to the clinical significance of

13          this finding."

14  Right?

15  A    Yes.

16  Q    So you're not sure what that means, right?

17  A    That's correct.

18  Q    But you say you suspect -- that is:

19          "I suspect" -- that's you -- "it represents a

20          biochemical imbalance in the basal ganglia induced by

21          long-term cocaine use."

22  Correct?

23  A    Yes.

24  Q    And then you go on to say:

25          "The basal ganglia, however, are not directly

Martino - Cross                                    7-57

1       involved in cognition."

2   A    The basal ganglia as involved in that scan.

3   Q    Well, do you say in your report the basal ganglia as

4   involved in that scan, however, are not directly involved in

5   cognition?

6   A    Well, when clinical neurologists refer to basal ganglia,

7   they're referring to the putamen and globus pallidus.  However,

8   anatomically, the caudate is a part of the basal ganglia;

9   however, the caudate was not involved in this finding.

10  Q    Which part was involved in this finding?

11  A    I believe the putamen and the globus pallidus most likely.

12  Q    And you've read the article entitled "The frontal cortex

13  and the control of behavior"?

14  A    Which article?

15          MR. WEIDNER:  May I approach the witness?

16          THE COURT:  You may.  Is that a chapter rather than

17  an article?

18          MR. WEIDNER:  No, it's -- it's a -- it's marked, Your

19  Honor, as an exhibit.  I --

20          THE COURT:  No, no.  I'm just asking you if that's

21  the one that says chapter two?

22          MR. WEIDNER:  Yes.

23          THE COURT:  Thank you.

24  BY MR. WEIDNER:

25  Q    "Frontal cortex and the control of behavior."

1  | A    I haven't read that chapter.

2  | Q    So the prosecutors in this case gave you some articles

3  | from the defense experts?

4  | A    Yes.

5  | Q    They didn't give you this?

6  | A    No.

7  | Q    Are you familiar with Bradshaw, "<u>Developmental disorders</u>

8  | <u>of the frontostriatal system</u>," Philadelphia, from the

9  | Philadelphia Press?

10 | A    No, I haven't read it.

11 | Q    Okay.  Well, didn't -- let me ask you this then.  Would

12 | you agree or disagree that:

13 |             "There has been an association within the frontal

14 |             regions and higher intellectual functions and it was

15 |             hinted at by the Greeks and Romans two thousand or

16 |             more years ago"?

17 | A    I wouldn't know what the Greeks and the Romans thought

18 | about it two thousand years ago.

19 | Q    How about in the 14th Century?  Did you know there was --

20 | there's a description of the clin -- the clinical sequillae for

21 | the frontal damage?

22 |             MS. STEPHAN:  I'm just going to object to pieces of

23 | this article that he didn't read.

24 |             THE COURT:  Well, not only that, but I really don't

25 | care what they thought

<u>Martino - Cross</u>                              7-59

1              THE WITNESS:  All right.  Well, let --

2              THE COURT:  -- fourteen hundred years ago, Mr.

3  Weidner.

4              MR. WEIDNER:  All right.

5  BY MR. WEIDNER:

6  Q     Do you agree or disagree that there is -- there is

7  documentation in the literature as to disorders of the

8  frontostriatal system, that there are three circuits described

9  as the doro -- dorsolateral prefrontal cortical circuit, the

10  lateral orbital frontocortical circuit, and the anterior

11  cingulet circuit that relate to executive cognitive function?

12  And they are -- they are treated as circuits that go through

13  the basal ganglia?

14              MS. STEPHAN:  Your Honor, I'm just going to object on

15  twofold.  One, again, if he's referring to anything taken from

16  the literature itself, I would object to that, unless that's a

17  question about the underlying (indiscernible - simultaneous

18  speakers) --

19              MR. WEIDNER:  I'll rephrase.

20              MS. STEPHAN:  -- I can't object to that.

21              THE COURT:  It would help -- all right.  It would

22  help if you kept that to a single inquiry.  You really had

23  two --

24              MR. WEIDNER:  All right.  I will, Your Honor.  I'll

25  slow down a bit and break it down then.

1   BY MR. WEIDNER:

2   Q    Do you know what the dorsolateral prefrontal cortical

3   circuit is?

4   A    It's referring to a fiber bundle in the frontal part of

5   the brain -- prefrontal part of the brain.

6   Q    The part of the brain that's involved with cognitive

7   function and executive function.

