## Martino - Cross                                        7-72

1  one gave you any information as to how much cocaine he was

2  actually using?

3  A    Well, I formed my opinion around the behaviors which he

4  could easily generate during that period of time, regardless of

5  how much cocaine he may have used the night before, he still

6  managed to get two people out of town with reasonably placed

7  airline tickets the next day.

8  Q    Okay.  We'll get --

9  A    That's what I formed my opinion around.

10 Q    Okay.  We'll get to that (indiscernible).  My question to

11 you isn't that.  I'd really appreciate it if you'd answer it.

12 As a part of your opinion to the effect that Mr. Boehm

13 supposedly was a leader or manager or organizer or supervisor,

14 did anyone tell you how much cocaine he was actually using

15 during the periods in question?

16 A    Well, three to five thousand dollars a day worth at one

17 point.

18 Q    Okay.  And if that's an ounce a day, that would have had a

19 significant impact, as you just told us under oath, on his

20 cognitive function, wouldn't it?

21 A    Sure.

22 Q    And now do you know what the delivery time is when one is

23 smoking crack cocaine between the time you smoke and the time

24 it gets to your brain?

25 A    I would say within seconds -- it'd be measured in seconds.

1  Q    Right.  And what's the half life -- how long does it last?

2  Is it about five or ten minutes?

3  A    They -- the euphoria lasts about five or ten minutes.

4  Q    Right.  So basically, you get into a situation where if

5  you got the supply, you just keep hitting the pipe about every

6  five or ten minutes?

7  A    Yes, if you had the -- the cocaine.

8  Q    So if someone's on a week run using an ounce of cocaine a

9  day --

10  A    Mm-hmm (affirmative).

11  Q    -- they're using a gram every hour or so?  You can assume

12  that twenty-eight grams an ounce, it's okay.

13  A    Okay.  I'll -- I'll take your word for that then.

14  Q    I'm not going to trick you, Doctor.  That's okay.  All

15  right.  So about a gram every hour?

16  A    Mm-hmm (affirmative).

17  Q    'Kay.  Now does sleep deprivation have an impact on one's

18  cognitive functions in terms of their executive ability?

19  A    Yes.

20  Q    'Kay.  And even going without sleep for twenty-four hours,

21  somebody could probably still function, couldn't they?

22  A    I have, yeah.

23  Q    Right.  How about a week?

24  A    Well, I think that would be difficult.

25  Q    Right.  Now in terms of the brain, when a person gets

## Martino - Cross                              7-74

1  knocked out -- knocked unconscious, what happens to the brain?

2  Why do they become unconscious?

3  A    Well, you'll have to tell me in what manner were they

4  knocked out?

5  Q    Hit over the head.

6  A    Hit over the head.

7  Q    Right.

8  A    Well, that's an interesting question, which -- the answer

9  to that is not perfectly clear, but -- but one of the dominant

10  ideas is that the -- there may be actually torsion of the brain

11  stem --

12  Q    Mm-hmm (affirmative).

13  A    -- which temporarily disables the body's basic -- you

14  know, basic functions.  In other words, your heart rate falls

15  and the excitatory stimulus to the upper centers of the brain

16  are cut off, and the individual loses consciousness.

17  Q    'Kay.  I'm sure you're familiar with what's referred to as

18  closed-head injury?

19  A    Yes.

20  Q    Closed-head brain injury, I'm talking about.  Right.

21  A    TBI.

22  Q    Right.  Yeah, and that's where someone has an impact of

23  their head, it injures their brain, but there's no actual wound

24  to the head in terms of breaking -- breaking into the cranial

25  area, correct?

<u>Martino - Cross</u>                          7-75

1  A    Right.  Closed-head injury implies there's no penetration
2  of the skull.
3  Q    Now you're aware of the fact that Mr. Boehm has had at
4  least four instances in his life of loss of consciousness due
5  to head injury?
6  A    Yes, I am.
7  Q    And did you refer to those in your report or not?
8  A    I believe I did.
9  Q    All right.  And can a closed-head brain injury lead to
10  permanent impairment -- cognitive impairment?
11  A    Yes, absolutely.
12  Q    And if you get closed-head brain injury, is it always
13  observable on the types of films that were taken in this case?
14  A    No.
15  Q    So Mr. Boehm then may well -- let's assume for a moment
16  then that as to Dr. Budding's testing, which you've told me you
17  haven't -- don't have any reason to quarrel with, I believe.
18  If that shows actual cognitive dysfunction in the cortical
19  regions as to executive function, could some of that be from
20  closed-head injury from his prior injuries?
21  A    Yes.  I believe the -- it's possible that the defendant's
22  neuropsychological testing would have been identical at age
23  twenty as it is now.
24  Q    All right.  Well, how about when he got hit over the head
25  by the people that were brought around by the co-defendants in

## Martino - Cross                                    7-76

1  this case and they knocked him out?  Was that at age twenty?

2          MS. STEPHAN:  Your Honor, I'm just going to object.

3  I'm not so sure --

4          MR. WEIDNER:  Let me rephrase.

5  BY MR. WEIDNER:

6  Q    Are you aware of testimony in this case by S.P. that they

7  would bring people that weren't regulars around and hit him

8  over the head, knocking him unconscious?

9  A    I'm not aware of that testimony.

10  Q    No one told you about that.

11                              (Pause)

12  The prosecution didn't tell you about that?

13          MS. STEPHAN:  I'm just going to object.  I don't

14  necessarily think that characterizes what was said in court.

15          THE COURT:  Well --

16          MS. STEPHAN:  (Indiscernible - microphone

17  interference) records to review himself.

18          THE COURT:  -- the point is he's not aware of it.

19          MR. WEIDNER:  All right.

20          THE COURT:  That's enough.  You don't need to pursue

21  the matter.

22  BY MR. WEIDNER:

23  Q    Well, let me explore that for a moment, then.  You

24  testified on -- on direct examination that the prosecution had

25  given you three transcripts from S.P.?

Martino - Cross                              7-77

1   A    Yes.

2   Q    Which three?

3   A    The two interviews by Mr. Shirtlieff --

4   Q    Mm-hmm (affirmative).

5   A    -- and grand jury testimony.

6   Q    Okay.  Did you know that there were other statements of

7   S.P. that were recorded and transcribed in this case?

8   A    Well, how -- how would I be aware of that?  I mean, I -- I

9   told you the three sources I have on S.P.

10  Q    But in any event, so you don't recall knowing that S.P.

11  said that people would actually knock him unconscious by

12  hitting him over the head?

13  A    I -- I -- I --

14            MS. STEPHAN:  Your Honor, can I just -- can he give

15  us the date of what transcripts he's referring to, what page,

16  so we know what he's quoting from?

17            MR. WEIDNER:  It was read yesterday, Your Honor.

18  I'll find it.

19                          (Pause)

20  (Indiscernible - away from microphone.)  It'll take me a

21  moment, Your Honor.  I can find it and come back to it.  I

22  don't -- (indiscernible - away from microphone), but --

23                          (Pause)

24  Actually, can I have just a moment?  (Indiscernible - away from

25  microphone) find it, the reference to that (indiscernible -

<u>Martino - Cross</u>                           7-78

1  away from microphone).

2                          (Pause)

3  Yes.  Your Honor, it's September 30th, 2004.  It's a recorded

4  interview of S.P. taken by Mr. Shirtlieff.

5  BY MR. WEIDNER:

6  Q    Was that one of the ones you reviewed?

7  A    Yes, I -- I guess I don't recall that testimony -- or not

8  testimony, but --

9           MR. WEIDNER:  Right.  Well, let me read you this.

10  Page sixty-two, counsel.

11  Question: "Well, that -- no, that's true.  You can only stay up

12           so long, but this guy" --

13  May I approach the witness, Your Honor?

14           THE COURT:  You may.

15           MR. WEIDNER:  I'll be glad to show it to you, sir --

16  A    Sure.

17           MR. WEIDNER:  -- so you can see what I'm reading.

18  BY MR. WEIDNER:

19  Q    Question: "Well, you know that's true.  You can only stay

20           up so long, but this guy -- I mean, they were

21           robbing him every day.  I mean, they had to

22           knock him out.  They had to either get him so

23           loaded that they could rob him and knock him

24           out.

25  Answer -- this is by S.P.  See, it's recorded interview --

<u>Martino - Cross</u>                                    7-79

1  A    Mm-hmm (affirmative).

2  Q    -- of S.P.?

3           "A lot of the time they'd have people who weren't

4           regulars or whatever come over and hit him over the

5           head.  It was sad, I mean --"

6  Question: "Do you know he was in control of all that?"

7  Answer:   "No way."

8  Question: "I mean, actually he could have had control if he

9           wasn't, but he just let people walk all over him?"

10 Answer:   "Getting high."

11 Do you see that?

12 A    Yes, I did.

13 Q    Now if somebody -- and they said a lot of -- she said a

14 lot of times?  Not just once, a lot of times?

15 A    Yes.

16 Q    What would that do if they were having people repeatedly

17 come over, hitting him over the head, and knocking him out?

18 What would that do to his brain?

19 A    Well, it could -- it could damage it, sure.

20 Q    All right.  Now you told His Honor that on this day some

21 fourteen months after he was arrested when you met Mr. Boehm,

22 that he had pretty good facial features or pretty good facial

23 look to him?

24 A    I felt his face was animated, yes.

25 Q    Right.  Didn't have a flat affect?

<u>Martino - Cross</u>                                    7-80

1   A    He -- I said in my report, he rarely laughed --

2   Q    Right.

3   A    -- but otherwise he was animated.

4            MR. WEIDNER:  Yeah, right.  May I approach the

5   witness, Your Honor?

6            THE COURT:  You may.

7            MR. WEIDNER:  Let me show you what's been marked as

8   Defendant's Exhibit A and D.

9            THE COURT:  I'm familiar with them.

10  BY MR. WEIDNER:

11  Q    Does he look animated in those photographs?

12  A    Well, it's a still photograph.

13  Q    Well, all right.  Does he -- does he appear to have a flat

14  affect?

15  A    You couldn't tell anything from a photograph.

16  Q    All right.  You can't tell anything at all from looking at

17  that photograph?

18  A    I -- I -- I mean, the place is a mess, but --

19  Q    All right.

20  A    -- I can't tell whether there's a flat affect 'cause it's

21  catching him at a moment in time.  He isn't smiling, I can say

22  that much.

23  Q    All right.  Going back to the subject of the impact of

24  cocaine on a person, what pleasure area of the brain does the

25  cocaine impact?

1  A    Well, it probably impacts the anterior dopaminergic

2  systems, the frontal systems.

3  Q    What specific part of the brain?

4  A    Well, the -- the striatal frontal tracts, at least in

5  part.  And it -- and it affects the motor part of the brain,

6  which is the basal ganglia, the dopamine tracts.