8   A    Yes, it is.

9   Q    Judgment?

10  A    They're a part of executive function.

11  Q    Generating organizational strategies?

12  A    Part of executive function.

13  Q    Retrieving memory?

14  A    Some types of memory is a function of executive function.

15  Q    Supervising people?

16  A    Yes.

17  Q    Acting as a leader?

18  A    Generally, leaders have good executive function.

19  Q    All right.  Okay.  And does the dorsolateral prefrontal

20  cortical circuit involve neurotransmissions through the basal

21  ganglia?

22  A    Well, the -- it -- it -- there are probably some

23  neurotransmission, but I'm not sure as to what kind because

24  neurotransmission goes both ways.  I'd have to read the article

25  to fully analyze, you know, 'cause -- 'cause you see basal

## Martino - Cross                                     7-61

1   ganglia get input from many, many parts of the brain, but the

2   -- the output is -- is what's most involved with the executive

3   function, usually of a caudate -- you know, from the caudate

4   nucleus.  So -- so, yeah, I'm sure the basal ganglia get input

5   from every single part of the brain.

6   Q    And is there a feedback loop back from the basal ganglia

7   back to the start of the portions of the frontal cortex that

8   involve this executive function?

9   A    There are feedback loops, yes.

10  Q    And as to the lateral orbital frontal cortical circuit, is

11  your answer the same?

12  A    There are feedback loops.

13  Q    And as to the anterior cingulet circuit, is your answer

14  the same?

15  A    Anterior cingulet circuit is considered a part of the

16  prefrontal executive area, yeah.

17  Q    So the anterior cingulet circuit has impact on cognitive

18  function, right?

19  A    Oh, yes.

20  Q    Executive function.

21  A    Sure.

22  Q    Planning, organization, leadership, things of that nature,

23  right?

24  A    Yes.

25  Q    And your answer's the same as to the lateral orbital

Martino - Cross                                    7-62

1   frontal cortical circuit, right?

2   A     They all have some influence.

3   Q     All right.  Now -- and they're all feedback loops, right?

4   A     Generally, most -- most loops in the brain are feedback

5   loops of some sort.

6   Q     And -- and when there's -- when there -- and they -- and

7   they go through the basal ganglia, right?

8   A     They may go through them, yes.

9   Q     When there's damage to the basal ganglia, what's the

10  impact on the feedback loops?  How does it work?

11  A     Well, it depends on what part of the basal ganglia we're

12  talking about, but when there's damage to the caudate, there's

13  impact on executive functioning.  When there's damage to the

14  putamen and globus pallidus, there is no significant impact.

15  Q     Well, it goes through those areas of the brain, doesn't

16  it?

17  A     Well, it -- it may or may not, I'm just telling you what

18  the clinical experience is.

19  Q     Well, if in fact these loops as described in the

20  literature and the literature is right, go through those last

21  two areas you described of the basal ganglia, they're part of

22  the feedback.

23  A     Mm-hmm (affirmative).

24  Q     What happens when those areas are damaged?

25        MS. STEPHAN:  I'm going to object, Your Honor.

Martino - Cross                                7-63

1  Again, he's referring everything back to the literature and

2  that's described in the literature --

3            MR. WEIDNER:  I'll rephrase.

4  BY MR. WEIDNER:

5  Q    If in fact, sir -- or give me those last two words you

6  used, so we're clear that we're talking about the same thing.

7  You said it's not the caudate, what -- what -- what -- what did

8  you just say?

9  A    Said that the clinical literature indicates --

10 Q    No.

11 A    Well, okaý.  You'll have to have somebody read it back to

12 me then.

13            THE COURT:  Could you just put another another

14 question --

15            MR. WEIDNER:  All right.

16            THE COURT:  -- Mr. Weidner?

17 BY MR. WEIDNER:

18 Q    What three areas of the basal ganglia are you referring

19 to?

20 A    Referring to when?

21 Q    What --

22            THE COURT:  Mr. Weidner, you know, I -- I hesitate to

23 interrupt when you're sort of in mid-questioning here, but --

24            MR. WEIDNER:  Can I just --

25            THE COURT:  -- that clock is slow.  It's now --

1          MR. WEIDNER:  Okay.  Can I get one -- one question

2     in?

3          THE COURT:  Oh, you can.  It was my -- it sounded

4     like you were about to embark on a series, that's why I

5     interrupted you.  But if you have only one question and it

6     makes sense to quit after that question, put it.