7  Q    Do you know what pleasure center of the brain cocaine

8  impacts, Doctor, or not?  It's okay if you don't, I'm just

9  trying to find out.

10  A    My impression, it was always the frontal -- primarily

11  frontal area.

12  Q    Where in the frontal area?  It's okay if you don't know, I

13  just want to know.

14  A    I'm not sure.

15  Q    Okay.  It's all right.  It's all right to say you don't

16  know.

17  A    Well, I don't know how specific an answer you want.

18  Q    Okay.  So you don't really understand the physiological

19  mechanism of cocaine on a particular part of the brain as to

20  its addictive mechanism?

21  A    As to what kind of mechanism?

22  Q    It's addiction mechanism.  The way it causes --

23  A    Well, it affects the reward -- the reward system of the

24  brain.  It reinforces the reward system of the brain and has a

25  very potent affect on the brain's reward system which is a

_Martino - Cross_                                    7-82

1  dopaminergic system primarily.

2  Q    But in terms of the dopamine impact on certain synapses of

3  the nerves, do you know which portions of the frontal part of

4  the brain it's actually impacting?

5  A    Well, I think the accumbens nucleus is -- is greatly

6  involved in it.

7  Q    You mentioned that you had been provided some statements

8  of S.P., and you indicated -- you gave your opinion about her

9  being naive like a child, right?

10 A    About certain issues.

11 Q    Right.  You recognize, do you not, that a child is a

12 competent witness in a court of law if they can recall and

13 relate?

14 A    Of course.

15 Q    And for instance, her observations, assuming she tells the

16 truth, that they were repeatedly hitting Mr. Boehm over the

17 head and knocking him out, that wouldn't be an example of her

18 being naive and not being competent, would it?

19 A    I -- I would say that that would not be an example of her

20 being naive.

21 Q    And you wouldn't have any reason to distrust her now that

22 you see that she said that they were repeating -- knock --

23 knocking Mr. Boehm out, would you?

24 A    I'm skeptical about that observation, but I don't know

25 what else I can say.

## Martino - Cross                                           7-83

1 Q    Did you read the part of her statement where she said that

2 they were putting things in Mr. Boehm's milk and his food, and

3 one occasion she ate something and she started talking to a

4 weight-lifting set and thought she was seeing aliens?

5 A    I remember she said that she thought they were putting

6 things in the food and Mr. Shirtlieff said did you ever see

7 them do it?  And she said no.

8 Q    Would you be kind enough to answer my question, sir?  Do

9 you remember --

10          MS. STEPHAN:  I'm going to object, Your Honor.

11          MR. WEIDNER:  I'll withdraw and rephrase.

12 BY MR. WEIDNER:

13 Q    Did you -- did you see the portion of her statement where

14 she said that she had ingested --

15 A    Mm-hmm (affirmative).

16 Q    -- some of the drink or food and she started talking to a

17 weight-lifting set and thought she was seeing aliens?

18 A    I think I did see that where she said she was

19 hallucinating.

20 Q    All right.  Do you think she was being naive in recalling

21 that memory?

22 A    I -- I do not think that the recollection of the memory is

23 naive, no.

24 Q    Now concerning the subject of this -- this trip to

25 Seattle.  You put a lot of emphasis on that in your opinion

1  that Mr. Boehm was some type of organizer or leader, right?

2  A    No, not a lot of emphasis.  I think I put more emphasis on

3  other things, but that was one example.

4  Q    All right.  Well, did you give it as an example to the

5  Court, right?

6  A    Yes, I did.

7  Q    All right.  Do you know how Mr. Burnett described the

8  purpose of that trip, as to whether it was because Kathleen

9  wanted to basically get away and go to Seattle?

10 A    I'm afraid I didn't catch the question in that.  Could you

11 repeat that, please?

12 Q    Well, let me read you page thirteen of a transcript of

13 Kathleen's -- I'm going to call her Kathleen P.

14 A    Mm-hmm (affirmative).

15 Q    You know know I'm speaking of, right?

16 A    Yes.

17 Q    And it said:

18 Question: "Did Joe -- was it Joe's idea to send them to Seattle

19             or was it their idea?  Did Joe tell you?"

20 Answer:    "Well, the only time that I actually sat them down

21             and talked to Kathleen, it was Joe -- Joe's idea to

22             send them to Seattle first.  Kathleen did say that

23             she wanted to go to Seattle to get away from her

24             situation.  That was later."

25 Do you recall that?

## Martino - Cross                                    7-85

1  A    I think I read it.

2  Q    All right.  Now what specific statement do you maintain

3  there is that Kathleen was actually calling AIH as opposed to

4  calling Mr. Boehm?

5  A    I believe, and I don't exactly know where I read it or

6  heard it, but there was some controversy about a trailer that

7  she said was ruined, and she called AIH about it.

8  Q    Okay.  Well, there was a question asked of S.P. at the

9  grand jury, and here was the testimony -- question by Mr.

10 Russo:

11          "Salley, you said you went to Seattle.  Now was your

12          Mom also calling the authorities on Joe and calling

13          AIH about Joe?"

14 Answer:  "Honestly, I don't know."

15 A    She didn't know.

16 Q    And as a part of that same exchange, the answer was given

17 -- question by the grand juror:

18          "He was nice to you?"

19 Answer:  "Yeah, he was.  He was very res -- like not

20          respectful, but he had a good heart.  Behind all the

21          drugs and all the things that were going around, he

22          did, he had a good heart.  He was the one that paid

23          for me and my Mom to move to Seattle and get away

24          from everything because he knew if I stayed up there"

25          -- or -- "stayed up here, I was going to die real

<u>Martino - Cross</u>                                      7-86

1        soon, whether it be another seizure or be to Bambi

2        because I -- Bambi didn't like me towards the end."

3   Do you recall that testimony?

4   A    I think that's part of her naivete concerning some of

5   these issues.

6   Q    All right.  You have to excuse me if I skip around a

7   little bit, Doctor, but I want to go just back for a second to

8   some of your neurological findings.  You said you referred to

9   Dr. Hope's report in Seattle?

10  A    Hope?  Yes.

11  Q    Right.  Now Dr. Hope is not a neurological psychologist,

12  is she?

13  A    She's not a neuropsychol -- psychologist, no.

14  Q    Right.  And she did not conduct a complete neurological

15  psychological evaluation of Mr. Boehm, did -- did she?  She did

16  some tests, but not a complete battery of tests.

17  A    Well, I mean, people may differ on what's a complete

18  battery, but -- but she didn't do some of the things that Dr.

19  Budding did.

20  Q    But Mr. Boehm was seen by an actual nur -- a nur --

21  another doctor in Seattle for a neurological evaluation?

22  A    Not that I'm -- well, I'm unaware of him --

23            THE COURT:  Mr. Weidner, Seattle may be the wrong

24  location.

25            MR. WEIDNER:  I'm sorry.  My -- yeah, thank you.

Martino - Cross                              7-87

1   A    In California.  I understand.

2   BY MR. WEIDNER:

3   Q    Los -- Los -- yeah, MDC in Los Angeles.

4   A    Yes, in Los Angeles.

5   Q    Right.

6   A    I was unaware that he saw a neurologist.

7   Q    Let me show you a copy of Exhibit N.  This has been

8   admitted in this case.

9                              (Pause)

10  I'll represent to you that this is a part of the medical

11  records that came back from the MDC evaluation.

12  A    Mm-hmm (affirmative).

13  Q    There's a reference at the bottom to a Babinski sign being

14  positive?

15  A    Yes.

16  Q    And what's the Babinski sign?

17  A    A Babinski sign is when you stimulate the sole of the foot

18  and the toe goes upwards.

19  Q    And what's that indicative of?

20  A    That's indicative of damage to some part of the motor

21  system.

22  Q    To the brain.

23  A    No, it could be in the spinal cord, it doesn't have to be

24  in the brain.

25  Q    All right.  All right.

1  A    Well, there's -- there's a difference.

2  Q    That's fine.  All right, that's fair enough.  But there's

3  an indication here then when he was examined by a neurologist

4  at the MDC that there was a positive Babinski sign?

5  A    Well, excuse me.  I don't see any evidence in here that

6  this man's a neurologist.  It says Clinical Director, MDC Los

7  Angeles.  I doubt a neurologist is going to be the clinical

8  director of that facility.

9  Q    All right.

10 A    But I -- you know, so I wouldn't -- I can't take your word

11 on it that he's a neurologist 'cause I doubt that he is.

12 Q    All right.  All right.  I'll rephrase.  When he was

13 examined and the clinical director in the MDC, this Dr.

14 Sinovinski (ph) examined him, there was an indication of a

15 positive Babinski sign, correct?

16 A    It said he found a Babinski.

17 Q    All right.  And are you aware of the fact that Dr.

18 Mittelberger, who's also an M.D., when he examined Mr. Boehm,

19 found a positive Babinski sign?

20 A    I think I'm aware of that.

21 Q    And if in fact those doctors were qualified doctors and

22 they found a Babinski sign, would that indicate to you that

23 there was some, except your testimony, damage in either his

24 brain or his spinal cord?

25 A    It's -- it's possible.  Many non-neurologists mistake

1   withdrawal for Babinski, but in fairness to them, Babinskies

2   can come and go; you can have them one day and not the next.

3   Q    All right.  And now he describes on 9/23/04 -- and I

4   always have a hard time reading my own writing and certainly

5   doctors' writing, but it says:

6             "A sixty-year-old white male, history of episodes of

7             slurred speech and report disorder associated with

8             weakness.  First episode three years ago, last ten

9             days ago.  These are associated with" -- it's kind of

10            written over here had something -- "and generalized

11            weakness."

12  Do you see that?

13  A    Yes.

14  Q    What do -- what are those symptoms consistent with?

15                          (Pause)

16  Slurred speech, memory disorder, generalized weakness, what are

17  they consistent with?

18  A    Well, I -- I think this individual interpreted them as

19  possible TIA's.

20  Q    And what is a TIA?

21  A    A Transient Ischemic Attack --

22  Q    'Kay.

23  A    -- which --

24  Q    Go ahead.

25  A    -- where there's a transient partial or complete loss of

1    function of a -- of a part of the brain due to impairment of

2    blood flow -- transient impairment of blood flow.

3    Q    To what part of the brain?

4    A    Well, it can be to almost any part of the brain, depending

5    on what blood vessel is at issue.

6    Q    Can it involve the frontal cortical areas of the brain?

7    A    It can.

8    Q    And he actually says -- this gentleman says it's possible

9    he had at one point a transient -- or a TIA?

10   A    Yes, I believe so.

11   Q    All right.  And he says the topic gives a credible

12   description -- description of a TIA?