7     BY MR. WEIDNER:

8     Q    Okay.  If the globus pallidus is involved in those

9     feedback loops --

10    A    Yes.

11    Q    -- and there's damage to that area, how does it impact

12    those feedback loops in the executive function?

13    A    Well --

14    Q    If you know.

15    A    -- according to Jeffrey Cummings' book on the frontal

16    lobes, he clearly states that when there's damage to the globus

17    pallidus and putamen, there is no significant impact on

18    executive functioning.

19    Q    And what's that text you just cited?

20         MR. WEIDNER:  I'm sorry, Your Honor.  One extra

21    question.  Can I get the text?

22    A    Jeffrey Cummings.  He wrote a book on the frontal lobes.

23    BY MR. WEIDNER:

24    Q    When?

25    A    I don't know.  A year or two.

<u>Martino - Cross</u>                              7-65

1  Q    Okay.  Do you have that here or anything?

2  A    No, I don't.

3         MR. WEIDNER:  Okay.  And we need to take a break.

4         THE COURT:  Yes, we do.  We'll take a luncheon recess

5  at this time.  We'll begin back here in the courtroom at 1:30

6  this afternoon.  See you all later.  We're adjourned.

7         THE CLERK:  All rise.  This matter now stands in

8  recess until 1:30.

9         (Recess at 12:02 p.m., until 1:32 p.m.)

10         THE CLERK:  All rise.  His Honor the Court, this

11  United States District Court is again in session.  Please be

12  seated.

13         THE COURT:  Good afternoon.  Is Dr. Martino here?

14         MS. STEPHAN:  He's coming, Your Honor.  As a

15  preliminary matter, if I could just address one matter?

16         THE COURT:  Yes.

17         MS. STEPHAN:  We just want to ensure that the experts

18  who I'm assuming are still on line to listen to Dr. Martino's

19  testimony aren't recording the testimony.  We've heard some

20  clicks, we're not sure what they represent, but we just want to

21  make that caution.

22         THE COURT:  Do you know, Mr. Weidner?

23         MR. WEIDNER:  I don't think they are.  I have no

24  reason to believe they are, Your Honor.  We can address them

25  and make sure they're not.  I have no reason to believe that

<u>Martino - Cross</u>                    7-66

1    anyone's recording this.

2           THE COURT:  Let me inquire.  Is anyone on the

3    telephone recording these proceedings?

4           THE CLERK:  They have not called in yet.

5           THE COURT:  Oh, they're not on the line yet.

6           MS. STEPHAN:  Oh.

7           MR. WEIDNER:  All right.

8           THE COURT:  Well, we can't wait for them.  When they

9    call in, we'll hook them up.  We need to proceed.  Dr. Martino,

10   you recall you're giving testimony under oath, sir?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  All right.  Mr. Weidner?

13                 **CROSS-EXAMINATION CONTINUED**

14   BY MR. WEIDNER:

15   Q    Good afternoon, Doctor.

16   A    Good afternoon.

17   Q    Doctor, your contact with Mr. Boehm was on -- on the --

18   what date?

19   A    February 14 of this year.

20   Q    And it's your understanding that he was arrested in

21   December of 2003?

22   A    In December, yes.

23   Q    Right.  So between December of 2003 and December of 2004,

24   we have twelve months?

25   A    Approximately.

1  Q    And then we go to Jan -- so you -- you -- you didn't see

2  him until fourteen months after he'd been arrested?

3  A    That's correct.

4  Q    And it's your understanding that during this fourteen

5  months he was incarcerated?

6  A    Yes.

7  Q    And it's your understanding, and you have no evidence to

8  the contrary, that during those fourteen months, he was

9  basically detoxing, in the sense he was not ingesting cocaine?

10  A    That would be my assumption.

11  Q    So your observations as to his mental capacity were made

12  some fourteen months after the time period where you have

13  information to the effect that he was actually using cocaine?

14  A    Yes.

15  Q    Now concerning the subject of use of cocaine, cocaine is

16  toxic to the body, is it not?

17  A    Yes.

18  Q    And it has a toxic impact on the brain?

19  A    Yes.

20  Q    And it actually has a significant impact on the dopamine

21  in the brain, does it not?

22  A    Yes.

23  Q    And dopamine is one of the neurotransmitters that's

24  important for cognitive function in the brain?