13   A    Umm --

14   Q    It's what he says, doesn't he?

15   A    Well, it's his opinion that it's a credible description,

16   yes.

17   Q    All right.  Now in your report, you discuss the issue of a

18   TIA, do you not?

19   A    Yes, I did.

20                            (Pause)

21   Q    What page is that -- I believe it's page nine.

22                            (Pause)

23   You say:

24             "Conclusions.  Mr. Boehm's descriptions of feeling a

25             vague sensation in his head followed by days of

<u>Martino - Cross</u>                    7-91

1          difficult with concentration and memory are not

2          consistent with TIA's."

3   A    Yeah.

4   Q    Why do you make that statement?  That having a vague

5   sensation in your head followed by days of difficulty with

6   concentration and memory are not consistent with a TIA?

7   A    Because that's not what TIA's are like.  Generally, a TIA

8   is -- is a focal interruption of neurological function, it

9   generally is very localized and lasts a -- a few minutes.

10  Q    All right.  If someone actually has though permanent brain

11  damage to the frontal areas of their brain, the ischemia for

12  instance, can that result in this type of sensation in your

13  head with difficulty in concentration and memory?

14          MS. STEPHAN:  Your Honor, I'm just going to object to

15  the question.  I think it's compound in the sense as referring

16  to ischemia as being a permanent brain damage, and that hasn't

17  been established.

18          THE COURT:  Would you put the question again, Mr.

19  Weidner?

20  BY MR. WEIDNER:

21  Q    If someone has permanent brain damage to the frontal

22  portions of their brain, can that result in this difficulty in

23  concentration and memory?

24  A    Over a period of days?

25  Q    Yes.

Martino - Cross                                    7-92

1  A     I doubt it.

2  Q     So if you have permanent brain damage to your brain, it

3  doesn't cause difficulty with concentration and memory over a

4  period of days?

5  A     Well, I -- I -- well, you're mixing your questions or

6  you're confusing me somehow.  Are we talking about this -- this

7  episode where he felt something in his brain and then he was

8  confused for a period of days?

9  Q     My question is if someone has permanent brain damage to

10  the frontal portions of their brain, can they have days of

11  difficulty with concentration and memory?

12  A     Not on the basis of a TIA.

13  Q     If someone has permanent brain damage to the frontal

14  portions of their brain --

15  A     Yes.

16  Q     -- can that result in days of difficulty in concentration

17  and memory?

18  A     Sure.  It could result in, you know, a permanent state of

19  difficulties with concentration and memory.

20  Q     So the mere fact that what you're saying here, that this

21  description is inconsistent with TIA's, doesn't mean it's

22  inconsistent with permanent brain damage, does it?

23  A     It's inconsistent with the fact that it's transient.  You

24  know, one of the characteristics of brain trauma is that it's

25  worse at the initiation of it and it gradually gets better.  It

Martino - Cross                                           7-93

1  isn't episodic, it doesn't come and go.

2  Q    When you say here's these descriptions of feeling the

3  vague sensation in his head, when was he experiencing that?

4  What -- during what period?

5  A    Well, both before and after he was incarcerated.

6  Q    Well, before he was incarcerated, he was using -- let's

7  assume he was using an ounce of cocaine a day.  Would that be

8  consistent then, having this difficulty in concentration and

9  memory when he's using an ounce of cocaine a day?

10 A    Well, of course it would be.

11 Q    Now you say he doesn't suffer from a fixed delusion,

12 right?

13 A    Right.

14 Q    But -- but -- but regardless of whether it's fixed or

15 not --

16 A    Mm-hmm (affirmative).

17 Q    -- if someone genuinely believes -- for instance, if you

18 were to genuinely believe that there were three of me, that

19 would be a delusion, wouldn't it?

20 A    Yes.

21 Q    'Kay.  If Mr. Fitzgerald couldn't talk you out of

22 believing there were three of me, then you'd say it was a fixed

23 delusion.

24 A    Yes.

25 Q    But while you were believing that there three of me, that

<u>Martino - Cross</u>                7-94

1   would be a delusion.

2   A    At that time, yes.

3   Q    Right.  And if Mr. Boehm believed there were three Bambies

4   and really believed it at a critical time, he'd be suffering

5   from delusions, right?

6   A    Yes.  If he really believed it in a fundamental way.  I

7   mean, you'd have to question him to see to what degree he

8   believed it.

9   Q    And if he believed that there were three S.P.'s or four or

10  five S.P.'s and really believed it, that that would be a

11  delusion, right?

12  A    If he really believed it, yes.

13  Q    And I know you're from Fairbanks, but maybe you've heard

14  about Flattop Mountain.  But if he really believed the Flattop

15  Mountain had changed, that would be a delusion, wouldn't it?

16  If it hadn't changed and a volcano hadn't blown --

17  A    Well -- well, you're -- maybe.  I mean, we get into these

18  ideas that are odd, but not necessarily delusional because

19  there -- you know, sometimes people share them with other

20  people.  But yes, theoretically, if he believed a mountain went

21  flat or something suddenly, that would be at least mistaken and

22  possibly delusional, depending on the context of it.

23  Q    And he -- with all due respect to these officers, if he

24  genuinely believed one or more of these officers was a porn

25  star, that would be a delusion, wouldn't it?

Martino - Cross                                    7-95

1  A    Most likely.

2  Q    All right.  And in terms of your use of the word

3  pornography -- now you used pornography -- you don't mean

4  actual illegal pornography, you're talking about adult films,

5  aren't you?

6  A    Yeah, legal pornography, yeah.

7  Q    All right.  Now it's your -- it's your understanding,

8  isn't it, that in this case, notwithstanding the fact that

9  there are allegations -- in fact, you said something about his

10  liking young women, that no physical evidence has been shown to

11  have been found in his found of any videos, commercial or

12  amateur videos, of underage women, isn't that true?

13  A    As far as the material available to me, that is true.

14  Q    Right.  And in terms of that issue, you're aware of the

15  fact that he was arrested, released on bail, Mr. Fitzgerald got

16  him out in state court, and then shortly thereafter he was

17  arrested again?

18  A    Yes, I'm aware of that.

19  Q    And there was no indication from you saying that there was

20  any attempt to hide his activities?  He basically went back to

21  the crack pipe and got busted again, right?

22  A    Well, I don't know if -- got busted again.  I -- I -- it

23  was my impression -- now I could be wrong, but -- that he was

24  re-arrested on -- on -- on federal charges --

25  Q    Right.  Okay.

<u>Martino - Cross</u>                                  7-96

1    A    -- which had occurred --

2    Q    Okay.

3    A    -- previously.  So it's -- I think it's a

4    misrepresentation to say he was busted again.

5    Q    But about two hundred tapes of videotapes and nothing

6    containing young girls or -- either commercial or amateur tapes

7    of young women, right?

8    A    Only one tape I saw reference to where they were, you

9    know, adults but made to look young, you know --

10   Q    Right, sure.

11   A    -- to -- to appeal to that particular fantasy.  But they

12   were a legal age.

13   Q    Okay.  All right.  Now you said that Dr. Budding used the

14   word "subtle."

15   A    Yes.

16   Q    Right.  Have you talked to Dr. Budding to see what she

17   meant by subtle?

18   A    No.

19   Q    Have you -- are you aware of any of the testimony from Dr.

20   Budding as to what she meant by subtle?

21   A    Well, I -- I don't -- subtle is subtle to me.  I don't

22   know how she may have elaborated upon it.

23   Q    Well, Doctor, can subtle be used in both a qualitative and

24   quantitative fashion?

25                              (Pause)

<u>Martino - Cross</u>                                    7-97

1   A    I -- not -- not with any acceptable clarity in my opinion.

2   I --

3   Q    All right.

4   A    If you give me an example, I'll --

5   Q    Well, in your own report, I think you talk about some

6   things that are hard to find by certain tests?

7   A    Yes.

8                            (Pause)

9   Q    And actually, before we go there, on page five of your

10  report --

11                           (Pause)

12  -- in your fourth paragraph, he's talking -- you're talking

13  about what Mr. Boehm had told you about the business deal and

14  he backed out of the deal.  "He states these people have made

15  subtle threats against him."  Does that mean they were not

16  serious threats?  (Indiscernible) your use of the word?

17  A    I -- I think you would judge that on the -- on the source

18  of the threat.

19  Q    Right.

20  A    If it's -- you know, I mean, if it's a gangster, that

21  would be serious; if it's an attorney, probably not.

22  Q    So a subtle finding -- a finding can be subtle, but the

23  real impact of the condition can be fairly significant, isn't

24  that true?

25  A    I suppose there would be certain cases where that would be

1  true.

2  Q    All right.

3                         (Pause)

4  Now in terms of your testimony about Mr. Boehm's difficulty in

5  recognizing faces, all right?

6  A    Yes.

7  Q    And you -- you advance that as a possible explanation for

8  his opinion that there are three Bambies, for instance.

9  A    A contribution to some of his -- contributing to some of

10 his odd ideas, yes.

11 Q    So it may'well be that just as to facial recognition, that

12 he may have a fairly significant defect in that regard.

13 A    I -- I think it could be significant at certain times.

14 Q    Okay.  But you say -- page nine of your report, last

15 sentence?

16 A    Mm-hmm (affirmative).

17 Q         "I" -- that's you -- "believe there may be some

18            subtle impairment in Mr. Boehm's ability to recognize

19            those faces either due to his history of head injury

20            or due to his history of extreme drug abuse."

21 A    Mm-hmm (affirmative).

22 Q    Right?

23 A    Yes.

24 Q    And you used subtle to describe that.

25 A    Yes.

<u>Martino - Cross</u>                                    7-99

1   Q    Which you just told us could be significant at times.

2   A    Well, it could be significant when you're intoxicated on

3   cocaine, but subtle when you're going about your day-to-day

4   business while not intoxicated.

5   Q    And you go on to say:

6                "It is not my opinion that Mr. Boehm has any

7                significant cognitive dysfunction.  My mental status

8                examination showed no evidence of dementia.  More

9                subtle cognitive difficulties may not be apparent on

10               such bedside exams."

11  That's your opinion?

12  A    Yes.

13  Q    All right.  In terms of the subject of vascular dementia,

14  you reviewed Dr. Smith's report, didn't you?

15  A    Yes, I did see Dr. Smith's report.

16  Q    And did you see where he said, in describing Mr. Boehm, at

17  the last two sentences the report, it says:

18               "This appears to go beyond dysthymia and may have

19               organic implications.  A vascular dementia with

20               delusional features should also be ruled out."

21  A    I -- I -- I saw that.  I didn't put much -- I mean, he's

22  -- he's just trying to cover all the -- all the possible bases.

23  That's not a high probability possibility 'cause -- 'cause he's

24  not a physician, and I think that's why he would latch on to

25  something like that to put at the end of the paper.