25  A    Cognitive and motor functioning, yes.

1   Q    Right.  Okay.  So if someone is using a significant amount

2   of cocaine at a particular time, it's having an actual direct

3   impact on the dopamine and on the cognitive function of the

4   brain?

5   A    It manipulates the dopamine system, yes.

6   Q    Right.  And in can actually -- cocaine actually can -- is

7   a vascular constrictant, is it not?

8   A    Yes.

9   Q    So it can cause brain damage just by constricting the

10  blood supply to areas of the brain?

11  A    Yes, it can.

12  Q    And that can also -- well, what are the other ways it can

13  cause damage to the brain other than constricting the blood

14  supply to the brain?

15  A    Well, there's some theories that it makes the lining of

16  the vessels dysfunction in some way, making them more readily

17  susceptible to clot.  So it can cause strokes actually through

18  clotting in the blood vessels.

19  Q    All right.  And in terms of impact on the brain, I want to

20  focus on cocaine's impact on the brain at the time that

21  someone's under the influence of it, as opposed to damage from

22  it.  Are you with me?

23  A    I am.

24  Q    All right.  You said that -- something about sometimes

25  they give fighter pilots stimulants to help them in their

1 mission?

2 A    Yes.

3 Q    You don't mean -- and I know you don't, but just so we're

4 clear, you don't mean to imply that they would give fighter

5 pilots significant amounts of cocaine to help them on their

6 mission.

7 A    No.   Usually, they use amphetamine.

8 Q    Right.   And at what dosage level?

9 A    As you would use it clinically, maybe ten milligrams or

10 so.

11 Q    A fairly small -- fairly small dose?

12 A    Yes.

13 Q    All right.   At a level of a gram a day of cocaine use, can

14 that have an impact on one's cognitive function?

15 A    I would think so.

16 Q    And by cognitive function, so we're clear, 'cause I don't

17 want to miscommunicate with you, Doctor, and I appreciate your

18 help here, I'm talking about -- I'm focusing on the executive

19 function frontal lobes of the brain, all right?

20 A    Yes.

21 Q    All right.   So a gram a day of cocaine could certainly

22 have a pretty substantial impact on one's cognitive or

23 executive function.

24 A    Yes.

25 Q    And especially if it was a gram a day for a long time,

Martino - Cross                                    7-70

1   right?

2   A    Yes.

3   Q    And so obviously then five grams a day would have a really

4   significant impact.

5   A    Yes, it would affect it.

6   Q    Right.  And I'm not giving you a math test, but -- and you

7   probably know, but how many grams are there in an ounce?

8   A    I don't know.

9   Q    Okay.  All right.  Fair enough.  Well, assuming there's

10  twenty-eight grams in an ounce, fourteen grams a day would

11  really have a pretty big impact on someone's executive

12  function, wouldn't it?

13  A    Have an effect on the brain, sure.

14  Q    Sure.  I mean, it's be pretty hard for someone to function

15  and exert their executive functions if they were using fourteen

16  grams of cocaine a day?

17  A    Yes.  Your brain function would be impaired.

18  Q    Impaired?

19  A    Yes.

20  Q    And it'd be -- it's fair to say it'd be pretty

21  substantially impaired, right?

22  A    Sure, I imagine so, right?

23  Q    All right.  And have you ever treated anyone in your

24  practice that was using fourteen grams of cocaine a day?

25  A    Not for long durations of time.

## Martino - Cross

1  Q    Right.  Okay.  How about twenty-eight grams a day, an

2  ounce of cocaine a day?  That would be pretty amazing, wouldn't

3  it?

4  A    That's a lot.

5  Q    It would pretty much blow out somebody's executive

6  functions, wouldn't it?

7  A    What was the term you used?

8  Q    I'll rephrase it.  It would really have a pretty dramatic

9  impact on one's executive functioning, wouldn't it?

10  A    Yes.

11  Q    And it'd be pretty hard for somebody to really be an

12  effective leader or manager or organizer or supervisor if they

13  were under the influence of an ounce of cocaine a day, isn't

14  that true?

15  A    While they're acutely intoxicated, I would think that

16  would be true.

17  Q    All right.  Do you know -- and I saw your notes, but do

18  you actually know what the testimony is as to how much cocaine

19  Mr. Boehm was ingesting each day and for how long during the

20  period of these alleged offenses?

21  A    No.

22  Q    The prosecution hasn't told you?

23  A    No.

24  Q    So as a part of you forming your opinion in this case when

25  you told the judge that Mr. Boehm was acting as a leader, no