Martino - Cross                                        7-100

1    Q    If he's not a physician, what is he?

2    A    Dr. Smith?

3    Q    Yeah.

4    A    I thought Dr. Smith --

5    Q    No, it's okay, but what --

6    A    I thought he was a psychologist.

7    Q    Okay.  And what is Dr. Hope?

8    A    Well, she's a psychologist, but she didn't make a

9    diagnosis of vascular dementia.

10   Q    Right.  Okay.  But -- so he's essentially the same as Dr.

11   Hope.

12   A    I -- I can't compare their -- their training.  I wouldn't

13   be able to do that.

14   Q    You don't disagree, do you, that -- that extensive drug

15   rehabilitation and treatment would be appropriate for Mr.

16   Boehm?

17   A    I don't disagree with that.

18   Q    And you don't disagree, for instance, if Dr. Jacobsen was

19   to testify that he has a good prognosis if he gets appropriate

20   training -- treatment?

21   A    That's always hard to judge, but I -- I would try to be

22   optimistic, yeah.

23   Q    Okay.  Do you, in your practice, treat people with

24   substance abuse problems?

25   A    Yes.

<u>Martino - Cross</u>                                    7-101

1  Q    Do you sometimes treat professionals?

2  A    Yes.

3  Q    Doctors?

4  A    Yes.

5  Q    Lawyers?

6  A    Yes.

7  Q    Businessmen?

8  A    Yes.

9  Q    And sometimes you have success?

10  A    Sometimes I do.

11  Q    Right.  And with a serious program and the person takes it

12  seriously, even though they've had a really bad drug problem,

13  they can come back and be a good -- good member of society,

14  can't they?

15  A    Yes, it's possible.

16  Q    Now in terms of the actual notes, you took notes of your

17  interview with Mr. Boehm?

18  A    I -- I did take notes.

19  Q    Now -- now that wasn't tape recorded, was it?

20  A    No.

21  Q    And his attorneys weren't present, were they?

22  A    No.

23  Q    All right.  And now you took some notes and then after

24  that, you wrote your report?

25  A    Yes.

<u>Martino - Cross</u>                              7-102

1    Q    How long after you took the notes did you write your

2    report?  Did you go back to Fairbanks first or not?

3    A    Actually, I dictated it in the airport.

4    Q    Okay.  All right.  Do you have a copy of your notes?

5    A    I do.

6    Q    You do?

7    A    Uh --

8    Q    I've got an extra copy for you.

9    A    Oh.  I don't have them on -- on me right at this second.

10          MR. WEIDNER:  May I approach, Your Honor?

11          THE COURT:  You may.

12   BY MR. WEIDNER:

13   Q    I'm not going to go through all your notes, Doctor, but

14   there's some areas that I'm, frankly, having a hard time

15   reading some of your writings.

16   A    Well, I'll probably have a hard time also at this point.

17          MR. WEIDNER:  Right.  Okay.

18                    (Pause)

19   On the third page -- may I approach, Your Honor.  It might help

20   -- so I can show him where I'm pointing to?

21          THE COURT:  You may.

22          MR. WEIDNER:  Right.

23                    (Pause)

24   BY MR. WEIDNER:

25   Q    The third page.  What does that say?

<u>Martino - Cross</u>                          7-103

1                              (Pause)

2    A    Lost some of either enthusiasm or of euphoria quite awhile

3    ago.  I think I meant to say enthusiasm.

4    Q    Mm-hmm (affirmative).

5    A        "Wanted people around him.  Did not want to be

6            alone."

7    Q    And that's what he told you?

8    A    Yeah.

9    Q    All right.  And --

10                             (Pause)

11   What -- what did he tell you right after this?  Right there.

12   A    Here?

13   Q    Yes.

14   A    "Felt New York people threatening him."

15   Q    And what did he tell you right here?

16   A    "Did not care about things after" -- I think that's

17   "lawsuit started in 2000."

18   Q    Right.  So you told His Honor that some fourteen months

19   after Mr. Boehm was arrested, you listened to some tapes and he

20   appeared to be able to give some directions and exert some

21   control, right?

22   A    Yes.

23   Q    Okay.  But he told you that prior to his arrest and his

24   detox, that he didn't care about things after the lawsuit

25   started in 2000?

<u>Martino - Cross</u>                                7-104

1    A    He -- he -- yeah, he lost enthusiasm and -- yeah.  Well, I

2    mean, not in an absolute sense.  I didn't take it that way when

3    he told it to me.

4    Q    But -- and in terms of any of your testimony about Mr.

5    Kangass, Mr. Kangass never described him as being intimately

6    connected in the business during the year 2003 or 2002, did he?

7    A    No.  Mr. Kangass said he was involved in some of the

8    planning, but was not involved in the day-to-day running of the

9    business, but he had to approve all the big decisions.

10                            (Pause)

11   Q    Now Mr. Boehm told you about being knocked out, didn't he?

12   A    In his accidents, yes.

13   Q    Well --

14                            (Pause)

15   You can just read off my copy.  What did you say there?

16   A    "Knocked out for five days."  That was -- let's see, let

17   me read the rest of it.  I think that was drugs.

18                            (Pause)

19   I think he was referring to -- to drugs.

20   Q    So he told you he'd been knocked out for five days, right?

21   A    Right.

22   Q    And what -- what did he say right there, after he met

23   Bambi, talking to her?

24   A    He met Bambi --

25   Q    But basically he's talking about -- he's with Bambi, and

1  the next thing he knew, he woke up five days later, right?

2  A    Right.  He was -- he was with Bambi.

3  Q    Right.  And he'd been knocked out for five days.

4  A    Well, let me talk about that a little bit.

5  Q    All right.

6  A    As I told you, this part of the exam is where I let the

7  individual, as best he can, tell it in his own words.  If, you

8  know, we were to pursue that, we would have a lot of questions

9  about that.  I mean, if you're unconscious for five days, you

10 know, you wake up very sick, dehydrated, in your own feces and

11 urine, it's quite a mess if you've seen anybody who's been

12 unconscious for five days.  I asked him a little bit about

13 that, and he said, well, his credit card hadn't been used that

14 long.  So the way I would have interpreted it medically is that

15 he wasn't unconscious for five days, but he may have been --

16 lacked memory for that period of time.

17 Q    His cognitive functioning wasn't functioning for five

18 days.

19 A    He may have lacked memory for that time.  There -- you

20 know, you can -- you can have severe memory dysfunction but

21 still have reasonable cognitive functions.  For instance, the

22 famous lost weekend.  Everybody tells you, oh, yeah, you did

23 fine, you did this, you did that, and you have no memory for

24 it.  That's -- that can be an effect of drugs.  I gave a

25 sleeping tablet to a local politician one time, and then he ran

1  the meeting -- the public meeting just fine, but he didn't have

2  any recollection of it.  It was a side effect of the

3  medication.

4  Q    Right.

5  A    So some of these functions can be selectively affected.

6  So you have -- so he tells you he's unconscious for five days.

7  You really do have to take it with a grain of salt.

8  Q    And to use your words, did you pursue it?  Did you ask him

9  if he woke up in his own feces?

10  A    No, I didn't ask him if he woke up in his own feces.

11  Q    Did you ask him if he woke up in his own urine?

12  A    No, I didn't.

13  Q    Did you ask him if he woke up and he was dehydrated?

14  A    Well, in my opinion, he wouldn't have woke up at all if he

15  were unconscious for five days.

16  Q    Did you ask him if he woke up and he was dehydrated?

17  A    No.

18  Q    So you didn't pursue it.

19  A    I pursued it with the credit card gambit.

20  Q    And concerning the subject of him being knocked out, what

21  do you have in your notes here?

22                        (Pause)

23  A         "People around him knocked out with drugs.  Wakes up

24            fourteen and sixteen hours later.  He would be

25            drooling" -- and I don't know what that says --

Martino - Cross                          7-107

1     "heavy face" I think.

2  Q    So he told you he was getting knocked out with drugs,

3  didn't he?

4  A    Yes, he did.

5                          (Pause)

6  Q    In terms of any discussion with him about underage girls

7  and whether he'd had sex with underage girls --

8  A    Mm-hmm (affirmative).

9  Q    -- what age did you specify as underage?  Did you specify

10 a year?  You just used the word underage, didn't you?

11 A    I used the word underage.

12 Q    Right.  Did you say under sixteen or over sixteen?

13 A    Well, he answered he never had sex with underage girls,

14 so that was the end of his discussion about it.

15 Q    Do you know what the legal definition of an underage girl

16 is in -- under Alaska state law?  It's sixteen, isn't it?

17 A    Sixteen is the age of consent.

18 Q    Well, in terms of the use of the word underage, do you

19 know if he was talking about anyone under sixteen or over

20 sixteen?  Do you know?

21 A    Well, he made a point of saying he didn't have sex with

22 Bambi until, you know, she -- I think she was over seventeen,

23 so -- plus, you know, by then he should have been well educated

24 to what underage meant.

25 Q    But you didn't define that for him.

Martino - Cross                          7-108

1   A    I asked him a question and he answered it.

2   Q    And you didn't record that conversation?

3   A    Well, I didn't have a recording apparatus there.

4   Q    By tape recording is what I'm talking about.  Well, that's

5   okay, you can look in your notes.  Now just so we're clear,

6   there was no actual tape recording of that conversation?

7   A    That's correct.

8   Q    Okay.

9                              (Pause)

10  And actually, in your notes --

11                             (Pause)

12  -- you talk about younger girls, don't you?

13  A    Those were his words.  I put quotes around it.  He said

14  there were no younger girls.

15                             (Pause)

16  Q    Now he told you that Bambi was territorial and didn't want

17  the other girls around, didn't he?

18  A    I'm not sure that he did.

19              MR. WEIDNER:  'Kay.  All right.

20                             (Pause)

21  If it's all right, Your Honor, I'm going to periodically

22  approach the witness.

23  BY MR. WEIDNER:

24  Q    What did you write down in your writing that he said?

25                             (Pause)

<u>Martino - Cross</u>                                7-109

1  A    Yeah, that -- that says Bambi was territorial, yes.

2  Q    And?

3  A    Did not want the other girls around.

4  Q    Did you ask him why she was territorial, as to whether she

5  was protecting her -- her mark or anything like that?  Did you

6  go into that?

7  A    I don't -- I don't recollect what that led to.

8                          (Pause)

9  Q    He told you he was concerned his house would be burned

10  down?

11  A    I don't think he said that to me during our interview, but

12  I think I read that somewhere, that he had some concerns.

13                         (Pause)

14  Q    Your notes, right?

15  A    Oh, accidently burn the house down, yeah.

16  Q    And he told you that the valley girls were basically just

17  stopping in and not part of the immediate group?

18  A    That's right.

19  Q    Just kind of curious, but can you tell me what this is?

20  This clock?

21  A    Oh, I just asked him to -- to draw a clock and set the

22  time.

23  Q    Okay.

24                         (Pause)

25  He told you he'd met Bambi at Trendsetters?

## Martino - Cross                    7-110

1    A    Yes.

2    Q    He ran into her a couple of times before the age of

3    eighteen, but he basically really met her at Trendsetters?

4    A    Right, he met (indiscernible) --

5    Q    I -- I can help you, Doctor.

6    A    Okay.

7    Q    Ran into her --

8    A    A couple of times before age eighteen, right.

9    Q    And she's now twenty-four, that's what he told you?

10   A    Right.

11   Q    And that -- met her when she was seventeen, going to

12   beauty school, then met her at Trendsetters?

13   A    That's what he said.

14   Q    All right.

15                         (Pause)

16   I just want to go back briefly to the subject of delusions.

17   Regardless of whether or not they are fixed delusions, you do

18   acknowledge, do you not, that there is significant evidence in

19   this case of delusional thinking in terms of multiple people,

20   police officers being in porn films, you may not know about it,

21   but having to take out the hot tub because he's afraid of

22   what's going to happen with the hot tub?  I mean, there is

23   significant evidence in this case of delusional thinking

24   regardless of whether or not it is fixed, isn't that correct?

25   A    There may have been some delusional -- delusions during

<u>Martino - Cross</u>                                    7-111

1    his periods of intoxication, yes.

2                          (Pause)

3              MR. WEIDNER:  Your Honor, I think that's all my

4    examination, but could we take a brief break so I can check my

5    notes and confer with my client and my co-counsel, please?

6              THE COURT:  Well, let me see how much -- whether

7    there's going to be any redirect.  Will there be redirect, Ms.

8    Stephan?

9              MS. STEPHAN:  There will be redirect.  I don't

10   anticipate it being too lengthy, but I do have some questions.

11             THE COURT:  And how many -- what other witnesses are

12   going to testify today?

13             MR. RUSSO:  I think we have Jim Brown and we have a

14   -- the mother of one of the victims.

15             THE COURT:  All right.  Well, if we take our recess

16   now, we won't take another one for the rest of the day.

17             MR. WEIDNER:  That's all right.

18             THE COURT:  All right.  We'll take a very brief

19   recess at this time.  Let's try and hold it down to five

20   minutes.

21             THE CLERK:  All rise.  This Court is now adjourned

22   for a brief recess.

23        (Recess at 2:30 p.m., until 2:43 p.m.)

24             THE CLERK:  All rise.  His Honor the Court, this

25   United States District Court is again in session.  Please be

<u>Martino - Cross</u>                    7-112

1   seated.

2           THE COURT:  Good afternoon.  Mr. Weidner, have you

3   finished?

4           MR. WEIDNER:  No, Your Honor.  I've got about another

5   ten, fifteen minutes.

6           THE COURT:  All right.  I understand the -- that your

7   experts are on the phone now?

8           MR. WEIDNER:  They are, Your Honor.

9           THE COURT:  Let me inquire of those of you on the

10  phone, are any of you or have any of you been tape recording

11  these proceedings?

12          DR. GLASER:  This is Dr. Glaser.  I have not.

13          THE COURT:  Anyone else?

14          DR. MITTELBERGER:  This is Dr. Mittelberger.  I have

15  not.

16          THE COURT:  Anyone else on the phone?  All right.

17  Thank you, gentlemen.  We're ready to proceed, Mr. Weidner.

18          MR. WEIDNER:  All right.

19                    **CROSS-EXAMINATION CONTINUED**

20  BY MR. WEIDNER:

21  Q    Doctor, part of your testimony on direct is that you

22  thought Mr. Boehm was capable of executive functioning and he

23  was some type of -- strike that.  (Indiscernible - paper

24  rustling) that an example of his executive functioning, he was

25  going to the bank every day or so and taking out three to five

1  thousand dollars in cash?

2  A     That's one example.

3  Q     So the mere fact that he was able to get the money out of

4  the bank for you is executive functioning?

5  A     Well, it means he's not staggering there and making

6  himself, you know, not a credible looking person that they want

7  to give cash to.  But there are better examples also.

8  Q     I'd like you to just focus on this for a moment, please.

9  Now you told the Court that that was an example of his

10  executive functioning.

11  A     That -- that is when -- I think it shows it's -- it's not

12  very credible to say that he was totally out of it all of the

13  time.

14  Q     Do you know how well they knew him at the bank?

15  A     I assume they probably knew him -- you know, they probably

16  knew him.  He'd been going there.  They said he went to the

17  same bank.

18  Q     Do you know how -- how willing they might have been to do

19  what he wanted when he came in and tried to cash checks?  Do

20  you have any direct knowledge of that?

21  A     I don't have direct knowledge of it.

22  Q     Do you know who took him to the bank?

23  A     He usually went accompanied by some of his friends.

24  Q     Do you know what they told him to do before he went into

25  the bank?

1  A    No.

2  Q    Do you know if the checks were made out before he went

3  into the bank?

4  A    I'd have no way of knowing that.

5  Q    Do you know what the instrument was withdrawing the money?

6  A    The what?

7  Q    The instrument for him withdrawing the money.  Was it by a

8  check or some other fashion?

9  A    No.  I mean, I -- I assumed it wasn't an ATM though.

10  Q    You assume it was an ATM?

11  A    It was not an ATM.

12  Q    All right.  So you don't know whether or not these co-

13  defendants took him to the bank, got him ready to get his

14  money, and pushed him into the bank and said do this, and he

15  was able to do it.  You don't know that, do you?

16  A    I don't know that.

17  Q    Do you actually treat sex offenders?

18  A    Sex offenders?

19  Q    Yes.

20  A    I don't -- I don't -- I don't treat them.  I -- I

21  sometimes do some evaluations, but I don't treat them.

22  Q    So any of your testimony about your opinions or anything

23  about reference to these sex issues is not on a basis of you

24  being -- having a practice of treating sex offenders, correct?

25  A    It's not on the basis of treating sex offenders, that's

<u>Martino - Cross</u>                                    7-115

1  right.

2  Q    And one thing you said that you thought was significant

3  about the common factors between this forty-year-old

4  convictions and the instant case was that Mr. Boehm had a

5  Thunderbird back then?  What is the significance of that?

6  A    Oh, I'm -- I'm saying, you know, he -- one of the

7  witnesses said, yeah, he's the guy who drives the big white

8  Thunderbird.  And -- and you know, and his white Cadillac came

9  up a number of times in -- and so I'm saying, you know, just

10 his -- his style hasn't changed all that much over the years.

11 Underage girls' and luxury cars.

12            MR. WEIDNER:  All right.

13                 (Pause - beeping on overhead speakers)

14            MR. FITZGERALD:  I think that's just someone being

15 added, Judge, by the operator.

16            THE COURT:  Has someone besides Dr. Mittelberger and

17 Dr. Glaser joined us on the phone?

18            MR. WEIDNER:  Maybe somebody dropped off, I don't

19 know.

20            THE COURT:  Dr. Mittelberger, are you still there?

21 Dr. Glaser, are you still there?

22            DR. GLASER:  Yes, I am.

23            THE COURT:  It sounds like maybe Dr. Mittelberger has

24 hung up.  All right.  Please proceed.

25            MR. WEIDNER:  All right.

## Martino - Cross                    7-116

1  BY MR. WEIDNER:

2  Q    Concerning your testimony that Salley was naive, do you

3  know what her experiences were before she met Mr. Boehm as to

4  whether her mother had sold her to a man named Carl?

5  A    (Indiscernible) she had a hard life.

6  Q    Had she worked as a prostitute before that, do you know?

7  A    I don't know.  I think she said her mother sort of let

8  other men have sex with her, but I'm not sure I saw the word

9  prostitution, but I wouldn't be surprised.

10 Q    All right.  Now I want to go back just briefly to this --

11 your testimony about her being naive in terms of her statements

12 about Mr. Boehm, the fact that he was the victim and he was --

13 we've seen her statements.  We don't have to go through all of

14 them, but where he says that he had a good heart -- behind all

15 the drugs, he has a good heart, he was the one that paid for me

16 and my Mom to move to Seattle and get away from everything

17 because he knew if I stayed up there or stayed up here, I was

18 going to die real soon.  When she's making that statement, is

19 she making some kind of conclusions as to whether or not she

20 wanted to go to Seattle to get away from everything, or is she

21 just simply stating the way it was?  She's not making

22 conclusions.

23 A    Well, I think she's making conclusions about the goodness

24 of his heart, his motivations.  I think that's a very big

25 conclusion.

<u>Martino - Cross</u>                            7-117

1    Q    But when she says that for her and her Mom to move to

2    Seattle to get away from everything, that's based upon her

3    desires, isn't it?

4    A    I can't glean that from that particular paragraph.

5    Q    And when she says if I stayed up here or stay -- I was

6    going to die real soon, she's stating what the facts were that

7    she observed, isn't that correct?

8    A    Those are the motivations I think she's saying that Mr.

9    Boehm had.

10   Q    When she talks about how Bambi didn't like her, she's

11   talking about -- she's not naive about that, is she?

12   A    All I have to say is that there -- there -- the conclusion

13   about having a good heart and why he wanted her to leave is a

14   rather naive conclusion which she couldn't have all the data

15   even to make that -- that -- that judgment.  It's typical of --

16   of middle adolescents to -- to feel this way.  She was very

17   ambivalent about Mr. Boehm in many of her statements.

18           THE TELEPHONE OPERATOR:  Dr. Mittelberger is back

19   online.

20           THE COURT:  I'm sorry.  Dr. Mittelberger, are you

21   there?

22           DR. MITTELBERGER:  Yes, I am.

23           THE COURT:  All right.  And you rang off earlier?

24           DR. MITTELBERGER:  I have a bad connection where I am

25   right now.

1    THE COURT:  All right.  Just we keep hearing beeps on

2  the phone.  We're trying to figure out who's there and who's

3  not.  Thank you.  Mr. Weidner?

4  BY MR. WEIDNER:

5  Q    Have you ever actually met Salley?

6  A    No.

7  Q    Never talked to her.

8  A    No.

9  Q    Never analyzed her.

10  A    No.

11  Q    Concern --

12                  (Beeping on overhead speakers)

13            THE TELEPHONE OPERATOR:  Dr. Budding is back online.

14  Thank you.

15  BY MR. WEIDNER:

16  Q    Yeah, and --

17            THE COURT:  Excuse me just a moment.  Whose voice was

18  that?

19            THE TELEPHONE OPERATOR:  This is the conference

20  operator.  I reconnected Dr. Budding and also Dr. Mittelberger.

21            THE COURT:  All right.  Thank you.

22            THE TELEPHONE OPERATOR:  Thank you.

23            THE COURT:  Dr. Budding, are you there?

24            DR. BUDDING:  Yes, I am.

25            THE COURT:  Dr. Budding, have you been recording what

1  you've heard in court today?

2          DR. BUDDING:  No.  Uh-uh (negative).

3          THE COURT:  Thank you.

4  BY MR. WEIDNER:

5  Q    Concerning her statements where you've said she was

6  drawing conclusions and naive, let me show you her grand jury

7  testimony at page twenty-three.  It says -- says:

8          "Okay.  Now in the house back at 300 Oceanview, what

9          was Bambi's role?

10         "Bambi had control over Joe himself actually.  Bambi

11         was -- if Bambi didn't like it, it didn't go.  Bambi

12         always had her way."

13 Is she giving some -- is she drawing some conclusions there

14 about --

15 A    Yes, yes, she is.  It's just like a child drawing

16 conclusions about their parents, who's in charge and who's not.

17 You know, when you do psychotherapy with families, you see that

18 it's -- it's very mistaken.  When Bambi [sic] says that she had

19 oral sex with Mr. Boehm fifty to a hundred times, that's an

20 observation.  When she says that he was being dominated by

21 Bambi, that's a conclusion.

22 Q    All right.  And when she goes on to say -- page twenty-

23 five:

24         "You know, she sure made -- she -- she sure made sure

25         she was in control" -- referring to Bambi.

Martino - Cross                    7-120

1   A    Mm-hmm (affirmative).

2   Q    You're saying that's just a conclusion.

3   A    Yeah.  I mean, that's -- I think that involves a great

4   deal of conclusion there because she doesn't know.  You know,

5   there are other people who maybe was the same witness that said

6   very clearly Bambi was in charge of the girls, this was Bambi's

7   role in the household.

8   Q    And when she testified under oath:

9            "Okay, did he have a role in the house?  He was the

10           head -- the head of" -- excuse me -- "she was the

11           head -- the head of everything for girls?

12           (Indiscernible).

13           "Yes, she'd steal from Joe and she liked to control

14           Joe with her mind 'cause she had control over Joe."

15   You're saying that's just a conclusion.

16   A    Sure.  She had control over him with her mind, isn't that

17   a conclusion?  I mean, how -- how can you actually observe

18   something like that?

19   Q    And so when you expressed your opinions in this Court that

20   you -- that -- that -- that Mr. Boehm was -- I think you used

21   the word ringleader -- and not Bambi, you're basically

22   disregarding much of S.P.'s statements and sworn testimony.

23   A    No, that's an unfair characterization.  I'm disregarding

24   conclusions which I don't think she had the maturity or the

25   knowledge to make.

<u>Martino - Cross</u>                          7-121

1  Q    Well, what weight do you give her statements -- her

2  repeated statements to the effect that Joe was the victim, that

3  Bambi was in control, that Leslie was -- and Bambi and Al were

4  the ringleaders, and that they were robbing Mr. Boehm, and

5  things of that nature?  What -- what -- what effect do you give

6  those statements?

7  A    Well, I don't totally disregard them, but I have to weigh

8  them in the totality of everything that -- that she has said.

9  I mean, you just can't pick out isolated statements and -- you

10 know, you have -- you have to look at the totality of it.  A

11 fifteen-year-old girl who doesn't know what goes on between two

12 adults, she herself is intoxicated on cocaine to such a degree

13 that she has convulsions.  Yeah, I'm not going to put a lot of

14 weight on her psychological conclusions.

15 Q    All right.  And how about J.M.?  Page fifteen of her

16 recorded statement.

17         THE TELEPHONE OPERATOR:  Please excuse me.  This is

18 the conference operator.  Again, I do have Dr. Mittelberger

19 back on line.

20 BY MR. WEIDNER:

21 Q    Page fifteen of J.M.'s --

22         MS. STEPHAN:  Excuse me.

23 BY MR. WEIDNER:

24 Q    -- recorded statement.

25         MS. STEPHAN:  Recorded statement.  What date are

1   you --

2             MR. WEIDNER:  January 31st, 2004.

3   BY MR. WEIDNER:

4   Q        "(Indiscernible) of Bambi, I didn't like her.

5            "Okay.  And why not?"

6   Answer:  "Controlling.  She was kind of -- she acted like she

7            was running things.

8            "Okay.  Did you spend enough time so you were able to

9            see what Bambi's relationship was with Joe?"

10  Answer:  "It was a love-hate relationship.

11           "Okay.  And what were your observations with regard

12           to Bambi, whether she manipulated Joe or tried to

13           control him?"

14  Answer:  "How would she do that?  Well, first of all --

15           "What did you observe?  Whether she was doing it?"

16  Answer:  "Yeah, she was threatening and controlling."

17  Okay.  And now the next question is:

18           "How would she do that?

19           "By saying I'll tell the cops you did this if you

20           don't do this type of thing."

21  Do you just -- do you just dis -- discount that as a

22  conclusion?

23  A    Well, she observed that Bambi would threaten to call the

24  cops, which is a threat and probably a threat Mr. Boehm took

25  seriously.

Martino - Cross                                  7-123

1  Q    And J.M. goes on to say:

2           "Okay.  And she used -- in other words, she used the

3           threat to call the police as a kind of sword to use

4           against Joe?"

5  Answer:    "Yeah.

6           "Okay.  In order to manipulate him?"

7  Answer:    "Yeah."

8  Is that a conclusion?

9  A    Well, she heard the threat, and that's an observation.  I

10 think everybody in that house held that kind of power

11 theoretically over Mr. Boehm, you know, to call the police.  In

12 fact, her mother eventually did.

13                         (Pause)

14 Q    Well, regardless of any opinion you may be expressing as

15 to discounting S.P.'s statements, you're not expressing any

16 opinion of relative culpability between the co-defendants, are

17 you?

18 A    Not -- no, I don't know enough about the other co-

19 defendants to make relative remarks.

20 Q    And pursuing your subject -- the subject of conclusions,

21 let me show you a recorded interview of M.D., June 1, 2004:

22 Question: "Did you ever see Joe give the young girls any

23           drugs?"

24 Answer:    "No.

25           "Never saw it?

<u>Martino - Cross</u>                    7-124

1              "No.

2              "Who would give them the drugs?

3              "Bambi and Leslie.

4              "Bambi and Leslie would give them drugs?"

5    Answer:   "Yes.

6              "And then what would -- what would happen with the

7              girls?  Would they doing any tricks or turning --

8              were they --

9              "Mostly with (indiscernible) Al.

10             "Mostly (indiscernible) Al was --

11             "Uh-huh.

12             "And now was Al running them as an escort service or

13             was he just --"

14   Answer:   "Pimping.

15             "Now he was -- he was pimping them or was he just

16             down with them?

17             "Just down with them.

18             "Okay.  He was --

19             "Matter of fact, he was involved with a girl named

20             Salley who might have been pregnant by him.

21             "You mean Jamie?"

22   Answer:   "Jamie.

23             "Jamie R.?

24             "Yes, she's pregnant by him."

25   Went on to say -- there's a question:

1 | "Okay, (indiscernible).  We're talking about what

2 | things went with Bambi was at the house.  Did it seem

3 | to you she ran the show?  Tried -- tried to control

4 | how Joe was getting robbed or --"

5 | Answer:   "Yes."

6 | Question: "What would she do?  How would she do this?

7 | "She would blackmail him, take his money, take his

8 | stuff, that would be mostly."

9 | And then she went on to say, page thirteen:

10 | Question: "I see.  And Joe never gave them drugs for sexual

11 | acts?"

12 | Answer:   "No.

13 | "And he never gave them any money for sexual acts?"

14 | Answer:   "No."

15 | Question: "Bambi and Al and Leslie paid?"

16 | Answer:   "Yes.

17 | "Or gave them drugs or what have you?"

18 | Answer:   "Yes.

19 | "As part of their scheme to rob Joe?  Does that sound

20 | right?"

21 | Answer:   "Yes.

22 | "Okay.  So they were just props, if you will -- the

23 | girls were just props in order to rob Joe, is

24 | that --"

25 | Answer:   "Yes."

## Martino - Cross                                    7-126

1   And finally:

2   Answer [sic]:  "They did his dope?

3           "Yeah, they gave him -- they put sleeping stuff in it

4           'cause he always fell asleep after he took a hit.

5           "And that's pretty unusual when you're just smoking

6           crack, huh?  You don't go to sleep when you're

7           smoking crack?

8           "Uh-huh.

9           "And you -- what do you -- he'd just get knocked out?

10          "Yeah.  He'd take a hit, bam, right to sleep.

11          "Okay.  You could be talking to him and look back and

12          he'd be out?"

13  Answer:  "Yeah."

14  Are those conclusions?

15  A    A lot of them are.

16  Q    All right.

17  A    Except the ones where, you know, she said she never saw

18  him give dope to the girls.  That's an observation.

19  Q    All right.  And finally, Doctor, before -- fore -- well,

20  just briefly here on this reduplicative phenomena.  What part

21  of the brain is normally associated with that phenomena?  What

22  -- what -- is it damage to the right cerebral hemisphere?

23  A    I don't what specific part of the brain.

24  Q    I'll help you out here.  On this article, it says --

25          THE COURT:  Excuse me.  If he doesn't know, can we

1    just move on to something else?

2         MR. WEIDNER:  All right.

3    BY MR. WEIDNER:

4    Q    Right before lunch, you referred to Mr. Cummings?

5    A    Yes.

6    Q    Is that Jeffrey Cummings?

7    A    Yes.

8    Q    All right.  And you referred to some of his articles?

9    Have you read his "Frontal subcortical neuronal circuits and

10   clinical neuropsychiatric: an update?"

11   A    I haven't read that particular one, although I did read

12   the article you made reference to this morning.

13   Q    All right.  What, you read that over the noon hour?

14   A    Yes.

15   Q    Good.  Okay.  We'll probably -- they may have some

16   questions for you on that and then we can go into that on -- on

17   recross.  But in terms of Dr. Cummings -- well, since you've

18   read that article, does he basically describe the same

19   phenomena in his articles of the -- the feedback loops and the

20   multiple circuits?

21        MS. STEPHAN:  And if we could just have a

22   clarification on what article he's talking about now.

23        MR. WEIDNER:  "Frontal-subcortical neuronal circuits

24   and clinical neuropsychiatric: an update," by Jeffrey L.

25   Cummings.

1  A    I think that's too broad a question.  I mean, the chapter

2  you pointed out this morning had a number of references from

3  him, so obviously there -- you know --

4  BY MR. WEIDNER:

5  Q    Okay.

6  A    -- they're some co-mingling of ideas here.

7  Q    Okay.

8  A    But that's a very broad question.

9  Q    All right.

10  A    I couldn't answer it.

11  Q    Well, is there something you'd like to explain about that

12  article you read over the noon hour?

13  A    Well, I --

14  Q    "The frontal cortex and control of behavior."

15  A    I -- I think the article made it clear that there was

16  hierarchy in executive function, and that the -- the putamen

17  and the globus pallidus were very low in that hierarchy.  All

18  the lesional studies I talked about -- a lesional study is

19  where they study people with injuries to a certain part of the

20  brain that affects executive functioning -- were all to the

21  cortex and to the supplemental motor strip.  There was one

22  reference to any lesional studies with the globus pallidus and

23  the putamen.

24  Q    Well, there are -- there is -- we've gone through this

25  already, but there's evidence in this case of actual damage to

## Martino - Cross/Redirect                     7-129

1  the frontal cortex, isn't there?

2  A    There's -- there's some neuropsychological testing that

3  shows there may be some executive dysfunction, subtle.

4  Q    'Kay.  Is that a yes?

5  A    You know, if you press me to a yes or no to distort my --

6  my opinion of the situation, I don't think that that clarifies

7  anything for the Court.

8  Q    It does --

9            THE COURT:  I must agree, Mr. Weidner.

10           MR. WEIDNER:  All right.

11           THE COURT:  I understand the answers when they're

12  given --

13           MR. WEIDNER:  Okay.  Do the -- do the --

14           THE COURT:  -- and if I don't, I'll let you know.

15           MR. WEIDNER:  All right.  I'll just -- I'll wait for

16  recross then, Your Honor.  I have no further questions.

17           THE COURT:  All right.  Thank you, Mr. Weidner.  Ms.

18  Stephan?

19                        (Pause)

20                   **REDIRECT EXAMINATION**

21  BY MS. STEPHAN:

22  Q    Dr. Martino, Mr. Weidner talked a little bit -- actually

23  pretty extensively about Dr. Budding's testing and her reports.

24  A    Mm-hmm (affirmative).

25  Q    Now her ultimate report -- or diagnosis, I guess -- is

1  cognitive dysfunction NOS, is that fair to say?

2          MR. WEIDNER:  I'm going to --

3  A    That was the diagnosis, not otherwise specified --

4  cognitive dysfunction not otherwise specified which she --

5          MR. WEIDNER:  Can we get an actual reference, Your

6  Honor, to page number?

7          THE COURT:  Excuse me.  That's not necessary.  The

8  question is was that her diagnosis.  We've heard lots of

9  testimony about that.

10          MS. STEPHAN:  Thank you.

11  BY MS. STEPHAN:

12  Q    Can you please explain to me what that diagnosis is?

13  A    Well, it means it's -- generally a diagnosis like that is

14  used for the situation where there's not cognitive deficits in

15  multiple areas, and it does not have to meet the criteria for

16  causing significant functional problems in day-to-day life.

17  Doesn't have to meet that particular criteria as the diagnosis

18  of dementia would.

19  Q    Okay.  So dementia is something that affects your day-to-

20  day life.

21  A    Absolutely.

22  Q    And she did not conclude that he had dementia.

23  A    That's correct.

24                      (Pause)

25  Q    Now there was also some talk about Dr. Budding's

1  neurological testing and her opinions about those tests,

2  correct?

3  A    I'm sorry, I didn't hear you.

4  Q    There's also some testimony on cross about Dr. Budding's

5  neurological testing that she performed, correct?

6  A    Neuropsychological testing.

7  Q    Neuro -- sorry -- neuropsychological testing.  Can you

8  tell me, practically speaking, if we accept everything Dr.

9  Budding says in her report, what the means on a practical

10 level?

11 A    Well, on a -- on a practical level, I've seen similar

12 reports for people that are -- they may not be able to think as

13 fast as they might otherwise, they may have to take longer

14 making, you know, decisions.  It's the kind of thing you can

15 see after people have relatively mild concussions, especially

16 if they've had more than one.  They lead normal lives except,

17 you know, they're not going to be a fighter pilot, you know,

18 they're not going to make rapid complicated decisions.  They

19 may be able to make decisions of fairly high quality, but

20 they'll be slower.  And they may have the tendency not to be as

21 flexible in their -- in their thinking.

22     So, you know, this discussion, well, can subtle impairment

23 cause major problems?  Well, if you're the CEO of GE and you

24 have a subtle impairment of your judging -- judgment, yeah,

25 that -- that might cause major problems in the performance of

<u>Martino - Redirect</u>                              7-132

1  that job.  But if -- if you're engaged in work as a -- the type

2  of work that the majority of us are engaged in, you can -- it

3  probably isn't going to cause you major difficulties, either

4  because it's too subtle or you find compensatory ways of -- of

5  overcoming your -- your slowness of thinking or, you know,

6  maybe you'll make more notes, but there are a lot of people

7  walking around who -- who are in that situation and -- and hold

8  -- hold jobs and support their families and don't get into any

9  trouble.

10  Q    Thank you.  Now there was also some talk about the use of

11  cocaine impacting executive functioning, and you had responded

12  -- your answers, I think, were couched in when someone was

13  acutely intoxicated.  Could you expand upon that a little bit

14  more for us?

15  A    Sure.  During the period of acute intoxication, obviously

16  you could be intoxicated to the point of being unconscious.  I

17  mean, that is impairing your executive functioning, but -- but

18  there is potential and capability of recovering so that you can

19  party during the evening and at least getting out late in the

20  day and -- and doing -- you know, meeting some of your

21  responsibilities.  At least having the cognitive ability to do

22  that.

23        And -- and the defendant was meeting some of his

24  responsibilities.  You know, he had -- he had three real estate

25  deals going, he was meeting some of the time with Mr. Burnett,

## Martino - Redirect                           7-133

1   his partners -- I shouldn't say partners, but Mr. Kangass and

2   some of his other associates say that, yeah, he looked at the

3   blueprints and he made some changes -- you know, one said they

4   were superficial changes, the other didn't specify, but they

5   both agree that nothing went forward unless he gave it the

6   okay.

7        Now that is a type of executive functioning right there.

8   I mean, some people have badly impaired executive functioning

9   just -- just -- just veto things; they -- they say no to

10  everything.  I mean, it takes a certain amount of smarts to --

11  you know, and executive functioning to approve a deal.  They

12  said all the major decisions had to be approved by him or else

13  they didn't happen.

14  Q    Now you had testified to a question about going to the

15  bank and whether that was executive functioning, your knowledge

16  of all the banking information.  You had also stated that that

17  was just one example you had used, and you had obviously just

18  given us a few in your last answer.

19  A    Right.

20  Q    Is there anything else you can point out to us that you

21  had relied upon?

22  A    Right.  I think it's mainly the fact that this is not an

23  all or nothing situation.  Absolutely, during his intoxication,

24  he was impaired, but there were other times during the day,

25  during the week, that he was able to go about and perform some

## Martino - Redirect                                              7-134

1  of his business, you know, have -- he was late to meetings, so

2  he made some meetings, he made some board meetings.  They were

3  brief meetings, but he got there and -- and obviously gave some

4  approval.  He signed contracts.  I assume the attorneys thought

5  he had the capacity to sign them.

6  Q    Did he mention to you at all during your interview with

7  him whether or not he specifically had sex with Salley?

8  A    He said he did not have sex with Salley.

9  Q    Is there any information he provided you about going to

10 AIH to get money or anything of that nature?

11 A    Yeah, I think that was another example where he didn't let

12 himself go over certain lines, you know?  He went there, he

13 opened the safe up, he took money out of it, he -- he left a

14 note saying how much he took, and he managed to keep things in

15 some reasonable balance, at least according to his office

16 manager.  He wasn't looting the company, accidently or

17 intentionally, he was -- he was observing the rules.

18 Q    And do you have an opinion then based upon, obviously,

19 your expertise in these areas as well as your review of all the

20 information, to whether or not during the time period in

21 question, the defendant could basically do what he had to do to

22 get drugs -- perform those functions?

23 A    Yes.  I think he had the capability of setting up the

24 system where he'd get drugs and -- and young girls, and he was

25 willing to pay the price monetarily in other ways, but -- but

Martino - Redirect                              7-135

1  as was pointed out by Dr. Jacobsen, when you're addicted,

2  you're -- you start channeling your energies and what executive

3  functioning you have towards getting -- getting drugs or

4  whatever else it is that -- that you're addicted to, and people

5  can be, you know, fairly clever about it.

6  Q    And you -- would it be fair to say that obviously one of

7  those addictions, if you want to call it that, was -- was

8  finding ways to get children to his house, young girls, so that

9  he could have sex with them?

10          MR. WEIDNER:  Objection.  Leading, Your Honor.

11          THE COURT:  Sustained.

12 A    I -- I -- I --

13 BY MS. STEPHAN:

14 Q    Can you tell me about the --

15 A    -- feel he had --

16 Q    -- defendant's functioning --

17 A    -- two basic goals, get drugs -- Salley probably said it

18 best, to get high and get off; you know, get drugs and get

19 young girls.

20 Q    And is -- can you tell me what your opinion is about

21 whether or not anything you have read or heard leads you to

22 believe he could not perform those functions in achieving those

23 goals?

24 A    I'm sorry, I didn't follow that.

25 Q    Sure.  Is -- can you tell us your opinion about whether or

1  not anything you have heard, anything that you have read, and

2  your own evaluation, whether or not he had any problem being

3  able to achieve those girls [sic] -- getting drugs and getting

4  sex from girls?

5  A    No.  I mean, admittedly it's not flying a jet plane, but I

6  think he had more than adequate capabilities to -- to meet

7  those goals.

8            MS. STEPHAN:  Nothing else, Your Honor.

9            THE COURT:  Thank you.  Mr. Weidner, anything

10  further?

11           MR. WEIDNER:  Yeah, just briefly, Your Honor.

12                    **RECROSS-EXAMINATION**

13  BY MR. WEIDNER:

14  Q    Concerning your ques -- the questions about Dr. Budding's

15  testimony --

16  A    Mm-hmm (affirmative).

17  Q    -- would you agree with Dr. Cummings that the Wisconsin

18  Card Sorting Test is a gold standard as to measure a disability

19  in executive function?

20           MS. STEPHAN:  Your Honor, I'm going to just object.

21  I talked about her conclusions of cognitive disorder.  I think

22  this is outside the scope.

23           THE COURT:  I -- it is beyond the scope.  I'll permit

24  this one question, then I'm going to hold you to the redirect.

25  A    It is an accepted test.

<u>Martino - Recross</u>                                    7-137

1   BY MR. WEIDNER:

2   Q    It's the gold standard.

3   A    I -- I -- I don't know if I would call it the gold

4   standard.

5   Q    You'd agree what Dr. Cummings says.

6   A    I respect Dr. Cummings.

7   Q    So he can party during the evening and function during the

8   day?

9   A    I said function to some degree at least later in the day.

10  Q    How about a gram of coke every hour, an ounce of coke a

11  day?  You going to -- you going to function in the morning if

12  you're hitting up every ten minutes and you're smoking an ounce

13  of crack a day?

14  A    I don't know.  He definitely got out of the house though,

15  so somewhere along the line, he managed.

16  Q    Well, I'm not talking about getting out of the house, I'm

17  asking are you going to function if you're smoking an ounce of

18  crack a day and you're hitting up a gram every hour and you're

19  hitting the pipe every ten minutes.

20  A    Well, not while you're acutely intoxicated.

21  Q    All right.  You said three real estate deals, all right?

22  You talked about Mr. Burnett.  What mistakes did Mr. Boehm --

23  have you actually seen these supposedly mistakes he found?  Do

24  you know if they were really mistakes or not on the contracts?

25  A    I -- I didn't -- I didn't see these -- these mistakes, but

1  I -- I think the main point of it is that Mr. Burnett, who's a

2  long-time businessman here in Anchorage --

3  Q    Mm-hmm (affirmative).

4  A    -- was trying to express his admiration for Mr. Boehm's

5  business skills even when he was in such a poor state with drug

6  abuse.

7  Q    Is mis -- is that the same Mr. Burnett that arranged for

8  S.P. to go to Seattle?

9  A    Yes, that's the same individual.

10  Q    Do you know if he was threatened by the Government with

11  criminal charges as a result of that?  Do you know whether or

12  not that happened?

13  A    I -- I knew there was some problem with it, but I don't

14  know the specifics.

15  Q    All right.  Okay.  And if there's a problem with it and

16  he's a target and he -- and these same people can put him in

17  jail, would that -- would you look at that in terms of his

18  testimony about this supposed business deal?

19  A    Well, a member of the grand jury asked him that question,

20  Mr. Russo didn't.

21  Q    But he's testifying before the grand jury when he's a

22  target and they hold the key to his freedom, and you wouldn't

23  consider that?

24  A    Well, one would think that if that were the case, he'd

25  want to make Mr. Boehm look as bad as possible.  This, to me,

1  was a statement trying to say, hey, this -- you know, this guy
2  can still be okay.
3  Q    Okay.  All right.  You said that all the major decisions
4  had to be approved.
5  A    I didn't say that.  That's what Mr. Kangass said in his --
6  and --
7  Q    Okay.
8  A    -- Mr. --
9  Q    All right.  You know if that meant simply saying, Joe, can
10  we spend the money?
11  A    Well, specifically, they were talking about the go-ahead
12  on -- on two new locations.  He had -- he had to give the go-
13  ahead on that.  He had to approve it.
14  Q    But do you know what -- whether he made the decision with
15  any kind of real executive function or they finally got him to
16  say yes, to go ahead and spend the money?  You don't know --
17  you don't --
18  A    I -- I -- well, I -- I don't think his long-time
19  associates are going to do something dishonest.  I think -- you
20  know, they gave me the impression that they -- they -- he had
21  to make a decision when I read the transcript, that -- you
22  know, these aren't the two dope dealers steering him into the
23  bank, these are his long-term employees and shareholders in the
24  company.
25  Q    I'm not talking about dishonest, I'm just saying do you

<u>Martino - Recross</u>                                      7-140

1   know if the actual act of making a decision simply meant to get

2   Joe to say, yes, we can spend the money?

3            MS. STEPHAN:  I'm just going to object.  I think he

4   answered to the best of his knowledge.  It's asked and

5   answered.

6            MR. WEIDNER:  I'll move on, Your Honor.

7   BY MR. WEIDNER:

8   Q    Now you're talking about the two dope dealers sending him

9   into the bank.  Are those the trusted lieutenants you were

10  talking about, Foul Al and Bambi and Leslie Williams?

11  A    Trusted to get him dope, yes.

12  Q    So those are the trusted lieutenants that he supposedly

13  supervised and organized them?

14  A    Trusted them to get him the narcotics -- cocaine rather.

15  Q    As opposed to then conspiring to rob him and steal from

16  him.

17  A    Drug addicts all have -- all have something going on.

18  Q    And how about S.P.'s statements to the effect that they

19  were robbing Mr. Boehm and they were in cahoots against him.

20  Are those conclusions that you discount?

21  A    That's harder to say.  She might have observed them

22  robbing him.  But this is -- this is part of the price of

23  admission, I believe, that -- that addicts are willing to pay.

24  In this case, Mr. Boehm was willing to pay.

25  Q    Price of admission?

## Martino - Recross                                      7-141

1  A    To -- to -- to get drugs and -- and sex.  I mean, part of

2  the risk is that you're going to get -- you're going to get

3  robbed from time to time, people are going to try to rip you

4  off.

5  Q    Concerning any questions that you may -- you may have

6  talked to him about whether or not he actually had sex with

7  Salley, do you know if Salley's threatening to sue him for

8  any --

9          THE COURT:  Mr. Weidner, this is well beyond the

10  scope of the redirect.

11          MR. WEIDNER:  All right.  I'm sorry, Your Honor.  I

12  had a note that she'd asked about that, but I'll move on.

13          THE COURT:  Well, I take that back.  I take that

14  back.  There was a question.  Mr. Boehm denied to -- to the

15  doctor that he had sex with Salley.

16          MR. WEIDNER:  Right, right.

17          THE COURT:  I -- you may proceed.

18          MR. WEIDNER:  Yeah, and I'm just going to -- couple

19  of quick questions, Your Honor.

20          THE COURT:  But --

21  BY MR. WEIDNER:

22  Q    My question is do you know if Salley, through an attorney,

23  has threatened to sue him for at least two million and up to

24  five million dollars?

25  A    That Salley was threatening to sue?

1  Q    Yeah.

2  A    No, I'm not aware of that.

3  Q    Now you said that he was getting drugs and that's some

4  kind of executive function, that he was able to get drugs?

5  A    It's -- it's a system set up so that he could get large

6  quantities of drugs.  As you pointed yourself, I mean, we're

7  talking about large quantities of drugs.

8  Q    Okay.  If he's getting large quantities of drugs and

9  they're buying drugs and cutting the drugs and stealing the

10  drugs and reselling them to him and ripping him off, is that a

11  real good use of executive function?

12  A    Well, it was something that went on for about three years

13  without -- without -- before it got broken up, so I -- I -- I

14  think that's fairly remarkable that something like this could

15  go on for so long a period of time.

16  Q    Because there was so much money.

17  A    Mr. Boehm's money is part of the control he exerted.  He

18  had the money, that gave him the control.

19  Q    But -- so you think it's a wise and a non-impaired use of

20  executive function to buy cut drugs, be ripped off, have the

21  drugs sold back to you, and over-priced drugs --

22           MS. STEPHAN:  Your Honor, it was just asked and

23  answered.  I think he just answered that question.

24           THE COURT:  I'll permit that question.

25  A    Use of drugs isn't wise, period.

Martino - Recross                    7-143

1  BY MR. WEIDNER:

2  Q    And now this -- this -- we're back to subtle again.  You

3  were talking about subtle impairment verse acute intoxication.

4  If someone is using an ounce of crack cocaine a day, that's not

5  subtle impairment, is it?

6  A    No, that -- not at the moment of intoxication, no.

7  Q    And this -- are you saying that Dr. Budding actually

8  diagnosed him with cognitive disorder not otherwise specified

9  or simply indicated that was an area to be explored?

10  A    It was my impression that was her diagnosis.

11  Q    In which report?  What date?

12  A    Her initial report.

13  Q    And she -- she filed a supplement report, didn't she?

14  A    I -- I don't recall seeing a change in her diagnosis in

15  the supplemental.

16  Q    All right.  Where is her diagnosis in the initial report?

17  What page and line?

18  A    Well, if somebody will provide me Dr. Budding's first

19  report --

20                      (Pause)

21          THE COURT:  Mr. Weidner, we really do need to get

22  moving along.

23          MR. WEIDNER:  I -- I know.  I just -- this is my last

24  area of inquiry.

25  A    Right there.

<u>Martino - Recross</u>                           7-144

1              (Pause)

2    Overall -- shall I read this?

3    BY MR. WEIDNER:

4    Q    Yeah -- what page?  Just give me a page, please.

5    A    Page eleven at the bottom.

6              THE COURT:  Go ahead and read it, Doctor.

7              MR. WEIDNER:  Mm-hmm (affirmative).

8    A         "Overall, Mr. Boehm presents with overall diffuse and

9              rather subtle deficits, and presents with symptoms

10             consistent with a cognitive disorder NOS."

11   BY MR. WEIDNER:

12   Q    So he [sic] said it was consistent, right?  She said it

13   was consistent?

14   A    Yes.

15   Q    And that -- that disorder does not eliminate the type of

16   cognitive impairment from frontal cortical -- frontal cortical

17   circuits that can impair executive function, does it?

18   A    I assume the diagnosis was based on the -- on her opinion

19   that he had impaired executive functioning.  That's why she

20   made that diagnosis.

21   Q    And the last question or area is this:  You're not

22   expressing an opinion as to the relative culpability of Mr.

23   Boehm verse the co-defendants because you simply don't know,

24   isn't that correct?

25   A    I think you asked that and I answered it.

7-145

1          MR. WEIDNER:  All right.  Thank you for your time.

2          THE COURT:  Thank you, Mr. Weidner.  Thank you very

3  much, Doctor.  I appreciate your coming in.  Do you still have

4  your copy of Exhibit 61, Doctor?

5          THE WITNESS:  Yes, I do.  (Indiscernible - away from

6  microphone) --

7          THE COURT:  If you'd give me your -- yeah, if you'd

8  give me your copy, we'll give the original back.

9                         (Pause)

10  All right.  I now have a copy of Exhibit 61, and the doctor is

11  going to give the originals to Mr. Goeke or someone over there.

12  And Mr. Goeke, would you give the originals of Mr. Weidner's

13  exhibits back to him, please?

14                         (Pause)

15  Thank you very much, Doctor.  Appreciate your being here, sir.

16          THE WITNESS:  You're welcome, Your Honor.

17          THE COURT:  Probably warmer in Fairbanks today than

18  it is here.  Who's the next witness?

19          MR. GOEKE:  Jim Brown, Your Honor, and he's here.

20          THE COURT:  All right.  Is Mr. Brown available?

21          MR. GOEKE:  He is.

22          THE COURT:  Mr. Brown, if you'll come forward down

23  this aisle and come through the gate, come around in front of

24  me and stand in front of this lady here to my right, she will

25  give you an oath.